IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

NEW YORK STATE ELECTRIC & GAS
CORPORATION,

          Plaintiff,

                                  Civil Action No.
                                  3:03-CV-0438 (DEP)

   v.

FIRSTENERGY CORPORATION,

          Defendant.
_____

FIRSTENERGY CORPORATION,

          Third-Party Plaintiff,

   v.

I.D. BOOTH, INC.,

          Third-Party Defendant.


_____

APPEARANCES:                        OF COUNSEL:

FOR PLAINTIFF:

DICKSTEIN SHAPIRO LLP            DAVID L. ELKIND, ESQ.
1825 Eye St., NW                 KEISHA A. GARY, ESQ.
Washington, D.C.  20037          GEOFFREY M. LONG, ESQ.
                                 KRISTIN C. DAVIS, ESQ.

HINMAN, HOWARD LAW FIRM
P.O. Box 5250
80 Exchange Street
700 Security Mutual Building
Binghamton, NY 13902-5250

JAMES S. GLEASON, ESQ.

FOR DEFENDANT/THIRD-
PARTY PLAINTIFF:

SAUL EWING LLP
1500 Market Street, 38th Floor
Philadelphia, PA 19102

JOHN F. STOVIAK, ESQ.
CATHLEEN M. DEVLIN, ESQ.
CHRISTINA D. RIGGS, ESQ.
AMY L. PICCOLA, ESQ.

COSTELLO, COONEY LAW FIRM
Salina Place
205 South Salina Street
4th Floor
Syracuse, NY 13202-1307

PAUL G. FERRARA, ESQ.

FOR THIRD-PARTY DEFENDANT
I.D. BOOTH, INC.:

DAVIDSON & O'MARA, P.C.
243 Lake Street
Elmira, NY 14901

DONALD S. THOMSON, ESQ.

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

TABLE OF CONTENTS

Page No.

I.   FINDINGS OF FACT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
     A.   Corporate Histories. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
          1.   NYSEG. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
          2.   AGECO. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
          3.   FirstEnergy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
     B.   Facts Related to Veil-Piercing Analysis. . . . . . . . . . . . . . . . 18
          1.   1906-1922. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
          2.   1922-1940. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
          3.   1940-1942. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
     C.   Environmental Concerns Associated with MGP Operations
          Generally. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
     D.   Summary of NYSEG'S MGP Investigations and Remedial
          Responses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
     E.   NYSEG's Responses at the Sixteen Sites in Dispute. . . . . . . 69
          1.   Corning. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69
               a.   Ownership and Operation. . . . . . . . . . . . . . . . . 69
               b.   Investigation and Remediation . . . . . . . . . . . . 70
          2.   Cortland-Homer. . . . . . . . . . . . . . . . . . . . . . . . . . . 71
               a.   Ownership and Operation. . . . . . . . . . . . . . . . . 71
               b.   Investigation and Remediation. . . . . . . . . . . . . 77
          3.   Dansville. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83
               a.   Ownership and Operation. . . . . . . . . . . . . . . . . 84
               b.   Investigation and Remediation. . . . . . . . . . . . . 85
          4.   Elmira-Madison Avenue. . . . . . . . . . . . . . . . . . . . . . 88
               a.   Ownership and Operation. . . . . . . . . . . . . . . . . 88
               b.   Investigation and Remediation. . . . . . . . . . . . . 93
          5.   Geneva-Border City. . . . . . . . . . . . . . . . . . . . . . . . . 96
               a.   Ownership and Operation. . . . . . . . . . . . . . . . . 96
               b.   Investigation and Remediation. . . . . . . . . . . . . 97
          6.   Goshen. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100
               a.   Ownership and Operation. . . . . . . . . . . . . . . . . 101
               b.   Investigation and Remediation. . . . . . . . . . . . . 102
          7.   Granville. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103
               a.   Ownership and Operation. . . . . . . . . . . . . . . . . 103
               b.   Investigation and Remediation. . . . . . . . . . . . . 105

Page No.

      8.    Ithaca - Court Street. . . . . . . . . . . . . . . . . . . . . . . 106
           a.    Ownership and Operation.. . . . . . . . . . . . . . . 106
           b.    Investigation and Remediation. . . . . . . . . . . 108
      9.    Ithaca - First Street. . . . . . . . . . . . . . . . . . . . . . . 114
           a.    Ownership and Operation . . . . . . . . . . . . . . 114
           b.    Investigation and Remedial. . . . . . . . . . . . 115
      10.    Mechanicville - Central Avenue. . . . . . . . . . . . . . 117
           a.    Ownership and Operation.. . . . . . . . . . . . . . . 117
           b.    Investigation and Remediation. . . . . . . . . . . 119
      11.    Newark. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125
           a.    Ownership and Operation.. . . . . . . . . . . . . . . 125
           b.    Investigation and Remediation. . . . . . . . . . . 126
      12.    Norwich. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127
           a.    Ownership and Operation.. . . . . . . . . . . . . . . 127
           b.    Investigation and Remediation. . . . . . . . . . . 128
      13.    Oneonta.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133
           a.    Ownership and Operation.. . . . . . . . . . . . . . . 133
           b.    Investigation and Remediation. . . . . . . . . . . 135
      14.    Owego.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140
           a.    Ownership and Operation.. . . . . . . . . . . . . . . 140
           b.    Investigation and Remediation. . . . . . . . . . . 142
      15.    Penn Yan-Water Street. . . . . . . . . . . . . . . . . . . . 147
           a.    Ownership and Operation.. . . . . . . . . . . . . . . 147
           b.    Investigation and Remediation. . . . . . . . . . . 149
      16.    Plattsburgh-Saranac Street. . . . . . . . . . . . . . . . . 150
           a.    Ownership and Operation.. . . . . . . . . . . . . . . 151
    b.    Investigation and Remediation.. . . . . . . . . . . . . . . 154
  F.    Cost Recovery and Allocation.. . . . . . . . . . . . . . . . . . . 162

II.     PROCEDURAL HISTORY. . . . . . . . . . . . . . . . . . . . . . . . . . . 164

III.    DISCUSSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 167
  A.    CERCLA Liability Generally. . . . . . . . . . . . . . . . . . . . . 167
  B.    Summary of NYSEG Claims and FirstEnergy Defenses.. . 176
  C.    Analysis of FirstEnergy's Liability Under CERCLA . . . . . . 179
      1.    Direct Owner Liability . . . . . . . . . . . . . . . . . . . . 180
      2.    Direct Operator Liability.. . . . . . . . . . . . . . . . . . . 181
      3.    Indirect Liability as an Owner and/or Operator.. . . . 188

Page No.

|   |   |   |   |   |
|---|---|---|---|---|
| | | a. | Pre-1922.. | 198 |
| | | b. | 1922-1940. | 200 |
| | | c. | 1940-1942. | 208 |
| | D. | Affirmative Defenses.. | | 209 |
| | | 1. | Bankruptcy Discharge. | 210 |
| | | 2. | 1945 Covenant Not to Sue. | 211 |
| | | 3. | Statute of Limitations. | 213 |
| | | | a. Plattsburgh. | 225 |
| | | | b. Owego. | 231 |
| | | | c. Ithaca-Court Street. | 233 |
| | | | d. Norwich. | 236 |
| | E. | Analysis of I.D. Booth's CERCLA Liability.. | | 239 |
| | F. | Compensable Response Costs. | | 254 |
| | | 1. | Certainty of Damages. | 255 |
| | | 2. | NCP Compliance.. | 259 |
| | | 3. | Necessity of Cost.. | 262 |
| | | 4. | Offset for Recovery From Collateral Sources. | 269 |
| | | | a. Insurance Recovery. | 271 |
| | | | b. Rate Recovery. | 276 |
| | G. | Allocation. | | 279 |
| | | 1. | Allocation Generally.. | 279 |
| | | 2. | Allocation as Between NYSEG and FirstEnergy. | 283 |
| | | 3. | Allocation as Between FirstEnergy and I.D. Booth.. | 286 |

IV.   CONCLUSIONS OF LAW.                                        290

V.    SUMMARY AND ORDER.                                        295

## DECISION AND ORDER

Plaintiff New York State Electric & Gas Corporation ("NYSEG") commenced this action in April of 2003 seeking to recover from defendant FirstEnergy Corporation ("FirstEnergy") expenses incurred to remediate twenty-four hazardous waste sites throughout Upstate New York formerly associated with manufactured gas plant ("MGP") operations of NYSEG and its predecessor utility companies.  The MGP operations conducted at those locations were typical of those carried out by many public utilities during the 1800s and the first half of the twentieth century to produce gas, manufactured principally through processes employing coal as raw material, for commercial and residential usage.  By their nature, MGP facilities generated significant quantities of byproducts, including coal tar and oils, containing what have come to be regarded as hazardous substances.  Those byproducts were typically stored on-site and often released into the soil and groundwater at and near the MGP sites, on occasion migrating off-site and into nearby waterways.

NYSEG's complaint, as amended in October 2004, at one time asserted a combination of federal and state law causes of action including, *inter alia,* under the Comprehensive Environmental Response,

1

Compensation and Liability Act of 1980 ("CERCLA"), as amended, 42 U.S.C. § 9601 *et seq.* Its claims, however, have been materially reshaped as a result of the ongoing refinement of CERCLA jurisprudence. Given the rapid and robust development of environmental caselaw, coupled with rejection by the court of plaintiff's contribution cause of action under § 113(f) of CERCLA, and dismissal of plaintiff's New York Navigation Law and common law indemnification counts, on stipulation of the parties, all that now remains is NYSEG's cost recovery claim against FirstEnergy under § 107(a) of CERCLA, together with FirstEnergy's contribution counterclaim and a third-party claim for contribution against I.D. Booth, Inc. ("I.D. Booth"), the current owner of portions of two of the sites in issue, both of which are asserted under § 113(f).

The action was tried to the court beginning on December 6, 2010.[1] For a variety of reasons, by the time of trial the number of former MGP sites implicated were winnowed from twenty-four to seventeen and, with the dismissal at trial of claims related to one site, now stands at sixteen.

_____

[1]      This matter is before me based on consent of the parties, pursuant to 28 U.S.C. § 636(c). *See* Dkt. Nos. 24, 25, 67, 70, 204, 205 and 206. I would be remiss if I did not take this opportunity to thank counsel for all parties to this action for the competence, professionalism and civility displayed by them during the pendency of these proceedings, and particularly in connection with the recent trial.

NYSEG claims to have paid more than $94 million through the end of

2009 to address contamination at the sixteen remaining MGP sites in

issue, with the expectation that the expenditure of upwards of an

additional $144 million will be required in order to complete the cleanup

process.  Those remedial efforts have been conducted in large part

pursuant to an administrative order issued in 1994 by the New York State

Department of Environmental Conservation ("DEC"), on consent,

addressing remediation efforts at several former MGP sites including all

but one of those now in issue.

    In addition to the issues normally associated with a typical

environmental cost recovery action, NYSEG's claims present complex

threshold questions regarding the interplay between a number of related

corporations, revolving around events dating back to the early twentieth

century.  Resolution of the CERCLA claims now presented turns, in the

first instance, on an exceedingly labyrinthine set of facts surrounding the

corporate history of NYSEG and its predecessor utility companies as well

as the relationship of NYSEG and its affiliates with their former parent

company, the Associated Gas & Electric Company ("AGECO") – a

predecessor of defendant FirstEnergy.  NYSEG contends that AGECO,

3

although in title a mere holding company, in reality ran the MGP facilities

falling under its umbrella and is therefore directly liable under CERCLA as

an operator of the sites involved at the time of the hazardous releases in

issue.  Alternatively, NYSEG argues that the facts justify piercing its

corporate veil, and those of its related utility operating companies, in order

to find derivative liability on the part of AGECO, the parent corporation, for

the environmental liabilities at issue, based upon AGECO's overwhelming

domination of those subsidiaries.

Although thousands of documents were received into evidence at

trial, comprising an estimated 90,000 pages, evidence related to the

intricate corporate histories associated with ownership of the various sites

in question as well as the relationship between NYSEG and its

predecessor utilities on the one hand and FirstEnergy's predecessor,

AGECO, on the other is somewhat scant.  Having considered the

available evidence, I conclude that there is a basis upon which to pierce

the corporate veil of NYSEG and its sister utility operating companies

during the period between 1922 and 1940, though not prior to or after that

time period, and accordingly to attribute their environmental liabilities to

AGECO, and that FirstEnergy therefore bears responsibility for hazardous

waste releases occurring during that time interval as an owner and operator of the facilities in issue.  I will therefore allocate the response costs incurred by NYSEG based upon that finding.  I also conclude that while NYSEG is entitled to reimbursement from FirstEnergy of a proportionate share of the vast majority of the expenses now claimed, recovery of the costs associated with two of the sites in issue is precluded, based upon the governing statute of limitations.  Finally, I find that FirstEnergy is entitled to contribution from I.D. Booth with regard to one of the sites involved based upon its status as an owner of the site. The following decision incorporates within it my findings of fact and legal conclusions regarding the matter.

I.      FINDINGS OF FACT

     A.      Corporate Histories

          1.      NYSEG

               1.      Ithaca Gas Light Company, which as will be seen is one of NYSEG's predecessor utility companies,  was incorporated in 1852.

               2.      On January 15, 1916, Ithaca Gas Light Company and Ithaca Electric Light & Power Company merged, with Ithaca Gas Light

Company remaining as the surviving company.

3.      Ithaca Gas Light Company changed its name to Ithaca Gas & Electric Corporation on January 15, 1916.

4.      The Homer & Cortland Gas Light Company, Norwich Gas & Electric Company and Oneonta Light & Power Corporation were merged into Ithaca Gas & Electric Corporation on June 1, 1918, with Ithaca Gas & Electric Corporation remaining as the surviving corporation.

5.      On July 3, 1918, Ithaca Gas & Electric Company adopted the name New York State Gas & Electric Corporation.

6.      New York State Gas & Electric Corporation later changed its name to the New York State Electric Corporation on March 8, 1928.

7.      On August 22, 1929, New York State Electric Corporation assumed its present corporate name of New York State Electric & Gas Corporation.

8.      NYSEG acquired Eastern New York Electric & Gas Company, Inc. on December 31, 1928.  Through that merger NYSEG acquired ownership of the Granville, Mechanicville and Plattsburgh MGP sites.

9.      On March 14, 1932, NYSEG acquired the property of Federal-New York Company, Inc. through a foreclosure sale.  Among the properties acquired by virtue of that transaction was the Goshen MGP Site.

10.      NYSEG acquired the properties of Empire Gas & Electric Company including  the Newark and Geneva-Border City MGP facilities, two of the sites now in issue, by merger on December 31, 1936.

11.      On December 31, 1936, NYSEG also acquired the properties of New York Central Electric Corporation, including the Corning, Dansville, and Penn Yan–Water Street MGP Sites.

12.      The Elmira Light, Heat and Power Corporation was merged into NYSEG on December 29, 1936.[2]  Through this merger, NYSEG acquired ownership of the Elmira-Madison Avenue MGP Site.

2.      AGECO[3]

_____

[2]      While the parties have stipulated that this merger occurred on December 29, 1936, there is evidence in the record suggesting that it actually took place on November 30, 1936.  *See* Exh. P-191 at NYS 17420.

[3]      Many of the following findings regarding the corporate lineages of AGECO and FirstEnergy are derived from the district court's decision and order, dated August 8, 2008, in *Rochester Gas & Elec. Corp. v. GPU, Inc.,* ("*RG&E*"), No. 00-CV-6369 (W.D.N.Y. 2008), *aff'd*, 355 Fed. App'x 547, 2009 WL 4673916 (2d Cir. Dec. 10, 2009).  Since defendant FirstEnergy is in privity with GPU, Inc., the defendant in that action, as a result of a 2001 merger it is collaterally estopped from relitigating the issues of fact determined against it in that case.  *McKithen v. Brown*, 481 F.3d 89, 105

13.     On March 19, 1906, the Associated Gas & Electric Company ("AGECO") was incorporated in New York by the owners of the Ithaca Gas Light Company as a public utility holding company for the group of operating companies controlled by those owners, in order to bring them under common control and management.

14.     A holding company is defined as one whose assets consist primarily of stock in one or more other companies.  A public utility holding company is simply a holding company whose portfolio consists primarily of stock in utilities.

15.     The existence of holding companies dates back at least as far as in or about 1879 when a law was passed in New Jersey permitting a corporation to invest in the stock of another corporation.[4]

16.     Prior to the holding company era, the MGP industry was principally configured as consisting of small individual

_____

(2d Cir. 2007).

        [4]      There is indication that at or about that same time other states were enacting similar provisions to allow for the formation of holding companies.  *See, e.g., Yankee Gas Servs. Co. v. UGI Utils. Inc.,* 616 F. Supp. 2d 228, 235 (D. Conn. 2009), *aff'd,* No. 10-1570-CV, 2011 WL 1395260 (2d Cir. 2011) (summary order) (noting the passage of a special act by the Pennsylvania Legislature in 1870 to permit the formation of the Union Contract Company and to allow that corporation to hold the stock of other corporations).

operating companies serving limited geographic areas and engaged in

fierce competition that was not beneficial to consumers or gas companies.

These factors caused many small gas companies to fail during those early

years.

17.    Holding companies were initially formed in the

public utility arena to foster investment by providing better access to

financial markets and systems, and to allow for economies of scale in the

production of gas.

18.    The original shareholders of AGECO were William

T. Morris, Ebenezer M. Treman, and Thos. W. Summers, all of Ithaca,

New York.

19.    Among the powers listed in AGECO's certificate of

incorporation, according to a Federal Trade Commission communication

to the United States Senate, were the following:

> To manufacture, purchase or otherwise acquire,
> hold, own, mortgage, lease, assign, and transfer,
> invest, trade, deal in and deal with, goods, wares,
> and merchandise and property of every class and
> description, including all kinds of engines, boilers,
> dynamos, generators, gas apparatus, including
> holders, case and wrought iron pipe, pumps,
> meters and all kinds of machinery and any and all
> kinds of implements and articles of manufacture,
> and any and all kinds of mechanical apparatus;

> To carry on a general contracting business, to do electrical work of every kind and description, including the business of electrical and mechanical engineers, and the dealers either as principal or agents in electrical machinery, appliances and supplies of any nature or kind whatsoever, to do the work of erecting gas apparatus of every description and kind, including the business of gas and mechanical engineers and dealers either as principal or agent in gas machinery, appliances and supplies of every nature and kind whatsoever;
>
> To construct, erect, build, equip and repair public works and conveniences of all kinds, including railways, trainways, tunnels, subways, reservoirs, water, gas, electric light and power, telephonic, telegraphic, and water supply works, and all other works or conveniences; to purchase or otherwise acquire any contracts or concessions for or in relation to the construction, building, erection, improvement or repair of public works or conveniences, and to execute, carry out, dispose of our [sic] transfer or turn to account the same, to carry on the business of builders, contractors, engineers, importers, exporters, and to provide, buy, sell and deal in property of all kinds; . . .

20.    The stock of various companies controlled by the incorporators was transferred into AGECO following formation of that holding company.

21.    In May of 1907, William T. Morris conveyed to AGECO the common stock of fourteen public utilities, including Penn Yan Gas Light Company, Homer & Cortland Gas Light Company, Newark

10

(N.Y.) Gas Light & Fuel Company, Owego Gas Light Company, Ithaca Gas Light Company, Ithaca Electric Light and Power Company, and Norwich Gas & Electric Company.

22.    W.S. Barstow & Co. acquired a controlling interest in AGECO in or about October of 1909.

23.    W.S. Barstow & Co. sold its shares in AGECO to Montgomery, Clothier & Tyler (later Montgomery & Co.), a Philadelphia banking group, in 1912.

24.    From 1912 up until March of 1922, AGECO was controlled by Montgomery, Clothier & Tyler, and J.G. White & Co., Inc., with a majority of the original shares of control stock in the company being held by J.G. White & Co., Inc. by the end of that period.

25.    In March of 1922, control of AGECO passed from J.G. White & Co., Inc. and Montgomery & Co. to Associated Utilities Corporation, a company controlled by Howard C. Hopson and various of his associates, including John I. Mange.

26.    Control of AGECO was transferred from Associated Utilities Corporation to Associated Securities Corporation in early 1923.

11

27.     Associated Securities Corporation was formed on November 17, 1922 as a Delaware Corporation by interests representing Hopson and Mange, for the purpose of holding the common stock of AGECO.

28.     Mange and Hopson held the common stock of Associated Securities Corporation until June 1924 when they transferred that stock to Associated Gas & Electric Properties, formed in 1924 under the name of Associated Gas & Electric Company, and also controlled by Hopson and Mange.  In 1926 that entity underwent a formal name change to Associated Gas & Electric Properties.

29.     In addition to Penn Yan Gas Company, Homer-Cortland Gas Light Company, Newark (N.Y.) Gas Light & Fuel Company, Owego Gas Light Company, Ithaca Gas Light Company, Ithaca Electric Light and Power Company, and Norwich Gas & Electric Company, at various relevant times AGECO controlled other utility operating and holding companies associated with certain of the MGP sites now at issue.

30.     One of those companies was Eastern New York Electric & Gas Company, Inc., which as will be seen owned the Granville,

Mechanicville, and Plattsburgh MGP sites at various times.[5]

31.    Sometime in 1929 AGECO acquired Rochester Central Power Corporation, a holding company that owned and controlled Empire Gas & Electric Company, Elmira Water Light & Railroad Company, and New York Central Electric Corporation.[6,7]  Of those, New York Central Electric Corporation owned the Corning, Dansville, Owego, Newark, and Penn Yan Sites; Empire Gas & Electric Company owned the Geneva-Border City MGP Site; and Elmira Water Light & Railroad Company owned the Elmira-Madison Avenue Site.

32.    At some time prior to December 31, 1929, AGECO acquired ownership and control of Federal-New York Company, Inc.  At the time, Federal-New York Company, Inc. owned the Goshen MGP facility.

─────────────────

[5]    NYSEG asserts that AGECO acquired control of Eastern's predecessor, Granville Electric & Gas Company, in October 1921.  The corresponding document cited, however, does not support that assertion.  *See* Exh. P-175 at NYS7021.

[6]    While NYSEG contends that the acquisition occurred in May of 1929, the document cited does not provide that information.  *See* Exh. P-171 at NYS5863-64.

[7]    NYSEG asserts that the Rochester Central Power Corporation acquisition also brought about AGECO's control of Owego Gas Corporation.  The document cited, however, does not support this assertion.  *See* Exh. P-171 at NYS5863.  I note, moreover, that it appears the stock of Owego Gas Light Company, the predecessor to Owego Gas Corporation, was acquired by AGECO in 1907.  *See* Exh. P-171 at NYS05839.

33.    On January 10, 1940, AGECO and its top holding company subsidiary, Associated Gas & Electric Corporation ("AGECORP"), filed for bankruptcy protection under Chapter X of the Bankruptcy Code.

34.    At the time of filing, AGECO had seven direct subsidiaries; four of those, like AGECO, were registered holding companies, including General Gas & Electric Corp., Associated Electric Co., NY PA NJ Utilities Company, and Northeastern Water Companies, Inc.  The remaining three direct non-holding company subsidiaries of AGECO were Associated Utility Corporation, The United Coach Company, and The Associated Corporation.

35.    Following the filing of bankruptcy, Walter H. Pollak, was appointed as trustee of AGECO, and Dennis J. Driscoll and Willard L. Thorp were appointed as trustees for AGECORP.

36.    In June of 1943, the trustees of AGECO and AGECORP submitted a plan of reorganization for both debtors to the Securities and Exchange Commission ("SEC") for consideration by that body.  The plan was approved by order issued by the Commission on April 14, 1944, with certain minor amendments and subject to various specified

14

terms and conditions.

37.    Based upon that approval, the plan of reorganization submitted on behalf of AGECO and AGECORP was confirmed by United States District Judge Vincent L. Leibell on August 9, 1945, and on January 10, 1946 was ordered to be consummated by the court.  The AGECO and AGECORP bankruptcy trustees were subsequently discharged by order issued on August 12, 1946.

38.    In accordance with the plan of reorganization, AGECO merged into AGECORP on January 10, 1946, and immediately changed its name to General Public Utilities Corporation ("GPU"), which later became GPU, Inc.

39.    A Certificate of Consolidation and Agreement of Merger setting forth the terms of the merger was publicly filed on January 12, 1946.  That certificate stated, *inter alia,* that

> [t]he consolidated corporation is one of the
> constituent corporations, namely AGECO, and not
> a new corporation.  The existence of AGECO shall
> continue for all purposes whatsoever after the
> consolidation and merger with and into itself of
> AGECORP, and the separate existence of
> AGECORP shall cease.

40.    Following the completion of the AGECO

bankruptcy process, GPU conducted its business from AGECO's corporate headquarters at 61 Broadway, New York, New York.

41.    In a December 1945 Annual Report to shareholders, GPU represented itself to be a public utility holding company registered with the SEC and the successor in interest to AGECO and AGECORP.

42.    By the time Judge Leibell ordered the reorganization plan implemented, the bankruptcy trustees had disposed of nearly all of the AGECO and AGECORP assets in order to comply with the Public Utilities Holding Company Act of 1935 ("PUHCA"), retaining only certain New York, New Jersey, and Pennsylvania subsidiary operating companies, including NYSEG.

43.    As a result of the plan of reorganization the remaining assets of AGECO, consisting of the stock in various operating utility companies, was held by NY PA NJ Utilities Company.  That corporation, in turn, was owned by GPU.  Both of those were holding companies were registered under the PUHCA.

44.    In December of 1946, the SEC approved of the dissolution of NY PA NJ Utilities Company and the acquisition by GPU of

16

all assets of that corporation, subject to its liabilities, if any.  Among the

assets acquired by GPU in connection with that transaction was the

common stock of NYSEG.

45.   In order to resolve certain potential financial claims

of NYSEG against AGECO, in 1945 NYSEG and the bankruptcy trustees

entered into the following covenant:

> Resolved, that in accordance with the request of
> NY PA NJ Utilities Company dated May 9, 1945,
> this Company shall take no action with respect to
> the filing of any claim or claims against the Estate
> of [AGECO] or the Estate of [AGECORP]. . .
> provided, however, that in consideration therefor
> NY PA NJ Utilities Company shall release this
> Corporation and its officers and directors from any
> liability arising from the omission of this
> Corporation to file such claim or claims and also
> from any liability for having made or approved
> allegedly excessive payments through various
> service corporations or funds prior to 1939; and
> provided, further that the Trustees of the above-
> mentioned Estates shall execute and deliver to this
> Corporation and appropriate covenant not to sue
> on account of any alleged failure to pay its *pro rata*
> share of any alleged Federal tax liability for the
> years 1927 to 1933, inclusive; . . .

46.   The minutes of a June 26, 1945 meeting of the

NYSEG Board of Directors, at which the covenant was approved, provides

the following clarifying language regarding its intent:

17

The Chairman stated that a letter had been
received under date of May 9, 1945 from Mr. E.W.
Morehouse, Vice President of NY PA NJ Utilities
Company in connection with the settlement of
certain claims and counterclaims between
[NYSEG] and the Trustees of [AGECO] and
[AGECORP] which he reviewed together with
previous reports made to this Board on the
possibility of such claims in connection with Case
No. 9587 of the Public Service Commission of the
State of New York.

3.   FirstEnergy

47.   FirstEnergy is a corporation organized under the

laws of the State of Ohio, with its principal place of business located in

Akron, Ohio.

48.   In 2001, GPU merged into defendant FirstEnergy.

B.   Facts Related to Veil-Piercing Analysis

1.   1906-1922

49.   Between 1906 and 1922, corporate formalities

were observed with regard to Ithaca Gas Light Company and its

successor corporations.  During that period annual shareholder and board

of directors meetings were regularly conducted, and minutes of those

meetings were maintained.

50.   During the late 1800s and early 1900s utility

18

companies began contracting with service companies to carry out certain of their corporate functions.  Such service companies, which in the case of Ithaca Gas Light Company included W.S. Barstow & Co. and J.G. White & Company, Inc., offered specialized expertise to the utility operating companies, permitting them to achieve economies of scale and affording them the ability to provide services on a streamlined and centralized basis.  Through the use of service agreements, public utilities were able to lower prices and expand service areas.

51.    Prior to April 1, 1912, W.S. Barstow & Co. operated as the general manager of Ithaca Gas Light Company pursuant to a series of such service agreements.

52.    The minutes of an Ithaca Gas Light Company board of directors meeting held on January 11, 1911 clarify the role of W.S. Barstow & Co. as general manager of the company, authorizing Barstow "to make all purchases of materials and supplies and to contract for the same, to negotiate sales of whatever nature, and . . . [perform] all powers not expressly herewith delegated to them, which as General Managers it would be their natural function to exercise . . . "

53.    On November 26, 1912, Ithaca Gas Light

Company entered into a contract with J.G. White & Co., Inc., under which White was appointed to replace W.S. Barstow & Co. as operating manager for the company.

54.     J.G. White Management Corp. was formed in December of 1912 and on the same date purchased the assets of J.G. White & Co. Inc.  AGECO acquired control of J.G. White Management Corp. sometime prior to May 1, 1928.

55.     At an Ithaca Gas Light Company board of directors meeting held on May 24, 1912, John I. Mange was appointed as a vice-president of the company, to act under the direction of J.G. White & Co. Minutes of that board meeting reflect the view of the company's president that "it was deemed to the best interest of the Company to employ a man as Vice-President who had broad operating experience, if the most effective results were to be obtained from the management of the plant." Prior to his appointment as vice-president, Mange had no direct involvement with Ithaca Gas Light Company as either an officer or a director.

56.     A new five year agreement with J.G. White Management Corporation, under which White was to act as operating

20

manager for the utility for a period of five years, beginning on October 1, 1913, was approved by the Ithaca Gas Light Company board of directors on December 31, 1913.

57.    On October 16, 1918, the Board of Directors of New York State Gas & Electric Corporation approved of a new five year agreement J.G. White Management Corp., under which representatives of White were to act as "Operating Managers of the Company" for a period of five years beginning on July 1, 1918.

58.    On May 1, 1928, J.G. White Management Corp. purchased from the Utility Management Corp. contracts for management of various operating companies within the AGECO system.

59.    The service contracts with W.S. Barstow & Co., and later with J.G. White & Co., covered management of Ithaca Gas Light Company's Cortland-Homer, Ithaca-Court Street, and Norwich MGP facilities, and by 1916 also encompassed the Oneonta MGP location.

60.    There was no evidence presented at trial of any fraud, wrongdoing, or abuse associated with the employment of service companies by NYSEG and its predecessor utilities prior to 1922.

61.    There is no evidence in the record of any

21

agreement between Ithaca Gas Light Company or its successor utility
companies with AGECO, prior to 1922, under which AGECO agreed to
oversee or manage the company's operation.

       62.    There was no evidence presented at trial to show
that between 1906 and 1922 Ithaca Gas Light Company and its
successors, including New York State Gas & Electric Corporation, were
inadequately capitalized.

       63.    From time to time between 1906 and 1922 money
was loaned by AGECO to Ithaca Gas Light Company or its affiliate
operating companies, which in turn executed promissory notes to
AGECO.  Those loans included $125,000 advanced to Homer & Cortland
Gas Light Company to be used for the purchase of stock of the Cayuga
Power Corporation, reflected by a promissory note and secured by a
pledge of Cayuga Power Corporation stock.

       64.    On occasion between 1906 and 1922 AGECO also
appears to have guaranteed loans made to Ithaca Gas Light Company,
Ithaca Gas & Electric Corporation and New York State Gas & Electric
Corporation.  As one example, on December 2, 1920 the board of
directors of the New York State Gas & Electric Corporation authorized

officers of the company to borrow a total of $30,000 from two separate

lending institutions and to execute notes in favor of those institutions or to

endorse the name of New York State Gas & Electric Corporation on

promissory notes of AGECO given to those lending institutions for the

amounts borrowed.

65.    Between 1906 and 1922, there was some overlap

in directors and officers of Ithaca Gas Light Company or it successor

companies and AGECO.  There is also evidence of overlap during that

same time period in officers and directors and other personnel between

Ithaca Gas Light Company, AGECO, W.S. Barstow & Co. and/or J.G.

White & Co., Inc.

66.    During the later years leading up to 1922, H.B.

Brown, C.A. Dougherty, C.A. Greenidge, John I. Mange and T.W. Moffat

served as directors of Ithaca Gas & Electric Corporation and later its

successor, New York State Gas & Electric Corporation.  During the earlier

years, including in 1910, the directors of Ithaca Gas Light Company and

its successors included E.M. Treman, J.B. Taylor, T.W. Summers, O.

Clement Swenson, and William S. Barstow.

67.    Between 1906 and 1922, annual meetings of

23

Ithaca Gas Light Company and its affiliated operating companies were held at various places, including at offices of W.S. Barstow & Co. and/or J.G. White & Co., Inc., during the times when those companies controlled AGECO, the parent company.  There is no evidence, however, that AGECO used the offices of Ithaca Gas Light Company for meetings or other purposes.

68.   The evidence adduced at trial was equivocal concerning whether or not AGECO and Ithaca Gas Light Company were treated as independent profit centers during the period between 1906 and 1922.  The outsourcing of operations by the parent company through the use of service contracts suggests that the individual operating companies were not so regarded.  Each of those companies, however, had its own customers.

69.   There was no evidence presented at trial to establish that between 1906 and 1922 Ithaca Gas Light Company corporate funds were diverted for personal purposes.

2.   1922-1940

70.   Between 1922 and 1940, the AGECO system was dominated and controlled by Hopson and, to a lesser degree, Mange.

24

71.   Hopson had no involvement with AGECO prior to 1922.

72.   By April 1923, Hopson and Mange had acquired all of AGECO's shares of voting stock, and exercised control over the boards of AGECO and its subsidiaries by holding their respective directors' undated signed resignations.

73.   Between 1922 and 1940, AGECO and its affiliate companies, sometimes collectively referred to as the "AGECO Empire," were controlled by Hopson through a maze of corporate structures and trusts.

74.   As of November 30, 1939, the AGECO Empire consisted of approximately seventy public utility companies, forty-two water companies, fifteen transportation companies, two ice companies, and twenty-six miscellaneous companies.  Among those public utilities held in the AGECO family was NYSEG.

75.   During the years of their control over utilities within the AGECO system Mange, who was connected with J.G. White Management Corp., was primarily involved in matters related to management of the operations of the various utility companies' properties

while financing, accounting, legal. and similar matters fell principally under the control of Hopson.

76.     It is estimated that between 1929 and 1938, through use of service companies, Hopson siphoned approximately $20 million principally from AGECO system operating companies, at least $7 million of which was unjustified profit.  During the period between 1934 and 1938, Hopson operated eighteen service companies, and he and his family received at least $3.6 million in revenue through this source.

77.     Between 1922 and 1940, AGECO held itself out as operating all of the properties within its system and having a single operating and ownership structure, and did not respect the corporate separateness of it and its various subsidiaries during that time period.

78.     Much of the focus at trial was upon the relationship between AGECO and NYSEG, and a not inconsiderable body of evidence was adduced bearing upon that relationship and the abuses worked by AGECO upon NYSEG during the period between 1922 and 1940.

79.     During the course of the AGECO bankruptcy the court recounted the following history of AGECO and its dominance by Hopson and Mange:

26

Ageco was incorporated in New York on March 19, 1906. It was a comparatively small public utility holding company with gross consolidated assets in 1922 of $7,000,000. Between March 14, 1922 and April 1923 Howard C. Hopson and John I. Mange acquired all of Ageco's outstanding shares of voting stock. Hopson and Mange held and exercised voting control of Ageco until January 10, 1940. Mange was the operating executive. Hopson controlled the financial and accounting policies of Ageco and its subsidiaries throughout. He controlled their Boards of Directors and held their undated signed resignations. Hopson's employees kept the minute books; some of the minutes were spurious. They also kept the books of account (irregularly maintained). Entries were changed and reinstated as Hopson directed; one item was changed 13 times. Alleged contracts for stock subscriptions of Ageco in subsidiaries, disappeared and reappeared as the occasion required. There were no corporate resolutions authorizing the transfer of the bulk of Ageco assets to AUICorp. The officers of Ageco and Agecorp were selected by Hopson and were paid through checks of Hopson 'service companies' which furnished the corporations in the Associated System with 'auditing, corporate, security, transfer, tax consultant and other services.'  For these services Hopson's personally-owned service companies were paid large sums by the companies in the Associated System, giving him and his family a profit in excess of $6,500,000 in the period of 1922 to 1938.

80.    In 1935, Congress enacted the PUHCA in

response to abuses worked by public utilities through manipulation of

27

corporate structures, resulting in burden to the ratepayers particularly during the Great Depression.  *See S. Union Co. v. Missouri Pub. Serv. Comm'n,* 138 F. Supp. 2d 1201, 1204 (W.D. Mo. 2001).

81.    The PUHCA, which resulted from a Congressionally-mandated investigation by the FTC into the concentration of power and "well publicized abuses committed by public utility holding companies", restricted utility holding companies to each operating a single regional utility system.  *Yankee Gas Servs.,* 616 F. Supp.  at 239.

82.    One of the concerns that prompted Congress to enact the PUHCA was the practice among utility companies of pyramiding, a phenomenon that did not appear to have a legitimate business purpose for the upstream subsidiaries.

83.    Pyramiding involves ownership of an operating company with a large series of holding companies conceptually positioned above the operating company, financed through the earnings from the operating company at the lowest level.  In a pyramid structure, dividends paid by the operating company flow upward to satisfy debts and obligations of the holding companies at the higher levels.  Typically, in a pyramid structure each of the holding companies finances itself with debt

28

and has as assets equity in the companies below.

84.    Between 1922 and 1940, the AGECO Empire epitomized the typical public utility pyramid ownership structure.  The following depicts the corporate holding company structure above NYSEG during that period:

| THE AGECO/NYSEG PYRAMID STRUCTURE 1922 - 1940 |
| --- |
| Associated Gas & Electric Properties (MA) |
| Associated Securities Corporation (DE) |
| Associated Gas & Electric (NY) |
| Associated Gas & Electric (DE) |
| Rochester Central Power (DE) |
| Rochester Central Power (NY) |
| Mohawk Valley Company (NY) |
| Mohawk Valley Company (DE) |
| New York Electric Company (DE) |
| NYSEG |

Both Associated Gas & Electric Properties and Associated Securities Corporation were holding companies within the AGECO Empire.

85.    The PUHCA placed holding companies under the supervision of the SEC, requiring that they register with that agency.  Registration under the PUHCA resulted in heightened scrutiny and

29

regulation of the company's investments in both utility and non-utility company stock.  *See S. Union Co.*, 138 F. Supp. 2d at 1204.   After unsuccessfully challenging the Act, AGECO eventually registered in 1938 with the SEC as a utility holding company.

86.   During the period from 1922 until 1940 the holding companies within the AGECO system and their subsidiary operating companies were not generally regarded as independent profit centers.  Instead, the entire pyramidal structure was treated as a single entity.

87.   At the time of their bankruptcy filing AGECO and AGECORP were registered public utility holding companies under the PUHCA.

88.   During the pendency of the AGECO bankruptcy a special master was appointed to conduct a hearing and report on the fairness of a proposed compromise of litigation pending in connection with that proceeding.  The transcript of the hearing extended over 12,000 pages, memorializing testimony taken over 133 sessions ending by the middle of September 1942.  During the course of the hearing approximately 700 exhibits were received in evidence.

89.   According to the district court's summarization, in

30

his report of that investigation the special master found that "[t]he various

wholly-owned subholding companies, on whose books the stocks

purchased by Ageco were entered as owned by the subholding

companies, were only 'corporate pockets' of Ageco."  The court went on to

note that "[t]he purchased properties were really owned by Ageco and had

been acquired with Ageco funds or by the issuance of Ageco debentures

and other securities."

       90.    In the years during which AGECO and its affiliates

were controlled by Hopson and Mange, those companies came under

scrutiny of several agencies, including the Federal Power Commission

("FPC"), the Federal Trade Commission ("FTC"), the SEC, and the New

York Public Service Commission ("PSC").[8]

       91.    During the period between 1922 and 1940, the

corporate separateness and distinctions between AGECO and its held

operating utility companies were blurred, if not non-existent.

       92.   On June 14, 1932, the PSC issued a report entitled

---

[8]    Like Judge Feldman in *RG&E,* I received into evidence the reports of the various governmental agencies that investigated the AGECO Empire pursuant to Federal Rule of Evidence 803(a), but rejected proffers of the accompanying transcripts of hearings conducted into the matters as constituting impermissible hearsay.

31

"Associated Gas and Electric System Practices."  That report contained

the following relevant observations:

        a.     All levels of operating utility employees, including meter readers, office clerks, and other front-line employees, devoted working time to selling securities in AGECO.

        b.     The local utility offices, trucks, equipment, and consumer utility bills all bore the title "Associated Gas and Electric System."  The local utility office was listed under "Associated Gas and Electric System" in the phonebook.  At least some of the local utilities used "Associated Gas and Electric System" letterhead.

        c.     A publicly distributed pamphlet, known as the "Harris-Forbes" booklet, emphasized the idea of a unified, centrally controlled "Associated Gas and Electric System."

        d.     On September 25, 1929, Empire Gas & Electric Company requested consent to transfer its franchises to NYSEG.  When the Commission's accountants examined Empire's books and accounts at Empire's Geneva office, the Commission was told that any contracts would have to

> be obtained from the New York
> City office of AGECO.

93.    The PSC report was critical of the use of service

contracts and other means by which holding companies were able to

divert funds from operating companies, noting the following:

> Twenty-five years ago, the holding company was in
> an embryonic stage and was used principally for
> the purpose of centralizing control.  In recent
> years, particularly during the last decade, the
> holding company idea has been utilized to siphon
> funds from operating utilities into holding
> companies or their subsidiaries and affiliates which
> are not subject to public regulation; and in certain
> instances, funds have been diverted even from the
> holding companies to the pockets of individuals.

The PSC report did not point to any abusive practices in place prior to

1922.

94.    The 1932 PSC Report noted that large payments

were made to various service companies from the operating utility

companies, including Utility Management Corporation (formerly J.G. White

Management Corp.), W.S. Barstow & Co. , The Utilities Purchasing and

Supply Company, and Public Utilities Appliance Corporation.  The PSC

report characterized the AGECO system service contracts as reflecting

"the influence and control of the system over the operations of the

33

controlled utilities."  The Commission went on to note that the terms of

those contracts

> would seem to cover almost every phase of utility
> operation, leaving no vestige of independent
> authority or control in the hands of the operating
> utilities.  Under the provisions of these contracts,
> the service corporations manage, dominate, and
> practically operate the utilities.  The contracts
> cover every activity of the local corporation and all
> its property.  No distinguishable workable identity
> remains.  The operating utilities become even less
> than agencies or instrumentalities of holding
> companies or the system.  They exist only in name
> and live only in the bookkeeping records of the
> system.

95.    One investigation conducted by the PSC resulted

in the issuance of an exhaustive opinion by PSC Commissioner Brewster

("Brewster Report") on December 30, 1940 recounting the abuses of

AGECO and its affiliates including in "siphoning of funds from the

treasuries of the operating companies to the pockets of those individuals

and corporations engaged in milking the operating companies through the

device of servicing and management contracts."

96.    That investigation, which focused on the period

between 1934 and 1938, was commissioned

> [a]s to the methods of accounting, the books,
> records, accounts and other documents of the New

34

York State Electric & Gas Corporation; that an investigation should be instituted as to the methods, practices, regulations and property employed by said corporation in the transaction of its business and as to whether said corporation is failing or omitting or about to fail or omit anything required of it by law or by order of the Commission, or is doing anything or about to do anything or permitting anything or about to permit anything to be done contrary to or in violation of law or of any order of the Commission; that an investigation should be instituted to determine the persons, corporations, partnerships or trusts who are affiliated interests of said corporation; and the extent and propriety of the transactions had by said corporation with such affiliated interests, and as to whether the contracts or transactions had by such corporation with affiliated interests are in the public interest.

The Brewster Report did not specifically focus upon the operation of MGP facilities.

97.    According to the Brewster Report, the Utility Management Corporation charged operating companies in the AGECO system, including NYSEG, a management fee equivalent to 2.5% of the gross revenues of the operating companies.  In 1939, however, there were no management employees from the Utility Management Corporation located on any property owned by the operating companies.

98.    The Brewster Report identified, among other

35

things, abuses related to defraying personal expenses of Howard C.

Hopson as well as Howard C. Hopson & Company, which were charged to

operating companies within the AGECO System.

99.    According to the Brewster Report, more than $1.3

million was siphoned from NYSEG by AGECO and its control group

annually.

100.   On September 27, 1940, the FPC issued a report

of an investigation of the AGECO system.  While the focus of the report

was on six Pennsylvania utilities it is relevant to the issues now before the

court, since from a managerial or governance perspective AGECO's

relationship with and handling of those Pennsylvania utilities was typical of

what has been described as its "cookie cutter approach" management

style with respect to its various utilities throughout the United States.

101.   In its report of that investigation the FPC wrote the

following: "[o]ur investigation has developed an extraordinary picture of the

exploitation of an essential public service for which the holding-company

device served as a cloak.  Almost every possibility for plunder was

exploited."

102.   Among the abuses uncovered by the FPC was the

36

diversion of millions of dollars from the operating companies through the
use of service companies formed by Hopson and his associates, in the
process going to great lengths to shield their identities and true
ownership, with the service companies charging exorbitant amounts and
realizing unjustified profits from the operating companies for performing
various services.

103.  The report of the FPC investigation concluded as
follows:

> While the record of this proceeding presents
> perhaps an extreme example of the evils of the
> holding-company system in the public-utility field, it
> was no isolated instance.  The unjust burdening of
> operating utilities with improper or unnecessary
> charges to their expense and property accounts,
> the concealment of real ownership and control, the
> efforts by one means or another to confuse and
> obstruct investigation and regulation, and,
> generally, the manipulation and exploitation of
> operating properties for the selfish interests of the
> holding companies and their owners, have all been
> inherent tendencies of the holding company
> method of organization as it has grown up in the
> inadequately controlled public-utility industry
> especially during the past two decades.
>
> Here, perhaps, there was a somewhat unusual
> concentration of mind and efforts almost
> exclusively devoted to manipulation and selfish
> exploitation.  It was legerdemain at its worse.  The
> ingenuity of Hopson and his associates were [sic]

indeed worthy of a better cause.  They were
apparently single-heartedly determined upon
extracting currently every dollar they could wring
from the operating utilities regardless of the effect
upon consumers and investors. The fact that they
were unjustly and improperly impairing the efficient
and economical operation of such utilities and
laying unlawful burdens upon the rate payers
seemed not to concern them at all.

The record and report submitted by the trial
examiner detailing the iniquitous practices and the
different schemes by which the respondents here
were victimized furnished impressive evidence of
the vision, foresight, and fidelity to the public
interest of those responsible for that great reform
measure, the Public Utility Act of 1935, under
which much has been achieved toward the onward
march of those modern freebooters who saw in the
rapid development of public utility service in the
United States only a new and unusual opportunity
for speculation and exploitation.

It should be noted, however, that the passage of
this Act requiring the service companies to operate
at cost, led Hopson and his associates to attempt
to retain unjustified profits by padding service
company costs.  Such inflation of costs must be
zealously guarded against and it is hoped that this
investigation may aid public regulatory bodies to
this end.  Further legislation may be necessary
effectively to close the door to such practices.

104.  The FPC investigation was followed by a separate

investigation conducted by the SEC, leading to the issuance of a report on

August 4, 1942 summarizing the agency's findings and ordering the de-

38

listing of AGECO securities from the Los Angeles Stock Exchange and the New York Curb Exchange on the ground that its application for registration and annual reports contained false statements and did not accurately represent the nature of intermediate control of operating companies through parent companies.

105.  In the report of its investigation, the SEC noted that with the filing of the AGECO and AGECORP bankruptcy petitions "[i]nvestors, both present and prospective, are now warned by the pendency of the reorganization proceedings that the financial statements and other information on file with the [the SEC] may not be accepted indiscriminately as the guides to the registrant's financial and the prospects for its reorganization."

106.  Hopson resigned from his position as a director of AGECO on August 30, 1935 and as treasurer of that company on December 30, 1935.[9]   Despite those resignations, Hopson continued to exert considerable influence over the AGECO Empire.

_____

[9]      Hopson was eventually investigated and criminally prosecuted for his conduct, leading to a conviction on December 31, 1940 for seventeen counts of mail fraud and a sentence of five years in prison.  *In re Associated Gas & Elec. Co.,* No. 1610, 11 S.E.C. 975, 1942 WL3406 (S.E.C.), *5 (SEC Aug. 14, 1942).

107.  During the period between 1922 and 1940, there was considerable overlap of officers and directors within the AGECO system, including among both holding companies were operating companies.  The following charts illustrate this overlap:

| Holding Company (AGECO, Mohawk Valley, and NY Electric) and NYSEG Overlaps of Officers and Directors | | | | |
|---|---|---|---|---|
| | AGECO | Mohawk Valley | NY Electric | NYSEG |
| Koch | ✓ | ✓ | ✓ | ✓ |
| O'Keefe | ✓ | ✓ | | ✓ |
| Dougherty | ✓ | ✓ | ✓ | ✓ |
| Mange | ✓ | ✓ | ✓ | ✓ |
| Weinberger | ✓ | ✓ | ✓ | ✓ |
| Hopson | ✓ | ✓ | ✓ | ✓ |
| Magee | ✓ | ✓ | | |
| Daly | ✓ | ✓ | ✓ | ✓ |
| Gober | ✓ | ✓ | | |
| Hill | ✓ | ✓ | ✓ | ✓ |
| Wetherell | ✓ | | ✓ | |
| Starch | ✓ | ✓ | | |
| McKenna | | ✓ | ✓ | ✓ |
| Edmunds | | | ✓ | ✓ |

40

| **AGECO and Operating Company Overlaps of Officers and Directors** | | | | | | | |
|---|---|---|---|---|---|---|---|
|  | AGECO | NYSEG | Federal-NY | Empire | Elmira | NY Central | Owego |
| Koch | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Dougherty | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| McKenna |  | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| O'Keeffe | ✓ | ✓ |  | ✓ | ✓ | ✓ | ✓ |
| Weinberger | ✓ | ✓ | ✓ | ✓ |  | ✓ | ✓ |
| Gober | ✓ | ✓ | ✓ | ✓ |  |  | ✓ |
| Daly | ✓ | ✓ |  | ✓ | ✓ | ✓ | ✓ |
| Magee | ✓ | ✓ |  | ✓ | ✓ | ✓ |  |
| Hopson | ✓ | ✓ |  | ✓ | ✓ | ✓ |  |
| Mange | ✓ | ✓ |  | ✓ | ✓ | ✓ |  |
| Hill |  |  | ✓ | ✓ | ✓ |  | ✓ |
| Moffatt |  |  |  | ✓ |  | ✓ |  |

108.  During the period between 1922 and 1940, board meetings for NYSEG and the various other AGECO operating companies were generally held in New York City at or near AGECO's offices at 61 Broadway, New York, New York.

109.  That address, 61 Broadway, New York, New York, is also the location of offices maintained during all or a portion of the period from 1922 to 1940 by Hopson's accounting and financial

41

organization, which rendered financing, accounting, legal, and auditing services to AGECO and its various subsidiary companies.

110.  Hopson was elected as a director of New York State Gas & Electric Corporation on August 19, 1927.

111.  During all or most of the years from 1922 until 1940, Mange served as president of AGECO, and a director of NYSEG.

112.  Hopson resigned from the NYSEG Board of Directors on May 14, 1934.  There is no indication, however, of any material change in the relationship between AGECO and NYSEG as a consequence of his resignation.

113.  Somewhat less is known from the record concerning AGECO's interaction with various of its other subsidiaries, including  New York Central Electric Corporation, Empire Gas & Electric Company, Eastern New York Electric & Gas Company, Inc., and Federal-New York Company, Inc., than has been revealed regarding its relationship with NYSEG.

114.  At trial, NYSEG's expert, Professor Jonathan Macey, opined that AGECO treated those operating companies in the same manner as others within the Associated System.

42

115.  In his decision, PSC Commissioner Brewster, concluded that the same fraudulent activities and policies that AGECO had imposed on NYSEG were also inflicted on those other operating companies.

116.  During all or portions of the period between 1922 and 1940, NYSEG, as well as affiliated companies Federal-New York Company, Inc. (beginning on or prior to December 31, 1929), Empire Gas & Electric Company (from May 1, 1929), Elmira Water, Light & Railroad Company, New York Central Electric Corporation (from May 1, 1929), New York Central Electric Corporation (from May 1, 1929), Eastern New York Electric & Gas Company, Inc. (from on or prior to December 31, 1926), and Owego Gas Corporation (from May 1, 1929), were all dominated by AGECO in such a way as to make them mere instrumentalities of AGECO, and AGECO exploited its control of those subsidiaries to commit a wrong, namely the operation of their MGP facilities and the resulting release of hazardous substances, causing those subsidiaries to suffer an unjust loss or injury as a result.

117.  During the period between 1922 and 1940, NYSEG and the other holding and operating companies within the

43

AGECO system retained little business discretion.  Many of the

management functions of NYSEG and the other operating utilities during

that time period were outsourced through the use of service company

contracts.

118.  On January 8, 1926, for example, NYSEG entered

into a five year agreement under which AGECO was retained "as general

operating and financial manager of [NYSEG's] properties, with authority to

supervise and direct the management and operation and financial policies

of such properties . . .".

119.   The service contracts through which NYSEG's

operations were outsourced during the period of 1922 to 1940 lack any

indicia of being arms length agreements since it does not appear that

there was anyone negotiating those agreements on behalf of NYSEG and

the other subsidiary operating companies within the AGECO Empire.

120.  None of the service agreements entered into by

NYSEG and its sister operating companies specifically referenced tar

handling services at MGP sites, or addressed environmental activities at

the facilities.

121.  Between 1922 and 1942, NYSEG was adequately

capitalized.

122.  NYSEG was profitable in every year between 1906 and 1942.  NYSEG's net income grew from $171,000 in 1921 to $2.99 million in 1931.

123.  In every year during the Great Depression in the 1930s, with the exception of 1935, NYSEG earned net income of more than $1.5 million.

124.  There is no evidence that NYSEG experienced financial distress at any point between 1906 and 1945, nor was evidence presented at trial to show that NYSEG was unable to pay its debts at any time during that period or was on the verge of receivership.

125.  NYSEG's revenues grew from $58,000 in 1906 to $28.585 million in 1942.  During the same time period NYSEG's operating profit margin generally ranged from 30% to 50%.

126.  Between 1906 and 1942, NYSEG observed all corporate formalities, including 1) holding regular meetings of its board of directors; 2) maintaining minutes of board meetings; 3) holding annual shareholder meetings; 4) issuing annual reports; 5) making routine filings with the PSC.

127.  Between 1906 and 1942, NYSEG was able to raise capital at rates similar to overall industry yields.  Between 1910 and 1941, NYSEG successfully completed ten separate bond issues, at rates comparable to industry averages for the electric utility industry.

128.  During that same period, according to Professor Frank C. Torchio, one of FirstEnergy's experts, NYSEG was viewed in the credit markets to be in a similar risk category as the average utility and was able to borrow money at comparable rates.

129.  During the period from 1922 until 1940, NYSEG had its own employees.  In 1935, the company had over 2,000 employees, and its workforce grew to 2,500 by 1939.  Among those employees during that time period was a plant superintendent at each of the NYSEG MGP facilities.

### 3.   1940-1942

130. During the course of reorganization following the filing of bankruptcy, AGECO and AGECORP were operated under the control of the bankruptcy trustees.

131.  There was no evidence presented at trial to suggest that the past domination, fraud, and abuses worked by AGECO

46

toward NYSEG continued into the bankruptcy period beyond the point

when AGECO began operating under the control of the bankruptcy

trustees.[10]

    C.    <u>Environmental Concerns Associated with MGP Operations Generally</u>

        132.  Manufactured gas plants began operating in the

United States by the mid-nineteenth century, and for  the most part had

ceased producing gas by the 1940s, when natural gas became more

readily available through the development of supply and transmission

systems.  Gas produced in MGP facilities was provided to residential and

commercial customers for use in heating, cooking and lighting.

        133.  NYSEG and its predecessor and other affiliated

utility companies sold manufactured gas to their respective customers

from approximately 1851 until around 1960 when the last NYSEG plant,

located in Plattsburgh, New York, was closed.

        134.  Because of the large volumes of water required to

operate MGP facilities, most were located near bodies of water.

----

[10]    In their proposed findings the parties have cited trustee reports covering various years, including a report dated December 31, 1945.  The only such report that was marked as an exhibit at trial, however, was for the year ending December 31, 1941.  *See* Exh. P-212.  That report, unfortunately, was never offered in evidence.

135.  Two primary technologies were used to manufacture gas at the MGP sites: coal carbonization and a carbureted water gas process.  The original method, coal carbonization, entailed heating coal in enclosed retorts or beehive ovens, resulting in volatile constituents being driven off as a gas, collected, cooled, and purified for conveyance by pipe networks into surrounding areas for use.  In the 1870s the carbureted water gas process was introduced, and by 1900 had become the predominate method of MGP production.  That process, which had several variations, typically began by heating coke or coal in the presence of steam, creating a flammable gas mixture of methane and carbon monoxide.  Petroleum products were then sprayed into the hot gas mixture, creating more methane and increasing the heating and lighting capacity of the gas.

136.  While these two  processes differed in how gas was produced, both created similar by-products when the gas cooled, including primarily coal tar and, in the case of carbureted water gas plants, oil.

137.  Some of the coal tar generated at MGP facilities was recovered for reuse or sale.  Coal tar, however, also typically leaked

48

from tar-handling equipment throughout the operation of MGPs, including

from underground bases of tar-handling equipment and from pipes.

Inadvertent spills of coal tar were also common.

138.  Coal tar generated from MGP operations typically

contained various chemical constituents, among them being polycyclic

aromatic hydrocarbons ("PAHs"), which do not readily dissolve in water

and therefore rarely migrate beyond the tar itself, and a family of volatile

organic compounds ("VOCs") including Benzene, Toluene, Ethylbenzine,

and Xylene ("BTEX").

139.  Although earlier recognized as a nuisance

associated with former MGP facilities and nearby waterways, as of 1991

coal tar was not yet officially listed as a hazardous waste under New York

law.  However, coal tar produced from MGP processes and its

constituents are now regarded as hazardous substances for purposes of

federal and state environmental laws.

140.  Once released, coal tar will tend to migrate in the

subsurface at a site.  Coal tar is heavier than water.  Accordingly, if a

sufficient amount of tar is released, it will travel through the water table

until it reaches a confining layer serving to impede its downward

movement.  Elements of coal tar can leach into groundwater, causing

groundwater contamination.  Even immobile tar may present concerns as

a potential source of groundwater contamination where  groundwater

contacts the tar and dissolves coal tar constituents.

141.  Coal tar is the primary contaminant of concern

("COC") at the sites in issue in this case.  As a result of tar leaks and

spills, as well as consequent tar migration, residual coal tar typically exists

at former MGP sites in three distinct potential forms.  First, coal tar may

be found in a semi-solidified mass remaining around MGP structures.

Second, it may be present as a viscous substance that has flowed some

distance away from MGP structures, including into adjacent surface water

bodies.  Finally, it may exist in a dissolved phase where the tar has

released some of its constituents.

142.  In addition to coal tar, the gas purification process

associated with MGP facilities was also known to produce a solid waste

material referred to as "purifier waste" or "box waste" generally consisting

of wood chips, iron filings and clumps of solidified tar.

143.  The New York State DEC serves as the lead

agency authorized to manage the cleanup of MGP facilities in New York

State.

144.  The DEC did not have a formal policy or program for remediation of former MGP sites in place until 1992 or 1993.  Prior to that time, however, the DEC became involved occasionally in discrete issues at an MGP sites, such as where pollutants at a portion of an MGP site were releasing into a body of water.  At various points in the 1980s, it was uncertain whether the DEC had jurisdiction over coal tar-contaminated sites.

145.  The state's policies concerning remediation of former MGP sites are laid out in a document which, while undated, appears to have been relatively recently generated based upon analysis of its contents, entitled "New York State's Approach to the Remediation of Former Manufactured Gas Plant Sites."

146.  The DEC reports that 235 MGP-related sites have been located in New York  State, with an estimate that in the past as many as 300 were operated within the state.  Of these, 202 have been identified as involving a current  New York State utility as the responsible party.

147.  Out of the 202 former MGP sites identified,

51

cleanup had been completed, or a no further action determination had been made, at only twenty-one locations as of the time of publication of the DEC's MGP remediation approach pamphlet.  Those cleanups were all relatively recent; no MGP site in New York State was fully remediated prior to 1990.

148.  Over time since the 1980s the technologies associated with treatment and disposal of coal tar impacted soils have improved and the costs associated with various available options for addressing MGP waste have decreased.  By way of example, it is estimated that the present cost of on-site thermal desorption of such contaminated soils is $60 per ton, as compared with an estimated per ton cost in 1988 of land burial in CECOS, a certified hazardous waste landfill, of $150.

D.   Summary of NYSEG'S MGP Investigations and Remedial Responses

149.  Currently at issue in this case are sixteen former MGP facilities currently or previously owned and operated by NYSEG or its predecessor utility companies.[11]

---

[11]     Plaintiff's claims related to a seventeenth site, the Auburn Clark Street Site, were dismissed pursuant to Rule 52(c) during the course of the trial, based upon a motion brought by defendant FirstEnergy at the close of plaintiff's case.

150.  All or most of the sixteen sites in issue were first listed by the DEC in 1986 as Class "2a" sites in the Registry of Inactive Hazardous Waste Disposal Sites in New York.  Class 2a is a temporary classification assigned to a site that has inadequate and/or insufficient data for inclusion in any of the other DEC classifications.  Several of the sites have since been re-categorized as falling within Class "2", signifying that they present a "significant threat to the public health or environment – action required."

151.  With the exception of Corning, NYSEG has incurred substantial costs in responding to the release of hazardous substances, including coal tar, at the sixteen sites at issue.[12]

152.  In the 1980s, NYSEG performed investigations at all of the MGP sites in this litigation, with the exception of the Newark and Corning Sites.  NYSEG's early investigation efforts at its former MGP facilities are summarized in a document prepared in August of 1989 by NYSEG employees T.M. O'Meara and Sheila Snyder.  That report

_____

[12]   There has not yet been an investigation conducted at the Corning Site, and it is not currently covered by the 1994 Consent Order.  Nonetheless, there likely were releases of tar in the subsurface at the site, given the nature of the MGP activities conducted there.

contains a ten year projection of those investigative efforts and the

anticipated resulting expense, describes NYSEG's "proposed

investigative/remedial approach", and notes that as of the writing of that

report "Plattsburgh is the only site that has undergone an extensive

remediation program."

153.  When Sheila Snyder, a NYSEG  employee who

testified concerning the company's efforts to evaluate remedial and

disposal options for MGPs in the late 1980s, searched for examples of

other MGPs that had been remediated she found only one, located in

Minnesota; while some work had been completed at that facility as of the

time of her study, however, it had not then been fully remediated.

154.  In November of 1983, NYSEG employee J.B.

Marean proposed conducting an investigative program over a five year

period beginning in January 1984 and ending in December of 1988 with

respect to seventeen NYSEG MGP sites, and estimated that any

necessary remedial work at any given site could be fully performed within

two years following completion of the investigative study.  By contrast, it is

now estimated that at the current pace it will have taken NYSEG forty

years to remediate all sixteen sites from the time those efforts were

initiated.

155.   NYSEG's early investigations of its former MGP sites were divided into a series of specific tasks, and were calculated to determine whether any of the sites posed a problem that needed to be addressed.

156.   The memorandum prepared in August of 1989 by T.M. O'Meara and Sheila Snyder described the various tasks to be undertaken in connection with NYSEG's early investigations of former MGP sites.  Task 1 was limited to identifying the location of any on-site coal gas plant structures such as gas holders and tar sumps, and to identify processing activities and waste disposal practices at each of the sites.  This task was accomplished primarily through review of historical documents and interviews of former employees.  Tasks 2 and 3 followed, consisting of a sampling program including "a geophysical survey, a soil gas survey, test pitting, soil borings, and monitoring well installations."  In conjunction with those testings and surveys, soils, stream sediments, ground and surface water, and air samples were chemically analyzed in an effort to ascertain the vertical and horizontal extent of any contamination.  Task 4 consisted of analysis of the collected data and

55

assessment of public health and environmental risks presented by the

site.  Task 5 entailed the preparation of a remediation plan for the site,

with Task 6 being the submission of the remedial plan to the DEC for

approval and, ultimately, including in a consent order.  The August 1989

memorandum also describes a seventh task, that being implementation of

an agreed-upon remedial plan.

157.  As NYSEG embarked upon the contemplated

investigations of the various MGP sites it forwarded courtesy copies of the

task reports to the DEC, although those reports were neither mandated

nor controlled by the agency.[13]

158.  With two exceptions, none of the early work at

NYSEG's former MGP sites proceeded past Task 4, in light of a

determination by the company's consultants that no further action was

required beyond worker protection, monitoring, and placing limitations on

groundwater extraction.  NYSEG's consultants did recommend further

action at Owego and  Mechanicville and steps were taken in the early

1990s to address those sites, under consent  orders with the DEC.

159.  In March of 1994, NYSEG acquiesced in the

_____

[13]      In 1991, NYSEG attempted to involve the DEC in its remedial program at
the former MGP sites; those efforts, however, were unsuccessful.

issuance of a Consent Order (No. DO-0002-9309) (the "1994 Consent

Order") by the DEC.  The 1994 Consent Order addressed the

investigation and cleanup of coal tar and associated contaminated

hazardous substances at all of the MGP sites at issue in this action, with

the exception of the Corning location.[14]

160.  At the time the 1994 Consent Order was signed

both NYSEG and the DEC anticipated that between two and three MGP

remediation projects would be conducted by NYSEG during each year.

161.  Pursuant to the 1994 Consent Order, NYSEG is

required to commence a  sequence of studies and reports in order to

investigate and remediate the sites covered, under the DEC's  direction.

Based upon an initial submittal by  NYSEG, the DEC must then determine

whether to require more data in order to characterize the nature  and

extent of hazardous substances at a given site, and to ascertain whether

---

[14]     Despite the parties' stipulation that remediation at the fifteen sites other
than Corning was governed by the 1994 Consent Order, that is not entirely accurate.
The plain language of the 1994 Consent Order indicates, in multiple sections, that the
separate and distinct orders on consent for Mechanicville and Owego governed those
respective sites.  Specifically, Remedial Investigations, Feasibility Studies, Remedial
Design, Remedial Construction, and Performance and Reporting of the Preliminary
Site Assessment and Remedial Investigations for Mechanicville and Owego were
covered by Orders on Consent A5-0276-91-10, dated February 23, 1993, and A7-
0150-88-09 from January 2, 1991, respectively.  However, both Owego and
Mechanicville were subject to the 1994 Consent Order in all other respects, including
the DEC's reservation of rights under both state and federal law.

such substances constitute a significant threat to public health or the environment, necessitating remediation.   In the event of unavailability of such information, the 1994 Consent Order requires NYSEG to create a Preliminary Site Assessment ("PSA"), which must "provide all appropriate assessments and evaluations" set forth in CERCLA, the National Contingency Plan ("NCP"), and EPA/DEC guidance documents.  The task reports prepared by NYSEG during its early investigations satisfied the PSA  requirement for any site for which they were available.

162.  All of the investigations performed by NYSEG pursuant to the 1994 Consent Order were mandated by the DEC.

163.  Under the Consent Order, if the DEC determines that a significant threat exists, NYSEG must next create a  Remedial Investigation ("RI")/Feasibility Study ("FS") Work Plan, incorporating all appropriate elements of an  RI/FS, as set forth in CERCLA, the NCP, and EPA/DEC guidance on regarding the preparation of an RI and an FS.[15]

_____

[15]     The preparation of an RI and an FS is a concept common to both federal and state environmental regimes.  In New York, a feasibility study is defined as

> [a] study undertaken to develop and evaluate alternatives
> for remediation, emphasizing data analysis.  The remedial
> investigation data are used to define the objectives of the
> site remediation program, to develop remedial action
> alternatives, and to undertake an initial screening and
> detailed analysis of the alternatives.  The term also refers to

164.   The 1994 Consent Order permits NYSEG to conduct Interim Remedial  Measures ("IRMs") at the covered sites, if approved by the DEC.  The order provides that any IRM must be performed pursuant to a DEC-approved IRM Work Plan, which must include a health and  safety plan, a contingency plan, and, if required by the DEC, a citizen participation plan.  While the 1994 Consent Order does not reference compliance with the  NCP with respect to IRMs, the regulations under which the consent order was issued do require both NCP compliance and cost effectiveness.  *See* 6 N.Y.C.R.R. § 375-2.8. After an IRM Work Plan is approved, the project is performed subject to DEC oversight.

_____

a report that describes the results of the study.

6 N.Y.C.R.R. § 375-2.2(f). State regulations define the term "remedial investigation" to include

[a] process undertaken to determine the nature and extent of contamination at a site or operable unit of a site.  The remedial investigation emphasizes data collection and site characaterization, and generally is performed in support of the selection of a remedy.

6 N.Y.C.R.R. § 375-1.2(an); *see also* 6 N.Y.C.R.R. § 375-1.8(e) (more fully addressing the scope of an RI).  In October of 1988 the EPA issued an extensive guidance document addressing the preparation of an RI and an FS for use by EPA personnel and other parties.  *See United States EPA,* GUIDANCE FOR CONDUCTING REMEDIAL INVESTIGATIONS AND FEASIBILITY UNDER CERCLA, interim final. EPA/540/G-89/004 (October 1998).

165.  NYSEG has conducted IRMs under the 1994

Consent Order at eight of the sites in issue.[16]  These IRMs are

summarized below and discussed in greater detail in the portion of this

decision addressing the specifics of NYSEG's environmental responses in

connection with the individual sites:

      a.      Cortland-Homer:  2002 utility reconstruction project

      b.      Elmira-Madison Avenue:  2003 removal of gasholders

      c.      Geneva-Border City:  1999 paving project; 2004 tar well excavation

      d.      Ithaca-Court Street:  2000 excavation and removal of coal tar impacted soil

      e.      Ithaca-First Street:  1998 soil stockpile removal

      f.      Mechanicville: 1999-2000 removal of gas relief holder foundation and piping

      g.      Norwich:  Three-phase IRM conducted from 1993 to 1997, with the first two  phases related to a demonstration project excavation.  The third phase carried out in 1997, included  excavation of a former relief holder, tar well, and associated pipe, and also installation of an air sparging/soil vapor extraction system

      h.      Plattsburgh-Saranac Street:  2002 removal of tarholders,

---

[16]    In October 2010, NYSEG finalized a Work Plan for another IRM, involving removal of a segment of the wooden tar ducts at the Ithaca-Court Street Site.

pipelines and purifier wastes.

166.  Several of those IRMs involved removals of MGP

structures, including gas holders containing source materials such as tar.

The DEC has an express policy of preferring the performance of source

removals as IRMs.  The document describing the agency's approach to

remediating MGP sites notes the following:

> MGP sites typically contain buried structures or
> other areas of highly concentrated wastes which
> are good candidates for interim remedial
> measures.  The Department MGP Program often
> conducts removals of gas holder foundations, tar
> wells, and/or other MGP-related structures as an
> initial step while more detailed evaluations are
> underway elsewhere on the site.  Where possible,
> IRMs are intended to achieve final remedial criteria
> to minimize the need to revisit an area during the
> final site remedy.  Thus, the IRMs seek to remove
> not only the contents of buried structures, but  also
> the structures themselves and any contaminated
> soils immediately surrounding and beneath the
> structure.

This is consistent with the DEC's policy approach concerning former MGP

facilities since at least 1997.

167.  Whether or not an IRM has been implemented at a

site, NYSEG is required to prepare an RI/FS Work Plan for each site

chosen by the DEC for remediation.  Following approval of the RI/FS

61

Work Plan, NYSEG is then required to prepare an RI Report.  Among

other requirements, the report must "provide all appropriate assessments

and evaluations" set forth in CERCLA, the NCP, and EPA/DEC guidance

documents.

168.   After the DEC approves an RI for a site, NYSEG

must then prepare and submit an FS.  Unless the DEC specifies

otherwise, the FS must be performed in a manner consistent with

CERCLA, the  NCP, and relevant guidance documents.

169.  Once an FS is approved, the 1994 Consent Order

requires NYSEG to cooperate with the DEC in soliciting public comment

regarding the RI/FS and a Proposed Remedial Action Plan ("PRAP"), in

accordance with CERCLA, the NCP, and relevant guidance documents.

170.  Following the close of the public comment period,

the DEC next selects the final remedial  alternative for the site for

inclusion into a Record of Decision ("ROD"), which becomes an

enforceable part of  the Consent Order.

171.  Following the issuance of the ROD, NYSEG must

next create a Remedial Design Work Plan, in accordance with the ROD.

Once that plan is approved by the DEC, the remedy must be implemented

62

as approved by the agency.

172.  The DEC typically stations one or more representatives on-site  throughout remedial construction.  Based upon post construction submissions, the DEC concludes whether remedial construction has been conducted in accordance with the Remedial Design.

173.  In addition to providing specific approvals, under the 1994 Consent Order the DEC also retains general  oversight power over the remediation process under a section which provides that

> [i]f the Department concludes that any element of the Remedial Program fails to achieve its objective or otherwise fails to protect human health or the environment, [NYSEG] shall take whatever action the Department  determines necessary to achieve those objectives or to ensure that the  Remedial Program otherwise protects human health or the environment.

NYSEG's only recourse if it does not agree with the DEC's decision-making at a site is to request a hearing before a DEC administrative law  judge, at which NYSEG would bear the of burden of proving that the DEC's position is unjustified.

174.  Each month NYSEG has provided progress reports to the DEC regarding its efforts at the sites covered, as required under the

Consent Order.  Those reports typically update monthly activity at the various sites, and also list major past events.

175.  One limitation faced by NYSEG in remediating the MGP sites in dispute, particularly in the earlier years, was the availability of relatively few disposal locations that would accept contaminated coal tar waste.

176.  Studies of various means of disposal of contaminated MGP waste were conducted by NYSEG in the 1980s.  One such study was reported in a memorandum dated August 22, 1988 from Sheila Snyder to J.B. Marean.   Among the options considered in that and other studies was the burning of coal tar contaminated soil.

177.   Between 1994 and 1998, NYSEG had the ability to co-burn coal tar contaminated soil at two of its coal burning power plants, including Hickling Station, located in Corning, New York, and Jennison Station, located in Bainbridge, New York.  Co-burning involves mixing coal tar impacted soils with coal for burning, with the percentage of MGP wastes not exceeding 25% of the total volume.  The process also requires the introduction of activated carbon into the mix, stockpiling of MGP waste, testing of the waste for toxicity, and then blending the waste

64

with coal.

178.  NYSEG's study of co-burning at Hickling and Jennison ultimately led to the submission of a proposal to the DEC on December 5, 1989, requesting permission to co-burn contaminated soils at the Jennison plant.

179.  In March of 1994, the DEC issued NYSEG permits for the co-burning of coal tar contaminated soil at both the Hickling and Jennison facilities.

180.  Co-burning was utilized in or about 1994 or 1995 to treat approximately 13,155 tons of contaminated soil excavated from the Owego Site.

181.  When all costs associated with co-burning of coal tar contaminated waste from the Owego Site were factored in, including excavation, backfilling, waste handling, air monitoring, transportation, disposal, crushing and screening, and adding carbon, the estimated cost of co-burning was $200 per ton.

182.  By comparison, at the time of trial NYSEG was paying approximately $60 per ton for on-site thermal destruction of coal tar contaminated soil.

65

183. In 1998, NYSEG sold the Hickling and Jennison facilities. Shortly after the sales, those facilities were closed.

184. Throughout the four year period during which Hickling and Jennison were available for use in co-burning MGP waste, the functionality of those facilities was limited by their ages, inefficiencies, operating schedules, capacities, and the DEC's schedule for investigation and remediation of NYSEG's MGP sites.

185. Another potential means of disposing of coal tar contaminated soil considered by NYSEG was removal to off-site landfills.

186. Prior to 1989, MGP contaminated soils were not classified as hazardous waste and could be disposed of at most landfills.

187. The Model City Landfill, located near Buffalo, New York, and the Seneca Meadows Industrial Solid Waste Landfill in Waterloo, New York, were permitted and able to accept MGP contaminated soils during the 1980s.

188. During the same period, the CECOS Landfill in Niagara, New York, the High Acres Landfill in Monroe County, New York, the Ontario County Landfill in Stanley, New York, and Safety-Kleen in Ontario, Canada were also permitted and able to accept MGP

66

contaminated soils.

189.  From 1989 through 2002, MGP wastes could be "decharacterized" and sent to most licensed landfills.

190.  Despite the availability of landfills for disposal of coal tar contaminated soils, NYSEG was reluctant to pursue that avenue, particularly since all or most of those landfills were unlined, given the potential that it could be considered a PRP for having disposed of contaminated soils should the receiving landfill later be declared a hazardous waste site under CERCLA.

191.  The DEC has been involved with all of the work that NYSEG has  performed under the 1994 Consent Order at each of the covered sites.  Throughout its investigations and remedial efforts, NYSEG has been in frequent contact with the DEC,  both regarding issues specific to the cleanup of individual sites and concerning the DEC's approach to MGP cleanup in the state generally.

192.  The DEC has frequently visited the MGP sites being remediated to monitor NYSEG's activities.  In addition, the DEC has reviewed  and commented on all remedial plans.  When necessary, NYSEG has revised those  plans in consultation with the DEC, and

resubmitted them for approval.

193.  NYSEG follows all work performed at a site with a report which certifies that the approved plans were followed, and this report itself is subject to DEC approval.  The DEC typically issues letters to NYSEG indicating whether it approves a given plan or  report.

194.  With minor exception, the DEC has approved all of the work that has been undertaken by NYSEG at the sites in dispute.[17]

195.  A failure by NYSEG to comply with any term of the 1994 Consent Order could constitute a violation of the order under New York State law.  The DEC has never taken the position that NYSEG is not in compliance with the 1994 Consent Order.

196.  Some of the delay in NYSEG's investigation and remediation of  its MGP sites has been caused by the DEC.  Between approximately 1994 and 1996 only one person at the DEC generally oversaw  NYSEG's work under the 1994 Consent Order.  As of 1996 or 1997, there were approximately five individuals performing in that role.  In those early years, it was very  difficult to get documents quickly reviewed

_____

[17]     In 1992, NYSEG removed a tar tank and cleaned out a tar sump at the Penn Yan-Water Street Site without DEC approval.  The DEC criticized NYSEG when it learned of this activity having been conducted without its prior approval.

and approved by the agency.  There now are about a dozen employees involved in the process at the DEC.

     E.     <u>NYSEG's Responses at the Sixteen Sites in Dispute</u>

          1.     <u>Corning</u>

          a.     <u>Ownership and Operation</u>

     197.  The Corning Site covers approximately two acres of land and is located at the intersection of Chestnut Street and West Tioga Avenue in the City of Corning, Steuben County, New York.

     198.  From 1892 until 1924, Corning Gas Company, and later Corning Light & Power Corporation, owned the Corning Site.

     199.  On August 1, 1924, New York Central Electric Corporation acquired the franchises, works and system of Corning Light & Power Corporation.

     200.  On December 31, 1936, NYSEG acquired New York Central Electric Corporation.

     201.  In 1946, NYSEG sold the Corning Site to Corning Glass Works.

     202.  The Corning MGP facility operated between 1860 and 1938.  During the time of its operation approximately 1,049.3 million

cubic feet of gas was produced at the facility.

203.  Between 1922 and the close of operations in 1938, 465.3 million cubic feet of gas was produced at the plant.  From the time AGECO gained control of the facility on May 1, 1929 until its closure, approximately 91.6 million cubic feet of gas was produced there.[18]

b.  Investigation and Remediation

204.  On January 17, 1991, NYSEG and Corning Glass Works representatives performed a visual site inspection of the Corning Site.

205.  To date, no other environmental investigation, remediation, or other similar other work has been performed at the Corning Site.

206.  The DEC has requested that NYSEG conduct a records search to ascertain information regarding MGP activities at the site, and whether NYSEG has potential responsibility for contamination at the site.  NYSEG expects to advance to the initial investigation phase at

_____

[18]  To obtain a figure for gas production from May 1, 1929 when AGECO began dominating New York Central Electric Corporation through the end of that year I have extrapolated, taking two-thirds of the 33.9 million cubic feet production figure for the year.  I have employed the same methodology in other instances when less than a full year is involved.

Corning, and that the site will eventually come under the purview of the

1994 Consent Order.  Both the DEC and NYSEG anticipate findings that

coal tar releases occurred at the site.

207.  To date, NYSEG has spent a total of $585 in

connection with investigation of the Corning site, and seeks recovery of a

portion of that amount in this action.

2.      Cortland-Homer

a.      Ownership and Operation

208.  The Cortland-Homer Site consists of two acres of

property located at 216 South Main (Route 11) Street in the Village of

Homer, Cortland County, New York.

209.  The Cortland-Homer Site encompasses two

adjoining land parcels, often referred to as the southern parcel and

northern parcel.

210.  The two segments are bordered by New York State

Route 11 to the east, the New York and Susquehanna railroad line to the

west, and commercial properties to the north and south.

211.  The southern parcel of the Cortland-Homer Site

contains a single-story commercial building, part of which is occupied by

71

I.D. Booth (hereinafter the "Booth building").  The northern parcel is utilized for parking.

212.  The Cortland-Homer Site was originally owned by Homer & Cortland Gas Light Company.

213.  The stock of Homer & Cortland Gas Light Company was transferred into AGECO in or about May of 1907.

214.  In or about 1916, AGECO sold the stock of Homer & Cortland Gas Light Company to Ithaca Gas & Electric Corporation.

215.  On June 1, 1918, Homer & Cortland Gas Light Company merged into Ithaca Gas & Electric Corporation, with Ithaca Gas & Electric Corporation remaining as the surviving entity.  Thereafter, in 1918, Ithaca Gas & Electric Corporation changed its name to New York State Gas & Electric Corporation.  The corporate name again changed in or about 1928 to New York State Electric Corporation, and later, in or about 1929, to NYSEG.

216.  In October of 1971, I.D. Booth purchased the Cortland-Homer Site property from Mack Trucks, Inc., which had earlier acquired the site from NYSEG.

217.  I.D. Booth has no corporate relationship with

NYSEG or FirstEnergy.

218.  At the time of its purchase of the Cortland-Homer Site, I.D. Booth was unaware of the existence of any hazardous substance or other contaminants on the property.

219.  Prior to the time of its purchase of the Cortland-Homer property in 1971, I.D. Booth did not perform a title search, interview any past owners, perform an appraisal, review aerial photographs or Sandborn maps of the property, or even walk or survey the site.

220.  Since its purchase of the Cortland-Homer Site, I.D. Booth has used the property for the sale of plumbing and heating products, and in addition has rented a portion of the site to New York Telephone Company/Verizon.

221.  In the early 1980s, I.D. Booth was notified that NYSEG would be conducting an investigation into the possible presence of potentially hazardous substances, including coal tar, at the Cortland-Homer Site.

222.  Following that notification, I.D. Booth permitted NYSEG access to the site for purposes of conducting its investigation and

performing any response actions.

223.  I.D. Booth has not been an active participant in the investigation or remediation processes at the Cortland-Homer MGP Site.

224.  Despite awareness of the possible presence of potentially hazardous substances at the site, in the late 1980s, when performing paving operations at the Cortland-Homer Site, one of I.D. Booth's contractors removed one of the wells containing coal gasification constituents.

225.  Two former gasholders, which are primary source areas of coal tar contamination at the Cortland-Homer Site, are located below the Booth building.

226.  In light of its desire to conduct source excavation as the preferred option at the Cortland-Homer Site, as a more permanent remedy, NYSEG approached I.D. Booth in the early to mid-1990s concerning the possibility of repurchasing the property.

227.  In 2005, NYSEG had the Cortland-Homer Site appraised on an uncontaminated basis.  The appraisal provided "an estimate of the market value of the real property, unencumbered by any form of environmental contamination and as of the date of inspection,

74

June 23, 2005."  As of that date, the estimated market value of the property was $350,000.

228.   I.D. Booth was aware that an appraisal was performed on an uncontaminated basis and that the appraisal estimated the fair market value in the mid-$300,000 range.

229.  I.D. Booth was reluctant to sell the property in light of the disruption which would result to its business as well as the loss of rental income from Verizon it would suffer.

230.  During ensuing negotiations with NYSEG, I.D. Booth demanded $2,000,000 for the southern two-thirds of the Booth building as the cost of relocating its business.  Significant delays occurred during the course of the parties' negotiations, owing principally to the conduct of I.D. Booth throughout the process.

231.  On May 8, 2008, NYSEG paid I.D. Booth $1,800,000 for the southern portion of the Booth building and granted I.D. Booth a right of first offer, whereby I.D. Booth retained the right to re-acquire the property after remediation of the Cortland-Homer Site for $1.00 in the event NYSEG were to decide to sell the property.  After the sale, I.D. Booth retained the northern portion of the Cortland-Homer Site.

232.   NYSEG agreed to demolish only two-thirds of the Booth building (the southern portion) so that I.D. Booth was able to relocate its business to the remaining one-third portion of  the Booth building (the northern portion).

233.   NYSEG did not consider requesting New York State to initiate condemnation proceedings to permit access to the I.D. Booth property as a suitable alternative to purchase in light of the estimated length of time – up to five years – the process could have taken.

234.   Pursuant to the parties' agreement NYSEG was responsible for demolition of the southern portion of the Booth building, and I.D. Booth was responsible for modifications of the remaining (northern) portion of the Booth building, with the exception of any required excavation.

235.   As part of the agreement, I.D. Booth promised to vacate the southern portion of the Booth building within eight months after the closing date.  However, I.D. Booth did not move out of that portion of the building until January 15, 2010 – more than eight months after the closing date – and therefore was required to pay a monthly rent of $5,450.00 until it relocated to the northern portion of the Booth building.

76

236.  The Cortland-Homer MGP facility was engaged in coal gasification from 1858 through 1921 and thereafter produced carbureted water gas from 1921 to 1933.  During the time of its operation approximately 1,416.3 million cubic feet of gas was produced at the facility.  Between 1922 and the close of operations in 1933, 634.4 million cubic feet of gas was produced at Cortland-Homer.

b.    Investigation and Remediation

237.  The Cortland-Homer Site is divided into two operable units ("OU"), OU-1 and OU-2.

238.  The focus of OU-1 of the Cortland-Homer Site is the former MGP area, including the Booth building, as well as two former gasholders and a purifying house, which are buried below the surface. OU-1 also encompasses offsite contaminated soils under Route 11.

239.  OU-2 of the Cortland-Homer Site includes a parcel of land between the Tioughnioga River and Route 11 (often referred to as the downgradient area) and contaminated sediments in the West Branch of the Tioughnioga River.

240.  In July and August of 1985, NYSEG, through its consultant E.C. Jordan Co., performed a Task 1 Preliminary Site

Evaluation at the Cortland-Homer Site, resulting in the issuance of a report in October 1995.

241.  From October 1985 through April of 1986, E.C. Jordan performed a Task 2 study of the Cortland-Homer Site, and a Task 2 report was generated in July of 1987.

242.  In May 1987, E.C. Jordan commenced a Task 3 "Expanded Problem Definition Program" at the Cortland-Homer Site, resulting in the issuance of a report in May of 1989.

243.  In March of 1991, the results of the Task 1 through 3 investigations were consolidated into a summary document entitled "Summary of Site Investigations;" that report was submitted to the DEC.

244.  In May 1991, E.C. Jordan completed a Task 4 "Risk Assessment" at the site.

245.  In 1992, NYSEG, through its consultant Remediation Technologies, Inc., performed an evaluation of remedial options for the Cortland-Homer Site.

246.  In the early 1990s, NYSEG hired Groundwater Technology, Inc. to review its historical investigative work done at the Cortland-Homer Site and to refashion its presentation into an acceptable

78

RI/FS format.  This reformatted "Summary Document" was completed in March 1993 and submitted to the DEC.

247.  In August 1999, NYSEG, through its consultant Stearns & Wheeler, Inc., performed a Supplemental Remedial Investigation ("SRI") at the Cortland-Homer Site.  The Work Plan for the SRI was finalized in October 1999.

248.  From August 7 through August 23, 2000, NYSEG performed a storm drain construction IRM adjacent to the Cortland-Homer Site.  The IRM was performed in conjunction with the New York State Department of Transportation's ("DOT") New York State Route 11 reconstruction and preservation project.  In carrying out the IRM, NYSEG removed 305.56 tons of impacted soil and disposed of it in the Seneca Meadow Industrial Solid Waste Landfill in Waterloo, New York.  A final engineering report concerning that IRM was submitted to and approved by the DEC in March 2002.

249.  On October 8, 2000, in response to the DEC's comments regarding the SRI Report, NYSEG prepared an SRI Work Plan Addendum, calling for a second phase of the SRI.

250.  In April 2001, as part of the SRI investigation,

79

NYSEG, through its consultant Stearns & Wheeler, Inc., prepared a historical summary of the Cortland-Homer Site.

251.   NYSEG later conducted a utility reconstruction project at  Cortland-Homer in 2002; that project was also denominated as an IRM.  The IRM was performed in response to DOT road construction plan that was to result in  excavation of coal tar-impacted soils.  NYSEG undertook that work pursuant to an IRM work plan due to the potential for human exposure to hazardous substances as a result of the road work.

252.   In March 2003, NYSEG, through its consultant Stearns & Wheeler, Inc., prepared a Revised SRI Report that was submitted to the DEC.  After an additional round of comments, the SRI Report was approved by the DEC and finalized in December 2003.

253.   On April 9, 2004, NYSEG, through its consultant URS Corporation, completed an FS Report for the Cortland-Homer Site.

254.   In February 2005, the DEC issued a PRAP for the OU-2 portion of the Cortland-Homer Site.

255.   In March 2005, the DEC issued a ROD for OU-2 of the Cortland-Homer Site.  The remedy selected by the DEC in the ROD included removal and off-site disposal of thirty-seven hundred cubic yards

of sediments contaminated with PAHs from the West Branch of the

Tioughnioga River and *in situ* stabilization ("ISS") of subsurface impacted

soil and NAPL in the downgradient area to a depth of below ground

surface.[19]

256.  In May 2006, NYSEG completed a Remedial

Design for OU-2 of the Cortland-Homer Site.

257.  NYSEG and the DEC chose to consider

implementing a remedy at OU-2 before completing the OU-1 remedy, in

light of I.D. Booth's ownership of the building, despite the fact that this

sequence was not generally considered as optimum from a technical

perspective.

258.  In February 2007, the DEC issued a PRAP for the

OU-1 portion of the Cortland-Homer Site.

259.  In March 2007, the DEC issued its ROD for OU-1

of the Cortland-Homer Site.  The remedy selected by the DEC for OU-1

entailed demolition of the southern portion of the Booth building, as

---

[19]     *In situ* stabilization has been described as "involve[ing] mixing the tar
ladent soil with a cement material and other binding agents in an effort to form a large
mass or block incapable of further migration or leaching."  *Rochester Gas & Electric,*
slip op. at 51, n.23.

necessary to enable excavation of contaminated soils, and excavation and removal of MGP waste, NAPL and contaminated soils, estimated to include 44,000 cubic yards, to a depth of twenty-four feet below ground surface, as well as evaluation of soil vapor intrusion in the remaining portion of the building.

260.   On October 20, 2007, NYSEG submitted to the DEC a 50% Remedial Design for OU-1 of the Cortland-Homer Site.

261.   In January of 2008, NYSEG, through its consultant Earth Tech Northeast, prepared a Utility Relocation Feasibility Study for the Cortland-Homer Site.

262.   In February 2008, Earth Tech Northeast, on behalf of NYSEG, finalized  an Internal Draft Remedial Action Design 75% Submittal for OU-1.  The Remedial Design was 100% completed in March 2008.

263.   In August of 2009 NYSEG, through its consultant AECOM, prepared a Proposed ROD Amendment for OU-1 of the Cortland-Homer Site.

264.   A Focused Feasibility Study of the Cortland-Homer Site was also prepared in August of 2009.

82

265.  Construction to implement the selected remedy at OU-1, earlier scheduled to commence in the Spring of 2010, has been postponed until at least 2012.

266.  The delay in NYSEG's ability to acquire the portion of the building necessary to remediate OU-1, caused by the protracted negotiations with I.D. Booth, led to corresponding delay in the issuance of a PRAP for the site.

267.  Source excavation was considered to be the preferred option for remediation for OU-1 of the Cortland-Homer Site, since it represented a more permanent remedy.  The delay caused by I.D. Booth's reluctance to sell the building was a significant obstacle in implementing source excavation at the Site.

268.  The delay caused by I.D. Booth's reluctance to sell the Booth building in implementing the remedy at the Cortland-Homer Site has exacerbated the contamination at the site, permitting continued migration of coal tar and other hazardous MPG waste.

269.  NYSEG incurred a total of $2,615,005.90 in response costs which are now claimed in this action in connection with the Cortland-Homer Site between 1994 and 2009.

83

3.    Dansville

a.    Ownership and Operation

270.  The Dansville Site is comprised of approximately 2.25 acres of land located at 50 Ossian Street in the Village of Dansville, Livingston County, New York.

271.  From 1861 until 1895, the Dansville Gas Light Company operated the Dansville MGP facility.

272.  Sometime between 1895 and 1899, the Dansville Gas Light Company and the Dansville Gas & Electric Light Company merged to form the Dansville Gas & Electric Company.

273.  The Dansville Gas & Electric Company owned and operated the Dansville MGP until 1924.

274.  On May 5, 1924, New York Central Electric Corporation acquired the franchises, works and systems of the Dansville Gas & Electric Company.

275.  On December 31, 1936, New York Central Electric Corporation was acquired by NYSEG.

276.  The Dansville MGP facility was built in 1861, and operated initially from then until 1921.  The plant was placed on standby in

84

1921 when natural gas became available, but resumed manufactured gas production from 1926 until in or about January of 1930.

277.   During the entire time of its operation approximately 267 million cubic feet of manufactured gas was produced at the facility.   Between 1922 and the close of operations in or about 1930, 79.6 million cubic feet of gas was produced there.  15.3 million cubic feet of gas was produced at the facility after AGECO's domination of New York Central Electric Corporation began on May 1, 1929.

b.     Investigation and Remediation

278.  The Dansville Site is divided into two operable units.  OU-1 consists of the soil lying above and below the groundwater table within a portion of the site.  OU-2 consists of all the remaining on-site soil, groundwater for the entire Dansville Site, and soil and groundwater in the areas of off-site migration.

279.  On April 20, 1986, TRC Environmental Consultants, Inc. ("TRC"), under contract with NYSEG, initiated an investigation of the Dansville Site.

280.  TRC conducted Task 2 field work at the Dansville Site between July 28, 1986 and June 10, 1987.

85

281.  On June 27, 1989, TRC, under contract with NYSEG, commenced a Task 3 investigation at the Dansville Site.  A report concerning that investigation was prepared in June of 1990.

282.  TRC, under contract with NYSEG, performed a Task 4 assessment at the Dansville Site; that assessment was completed in May 1991.

283.  Between 1991 and 2003, NYSEG monitored groundwater at the Dansville Site.  There is indication that that groundwater sampling program addressed chlorinated solvents potentially attributable to a nearby dry cleaning business.  It is clear, however, that the primary thrust of that program was to study the migration of MGP waste.  Since the court has not been provided with any basis for apportioning the groundwater monitoring expenses between the COCs associated with the two potential sources of contamination, I have not discounted the amount now sought by NYSEG for remedial activity at the site on this basis.[20]

_____

[20]      In its proposed findings, FirstEnergy urges the court to disqualify the expenses associated with sub-slab depressurization at one on-site structure as a response to the presence of chlorinated solvents in groundwater.  *See* Defendant FirstEnergy's Corporations's Proposed Findings of Fact and Conclusions of Law (Dkt. No. 344) at pp. 65-66.  FirstEnergy has not quantified those costs, nor is the court able from evidence in the record to discern the amount expended on that endeavor, and

284.  In November 2003, NYSEG submitted to the DEC a Final Work Plan for an SRI in connection with the Dansville Site.

285.  In January 2006, NYSEG, through its consultant Ish, Inc., finalized an SRI Report for OU-1 of the Dansville Site.

286.  In May of 2006, NYSEG, through its consultant Ish, Inc., finalized an SRI Report for OU-2 of the Dansville Site.

287.  In October 2007, NYSEG, through its consultant Ish, Inc., finalized an FS and Addendum for OU-1 of the Dansville Site. The DEC approved the FS for OU-1 on October 31, 2007.

288.  In November of 2007, the DEC issued a PRAP for OU-1 of the Dansville Site.

289.  In March 2008, the DEC issued a ROD for OU-1 of the Dansville Site.  The remedy selected by the DEC called for demolition of the southern portion of an on-site building as necessary to enable the excavation of contaminated soils, and the excavation of contaminated soils to an estimated depth of sixteen feet below the ground surface.

290.  In September of 2008, NYSEG, through its consultant Ish, Inc., prepared a Final Work Plan for Pre-Design

_____

whether they are among the costs now sought by NYSEG.

87

Investigation for OU-1 of the Dansville Site.

291.  On July 2, 2009, NYSEG submitted a Pre-Design Investigation Report for OU-1 of the Dansville Site to the DEC.  The DEC approved the Pre-Design Investigation Report for OU-1 on July 2, 2009.

292.  On October 1, 2009, NYSEG submitted a 50% Remedial Design for OU-1 to the DEC.

293.  NYSEG incurred a total of $864,961.26 in response costs which are now claimed in this action at the Dansville Site between 1996 and 2009.

    4.    <u>Elmira-Madison Avenue</u>

    a.    <u>Ownership and Operation</u>

294.  The Elmira Site is situated on an approximately six-acre parcel located in the City of Elmira, Chemung County, New York, comprised of three parcels acquired at different times.  The Elmira Site is bounded by East Fifth Street to the north and northeast, East Clinton Street to the south, and Madison Avenue to the west.

295.  In 1884, the Elmira Gas Light Company acquired tract number 1 of the Elmira Site from numerous members of the Arnot family.

296.  The Elmira Gas Light & Illuminating Company acquired tract number 2 of the Elmira Site from Dugold Graham in 1892.

297.  On July 3, 1893, the Elmira Gas & Illuminating Company acquired the property, rights and franchises of the Elmira Gas Light Company.  Accordingly, as of July 1893, that entity owned tracts 1 and 2 of the site.

298.  On May 25, 1900, the Elmira Gas & Illuminating Company conveyed its property, rights and franchises to the Elmira Water, Light Company.  On May 26, 1900, the Elmira Water, Light Company changed its name to the Elmira Water, Light & Railroad Company.  Accordingly, as of May 1900, the Elmira Water, Light & Railroad Company owned tracts 1 and 2.

299.  In 1920, the Elmira Water, Light & Railroad Company acquired tract number 3 of the Elmira Site from Arnot Realty Corp.  As of 1920, the Elmira Water, Light & Railroad Company therefore owned tracts 1 through 3 of the site.

300.  On April 27, 1932, the Elmira Water, Light & Railroad Company changed its name to the Elmira Light, Heat & Power Corporation.  As of 1920, that corporation therefore owned tracts 1

89

through 3.

301.  On December 29, 1936, the Elmira Light, Heat & Power Corporation merged into NYSEG.

302.  In 1977, NYSEG sold the western portion of the Elmira Site, including all existing buildings, to I.D. Booth.

303.  When purchasing the property I.D. Booth did not perform a title search, interview past owners, obtain an appraisal, review photographs of the site, or even walk or survey the property to be purchased.

304.  Prior to purchasing the Elmira Site I.D. Booth was not aware of the existence of hazardous substance or other contaminants on the premises, including coal tar.

305.  I.D. Booth used the Elmira Site as a "heavy hardware store" selling nails, horseshoes, pipes, and fittings, in addition to plumbing, heating, and electrical supplies.

306.  NYSEG retained ownership of the northeastern portion of the Elmira Site, and continues to operate an electric substation in that area.

307.  The portion of the Elmira Site purchased by I.D.

Booth is contaminated with MGP waste.

308.  In the mid-1980's, I.D. Booth was notified by NYSEG that it would conduct an investigation into the possible presence of potentially hazardous substances at the Elmira Site, and in that timeframe became aware of the presence of coal tar on the property.

309.   Since that notification I.D. Booth has cooperated with NYSEG in connection with its investigation and has provided access to the property for that purpose.

310.  In the late 1980s, and continuing through the 1990s, discussions occurred between NYSEG and I.D. Booth concerning a trade between the two companies of portions of the Elmira Site in order to facilitate NYSEG's remediation efforts.

311.  In 2003, I.D. Booth conveyed the western portion of the Elmira Site back to NYSEG for $225,000. Specifically, in that transaction I.D. Booth sold NYSEG approximately 2.9 acres, which included "the former MGP site, the large warehouse building and the smaller maintenance shop."

312.  As part of this transaction, NYSEG paid I.D. Booth $17,000 for moving expenses and $6,000 for yard work it had done "to try

91

to fix the parking lot problems which resulted from NYSEG's restoration after the PCB remediation", and I.D. Booth retained the right to lease the building and land as well as the right to purchase the land back after remediation.  This portion of the Elmira Site has MGP residual impacts.

313.  In or around April 2008, NYSEG offered to purchase the Judson Street Extension portion of the site back from I.D. Booth for $25,000. NYSEG proposed that Booth sell back the entire parcel or, in the alternative, just the eastern portion.

314.  I.D. Booth did not accept the offer, and currently owns the Judson Street Extension portion of the Elmira Site.

315.  A portion of the Elmira MGP Site owned by I.D. Booth contains contaminants generated by the MGP operations at the Site.  NYSEG's investigation and remediation of the Elmira MGP Site will include work at the property owned by I.D. Booth.

316.  The Elmira MGP facility operated between 1869 until 1914, and later resumed operation in 1922, producing gas through 1931.[21]  Until 1915, coal gas was manufactured at the Elmira MGP Site by

---

[21]    In its proposed findings, NYSEG asserts that the Elmira MGP was operational until 1947, a date that draws some support from the ROD issued for the site by the DEC in March of 2008.  *See* Exh. P-381.  However, there is no other evidence in the record to support a finding that production at the plant extended

baking coal in a dry retort oven.  When production was restarted at the

facility, the carbureted water gas method of gas production was employed.

317.  During the time of its operation approximately

4,964 million cubic feet of gas was produced at the Elmira MGP facility.

Between 1922 and the close of operations in 1931, 3,743.1 million cubic

feet of gas was produced at the plant.  Approximately 864.8 million cubic

feet of gas was produced at the facility following commencement of

AGECO's domination over the plant's operating utility in May 1, 1929.

b.    Investigation and Remediation

318.  TRC Environmental Consultants, Inc. ("TRC"),

completed Task 1 of its four-part investigation of the Elmira Site for

NYSEG in November 1985, and generated a report of that preliminary site

evaluation on March 21, 1986.

319.  A Task 2 Report was submitted to NYSEG by TRC

on June 18, 1987.

320.  Between 1986 and 1989, a Task 3 field

---

beyond 1931, and even plaintiff's expert, Dr. Karls, has stated that in the later years
leading up to its closure Elmira in all likelihood was on standby and did not actually
report any gas production for those years.  I have therefore selected 1931 as the
appropriate end date for purpose of my calculations.

investigation was conducted at the Elmira Site, a report of which was provided to NYSEG in July of 1990.

321.  In August 1990, TRC presented NYSEG with a Task 4 Report concerning the Elmira Site.

322.  In 2003 and 2004, NYSEG completed an IRM at the Elmira Site, consisting of the removal and disposal of the contents and foundations of former gasholders.  The Work Plan for that project was approved by the DEC.  That IRM was performed to address the threat that the holder foundations, which are bulk storage containers, posed a threat of release of the coal tar contained within them through leakage.

323.  NYSEG undertook another IRM at the Elmira Site in 2003.  That IRM involved demolition of a former gas house located at the site.

324.  During the course of performing the 2003 gas house demolition IRM, NYSEG discovered the presence of purifier waste located at the surface of the ground and on an adjacent property owner's property, creating a threat of actual or potential exposure to nearby human populations.

325.  In 2004, NYSEG undertook an IRM that involved

excavation of the purifier wastes discovered along the southern boundary of the Elmira Site during performance of the 2003 IRM.  The SRI Work Plan for that IRM was approved by the DEC on August 6, 2003.

326.  In January 2006, NYSEG received the combined Final Engineering Report for the gashouse and gasholder IRMs.

327.  Beginning in 2003, NYSEG, through its consultant Blasland, Bouck & Lee, performed an SRI concerning the Elmira Site.  In February 2007, NYSEG submitted the Final SRI report to the DEC, which approved the report on February 28, 2007.

328.  In January 2008, NYSEG submitted an FS for the Elmira Site to the DEC.  The DEC approved the FS on April 8, 2008.

329.  The DEC issued a PRAP for the Elmira Site in March 2008.

330.  The DEC's ROD for the Elmira Site was published in March 2008.

331. The selected remedy at the Elmira Site was the excavation of an oil and tar separator, removal of a concrete pipe, excavation and removal of MGP tar impacted soil, *in situ* solidification/ stabilization of deeper tar impacted oil; oxygen enhancement of

groundwater, and passive coal tar recovery.

332.  In August 2008, the DEC approved a final Remedial Design Work Plan for the Elmira Site.

333.  In February 2010, NYSEG submitted a Pre-Design Investigation Report ("PDI") regarding the Elmira Site to the DEC.  The PDI contains the observation that it was "required to further define the extent of heavily impacted soil that will require excavation and/or ISS treatment."

334.  The DEC approved the PDI on February 25, 2010.

335.  NYSEG incurred a total of $2,986,631.15 in response costs which are now claimed in this action at the Elmira-Madison Avenue Site between 1994 and 2009.

     5.   Geneva-Border City

     a.   Ownership and Operation

336.  The Geneva-Border City Site, which is currently owned by NYSEG, occupies approximately 15 acres of a 100-acre tract of land in Border City, Seneca County, New York.

337.  The Geneva-Border City Site is divided into two areas – the Main Site and the Eastern Waste Disposal Area.

338.  The Geneva-Border City MGP facility began

operating in or about 1901, and was owned at that time by Empire Coke

Company.

339.  In November 1920, Empire Gas & Electric

Company purchased Empire Coke Company.

340.  On December 31, 1936, Empire Gas & Electric

Company merged into NYSEG.

341.  The Geneva-Border City MGP facility produced

manufactured gas from 1901 until 1934.  During the time of its operation

approximately 27,180 million cubic feet of gas was produced at the facility.

Between 1922 and the cessation of production in 1934, 17,997 million

cubic feet of gas was produced at the plant.  8,087 million cubic feet of

gas was produced at the facility after AGECO's dominance of Empire Gas

& Electric Company began on May 1, 1929.

        b.     Investigation and Remediation

342.  In 1985 and 1986, TRC Environmental

Consultants, Inc. ("TRC"), performed a Task 1 investigation at the

Geneva-Border City Site.

343.  TRC began Task 2 work at the site in January of

97

1986.

344.  In early 1986, a sewer line was excavated at or near the Geneva-Border City Site.  In the course of this work, NYSEG performed soil testing and identified coal tar in two locations.

345.  From December 15 through 17, 1987, TRC performed a Task 3 investigation at the Geneva-Border City Site.

346.  That report was followed in 1989 by the preparation by TRC of a Task 4 report regarding the site.

347.   In 1990, Treatek, Inc. conducted a demonstration biotreatment pilot at the Geneva-Border City Site.

348.  In January and February of 1993, NYSEG, through its consultant Blasland, Bouck & Lee, conducted a focused feasibility investigation at the Geneva-Border City Site.

349.  In July 1996, a crush and screen demonstration project work plan was prepared for the site.

350.  Two IRMs have been undertaken at the Geneva-Border City Site.[22]  In 1999, an  IRM was performed to address coal tar uncovered in the course of a paving  project.  That work was properly

---

[22]    In 2000, NYSEG removed a storm drain as part of a construction project, and not as an IRM.

performed as an IRM since the project required disturbance of a subsurface containing coal tar.

351.  Beginning in May 2004, NYSEG performed a second IRM to excavate and dispose of coal tar that had migrated from a tar well to the surface at the western-most portion of the Geneva-Border City Site.  That IRM  addressed coal tar in the soil around the pit, which presented a high risk for human exposure at  the site.  While Dr. Neil Shifrin, FirstEnergy's environmental expert, testified that this work was only partially  qualified for cost recovery, because in his view the "deeper tar" that was removed should have been left for a full remediation, he acknowledged that  removing only a top level of shallow tar could cause the remaining tar simply to rise to the surface  in hot weather.

352.  Removal of the former tar pit and associated soil resulted in that  area of Geneva-Border City Site getting a "no further action" determination in the later-issued ROD.

353.   A Revised RI Report was completed in connection with Geneva-Border City in July 2007.

354.  In December 2008, NYSEG submitted an FS for the Geneva-Border City Site to the DEC.

99

355.  On February 27, 2009, the DEC issued a PRAP for the Geneva-Border City Site.

356.  In March 2009, the DEC issued its ROD for the Geneva-Border City Site.  The remedy prescribed in the ROD includes removal and off-site treatment and disposal of MGP contaminated soils, removal and off-site disposal of a sub-surface vault and its contents as well as several intact purifier waste structures, and groundwater management.

357.  NYSEG and the DEC have agreed that because the Geneva-Border City Site is not a high  priority, remedial design for implementation of the prescribed remedy will not be performed for several years.  This lowered prioritization is due to the fact that the prior tar pit IRM performed at the site in all likelihood removed the main concern area for the site, and because NYSEG owns and controls the site.

358.  NYSEG incurred a total of $2,650,533.93 in response costs which are now claimed in this action at the Geneva-Border Site between 1994 and 2009.

      6.    <u>Goshen</u>

          a.    <u>Ownership and Operation</u>

359.  The Goshen MGP Site consists of a one acre parcel located on West Main Street in the Village of Goshen.

360.  Sometime prior to 1905, A. Van Derwerken Water Gas Works, the prior owner of the facility, conveyed the Goshen Site to the Goshen Gas Light Company.

361.  In approximately 1923, ownership of the site was transferred to the Goshen Illuminating Company.

362.  On August 9, 1928, Federal-New York Company, Inc. acquired the franchises, works, and systems of Goshen Illuminating Company.

363.  On March 14, 1932, NYSEG acquired the assets owned by Federal-New York Company, Inc., including the Goshen MGP, at a foreclosure sale.

364.  Sometime between 1885 and 1889, water gas operations began at the Goshen MGP.  By 1923, the Goshen MGP had transitioned to a coal carbonization process.

365.  By 1948, the Goshen plant had been converted to use in connection with the distribution of natural gas.

366.  The Goshen MGP facility operated beginning from

101

sometime between 1885 and 1889 and ending in 1938.[23]  During the time

of its operation approximately 321.9 million cubic feet of gas was

produced at the Goshen MGP Site.  Between 1922 and the close of

operations in 1938, 188.0 million cubic feet of gas was produced at the

facility.  From the time of AGECO's dominance over Federal-New York

Company, Inc., which began on or prior to December 31, 1929, until

cessation of operations, a total of 106.1 million cubic feet of gas was

produced there.

>        b.      Investigation and Remediation

>        367.  In 1990, NYSEG, through its consultant

Engineering Science, began a Site Screening and Priority Setting System

(SSPS) at the Goshen Site.

>        368.  In 1992 and 1993, NYSEG, through its consultant

Blasland, Bouck & Lee, Inc., conducted a Task 2 investigation at the

Goshen Site.

>        369.  In 2001, NYSEG, through its consultant Blasland,

Bouck & Lee, Inc., submitted to the DEC a Site Characterization and Data

---

[23]      In its proposed findings, NYSEG asserts that Goshen was operational
until 1948.  *See* New York State Electric & Gas Corporation's Proposed Findings of
Fact and Conclusions of Law (Dkt. No. 345) ¶ 4.  This date was not agreed upon in the
parties' stipulation, nor does there appear to be support for it in the record.

Summary that included a compilation of the data gathered during the 1991 and 1993 investigations of the Goshen Site.

370.  In 2008, NYSEG, through its consultant Arcadis of New York, Inc., performed a soil vapor intrusion evaluation of NYSEG's service center building located at the Goshen Site.

371.  In August of 2008, NYSEG submitted a Remedial Investigation Work Plan for the Goshen Site to the DEC.  The DEC approved the work plan in September 2008.  NYSEG commenced the RI work in 2008, and continued that work into 2009.  NYSEG provided the DEC with an RI Data Summary on June 18, 2009.

372.  NYSEG is currently in the  process of preparing an FS for the Goshen Site.

373.  NYSEG incurred a total of $474,406.70 in response costs which are now claimed in this action at the Goshen Site between 1995 and 2009.

       7.    Granville

       a.    Ownership and Operation

374.  The Granville Site is a sixteen-acre tract of land located one-quarter mile north of the Village of Granville, between the

103

Mettowee River and an abandoned railroad right-of-way, approximately 200 feet west of Route 149.

375.  Four areas are under investigation at the Granville Site, including but not limited to the former MGP facility as well as a 1,000-foot reach of the Mettowee River.

376.  From 1903 until 1925, Granville Electric & Gas Company owned and operated the Granville MGP facility.

377.  Records of the AGECO system show that it acquired 1,404 shares of capital stock in Granville Electric & Gas Company from Public Utilities Investing in December 1922.

378.  On March 16, 1925, Granville Electric & Gas Company changed its name to Eastern New York Electric & Gas Company, Inc..

379.  On December 31, 1926, Eastern New York Electric & Gas Company, Inc. merged into Plattsburgh Gas & Electric Company which subsequently adopted the name Eastern New York Electric & Gas Company, Inc.

380.  On December 31, 1928, Eastern New York Electric & Gas Company, Inc. merged into NYSEG.

381.  The Granville MGP facility produced manufactured gas from approximately 1898 to 1946.  During the time of its operation approximately 329.7 million cubic feet of gas was produced at the Granville MGP facility.  Between 1922 and 1940, 160.1 million cubic feet of gas was produced at the plant.  From the earliest point that Granville became a part of the AGECO System in December of 1922 through 1940 a total of 153.4 million cubic feet of gas was produced there.

b.    Investigation and Remediation

382.  In October 1990, NYSEG, through its consultant Engineering Science, began instituting a five-part Site Screening and Priority-Setting System (SSPS) at the Granville Site.  The SSPS Report was finalized in January 1992.

383.  During 1993, NYSEG, through its consultant Blasland, Bouck & Lee, Inc., performed a Task 2 RI at the Granville Site.

384.  In February of 2003, NYSEG, through its consultant Blasland, Bouck & Lee, Inc., submitted to the DEC a Site Characterization and Data Summary that included a compilation of the data gathered during the 1990 and 1993 investigations of the Granville Site.

385.  On August 14, 2008, the DEC approved a

Remedial Investigation Work Plan prepared by ENSR/AECOM, at the

direction of NYSEG, related to the Granville Site.  An addendum to the

Mettowee River Test Boring Work Plan was approved by the DEC on

September 14, 2009.

386.  The RI fieldwork at the Granville Site was

completed in 2009.  A draft report of the RI results was submitted to the

DEC in the Fall of 2010.

387.  NYSEG incurred a total of $709,209.51 in

response costs which are now claimed in this action at the Granville Site

between 1995 and 2009.

      8.    <u>Ithaca - Court Street</u>

      a.    <u>Ownership and Operation</u>

388.  The Ithaca-Court Street Site consists principally of

an approximately two-acre tract of land located in the City of Ithaca,

Tompkins County.  The site also includes a subsurface tar conduit system

beginning at the corner of North Plain and Court Streets and continuing

down Court Street to the former Ithaca Cayuga Inlet MGP Site.

389.  The system of conduits, including wooden ducts

106

and clay pipes, was used to transfer coal tar from the Ithaca-Court Street MGP to the Ithaca Cayuga Inlet Coal Tar Site.[24]

390.   The original Ithaca-Court Street Site comprises the western half of the block bounded by the southern edge of the sidewalk along Esty Street, the eastern edge of the sidewalk along North Plain Street, the northern edge of the sidewalk along West Court Street, and North Albany Street.

391.   The Ithaca Gas Light Company and its corporate successors, including NYSEG, owned and operated the Ithaca-Court Street MGP Site during the entire period of its manufactured gas production operations.

392.   In 1964, NYSEG sold the Court Street property to the Ithaca City School District ("ICSD").

393.   The ICSD rented space in the buildings on the Ithaca-Court Street Site to the Board of Cooperative Educational Services ("BOCES") from 1966 to 1972 for use in conducting industrial workshops.

394.   From 1969 through 1978, the ICSD used the Markles Flats Building, the former gas production building, to house an

_____

[24]     The Cayuga Inlet Site is considered as a separate site from the Court Street Site under the 1994 Consent Order, and is not presently involved in this action.

alternative high school at the Ithaca-Court Street site.

395.   Since 1978, the ICSD has rented space in the Markles Flats Building on the Ithaca-Court Street Site to various non-school tenants and has utilized one room in the building for storage.

396.  In the early 1970s, the City of Ithaca paved a major portion of the Ithaca-Court Street Site for use as a playground and installed an above-ground swimming pool on the site.

397.  Since 1980, the ICSD has used the remaining buildings on the Ithaca-Court Street Site for storage, offices, workshops and vehicle maintenance facilities.

398.  The Ithaca-Court Street MGP facility manufactured gas from 1853 until 1927.  The plant operated as a coal carbonization facility until 1911, at which time a water gas system was added.

399.   During the entire time of its operation the Ithaca-Court Street plant produced a total of 2,165.6 million cubic feet of gas. Between 1922 and the close of operations in 1927, 659.2 million cubic feet of gas was produced at the facility.

b.    Investigation and Remediation

400.  OU-1 of the Ithaca-Court Street Site initially

108

consisted only of the site property, extending to the surrounding

sidewalks, and the wooden ducts.  OU-1 of the Ithaca-Court Street Site

has since been expanded, and now includes both the former MGP

property and the wooden duct that runs beneath West Court Street.

401.  OU-2 of the Ithaca-Court Street Site was initially

defined as encompassing any remnants of the wooden duct that remained

west of Meadow Street, as well as all coal tar (and associated soil and

groundwater) that migrated from the Ithaca-Court Street Site and the

wooden duct.  OU-2 of the Ithaca-Court Street Site now includes wooden

ducts and clay tile pipes that were not previously addressed and any

properties that may have been impacted by the migration of MGP material

from OU-1.

402.  There are four subsurface conduits – two wooden

ducts and two clay pipes – associated with the Ithaca-Court Street Site.

403.  In April 1986, E.C. Jordan prepared a Task 1

Investigation Report for NYSEG regarding the Ithaca-Court Street Site.

404.  In December of 1986, E.C. Jordan submitted a

Task 6 Work Plan to NYSEG.

405.  In February of 1987, E.C. Jordan produced a Task

2 Report for the Ithaca-Court Street Site.

406.  In March of 1988, a Task 3 Report was produced for the Ithaca-Court Street Site.

407.  In March of 1990, E.C. Jordan prepared a Task 4 Report for the Ithaca-Court Street Site.

408.  In October 1990, E.C. Jordan prepared a Work Plan for the Ithaca-Court Street Site for removal of coal tar waste from underground storage vessels at the former MGP facility as an IRM.  That proposed IRM was not undertaken.

409.  On August 30, 1993, OHM Remediation Services Corp. submitted to NYSEG a Work Plan for an IRM at the Ithaca-Court Street Site, consisting of underground vessel investigation and remediation.  That proposed IRM similarly was not undertaken.

410.  In 1995, NYSEG became involved in a New York DOT construction project near the Ithaca-Court  Street Site that had the potential to impact coal tar contaminated soils.  The potential impact upon contaminated soils was an unexpected event, which NYSEG learned of just days before commencement of the project.  NYSEG's work in connection with the project included excavation of soils and removal of a

110

portion of a wooden duct for the  DOT.  NYSEG is not seeking cost recovery with respect to this project.

411.  In March of 2000, as a DEC-approved IRM, NYSEG excavated coal tar and contaminated soil and water associated with two tar wells in close proximity to the Markles Flats Building at the Ithaca-Court Street Site.  In the process NYSEG removed 1,900 gallons of coal tar from the two underground storage tanks and excavated a buried scrubber, tar separator and associated piping encountered during the process.  As part of the project NYSEG also excavated an additional 225 tons of solid material and captured 26,916 gallons of water and liquid tar classified as hazardous waste under the Resource Conservation and Recovery Act ("RCRA")*, 42 U.S.C. § 6901 et seq*.

412.  An RI was completed in connection with the Ithaca-Court Street Site in October of 2002.

413.  In 2002, NYSEG replaced iron natural gas main piping beneath Park Place and North Plain Street in the City of Ithaca.

414.  In April 2003, NYSEG, through its consultant MWH Americas, Inc., submitted an RI Report for OU-1 of the Ithaca-Court Street Site to the DEC.

111

415.  In May of 2003, NYSEG, through its consultant MWH Americas, Inc., submitted a Focused FS Report for OU-1 of the Ithaca-Court Street Site to the DEC.

416.  In June of 2003, the DEC issued a PRAP for OU-1 of the Ithaca-Court Street Site.

417.  In September 2003, the DEC issued a ROD for OU-1 of the Ithaca-Court Street Site.  The remedy selected by the DEC included excavation of the top two feet of soil from the entire site, and excavation and off-site treatment or disposal of all subsurface soil to a depth of eight feet containing unacceptable levels of PAHs or visibly impacted by coal tar, and removal of the subsurface wooden duct along West Court Street from the former plant site to Meadow Street.

418. In April 2007, a Final Engineering Report for OU-1 of the Ithaca-Court Street Site was prepared.

419.  A Remedial Design ("RD") Work Plan for OU-1 was finalized in July of 2007.  The RD describes the removal and disposal of contaminated soils and sub-grade structures associated with the Ithaca-Court Street former MGP, as well as containment measures around the Markles Flats Building.  The DEC approved the RD Work Plan on

112

November 6, 2007.

420.  On September 12, 2008, the DEC approved a

Sediment and Erosion Control Plan for Markles Flats.

421.  On or about September 15, 2008, construction of

the OU-1 remedial design commenced.

422.  Hand-in-hand with removal of the coal tar ducts

associated with OU-1, NYSEG replaced sewer piping owned by the City of

Ithaca.  The costs associated with the replacement of that piping were

paid by the City, and NYSEG does not seek recovery of the cost directly

attributed to the replacement of the sewer piping.

423.  In August 2002, NYSEG, through its consultant

MWH Americas, Inc., prepared an Interim Draft Supplemental RI Report

for OU-2 of the Ithaca-Court Street Site.

424.  In September of 2009, NYSEG, through its

consultant AECOM, prepared an RI Work Plan for OU-2.

425.  A revised RI Report was submitted by the DEC in

August of 2010, and is awaiting approval.

426.  Investigation work is continuing with respect to OU-

2 of the Ithaca-Court Street Site, contemporaneous with commencement

of an FS that was estimated to be completed by August 30, 2010.

427.  In October 2010, NYSEG finalized a Work Plan for an IRM to remove the wooden ducts on West Court Street between Meadow and Fulton Streets.

428.  NYSEG incurred a total of $29,048,258.72 in response costs which are now claimed in this action at the Ithaca-Court Street Site between 1995 and 2009.

> 9.   Ithaca - First Street

> > a.   Ownership and Operation

429.  The Ithaca-First Street Site consists of an approximately three-acre area, situated on an 10.74-acre parcel, located between Third Street and Cascadilla Creek in the City of Ithaca, Tompkins County, New York.

430.  The Ithaca-First Street Site was acquired by NYSEG's predecessor, Ithaca Gas & Electric Corporation, in or prior to 1927.

431.  In 1959, the City of Ithaca purchased the Ithaca-First Street Site from NYSEG to expand and construct a wastewater treatment facility.

114

432.  In connection with the City of Ithaca's purchase, NYSEG leased a portion of the Ithaca-First Street Site back from the City from 1959 through 1969.  The deed evidencing that transaction lists "a total consideration of $88,850, $16,000 of which is to be credited to [the City] and represents rental by [NYSEG] of a portion of the property to be conveyed to [City] for a period of ten years."

433.  The Ithaca-First Street Site is currently owned by three municipalities – the City of Ithaca, the Town of Ithaca, and the Town of Dryden, New York.

434.  The Ithaca-First Street MGP began gas production in 1927, when the Ithaca-Court Street MGP facility closed, and operated until 1932 when it was placed on standby status.  During the time of its operation between 1927 and 1932 a total of 998.3 million cubic feet of gas was produced at the Ithaca-First Street plant.

b.      Investigation and Remedial

435.  In October 1985, E.C. Jordan Co. began a Task 1 investigation of the Ithaca-First Street Site.  A report of that investigation was issued in February of 1986.

436.  Beginning in December 1985, E.C. Jordan Co.

115

performed a Task 2 initial field investigation at the Ithaca-First Street Site.

437.  In December 1987 and January of 1988, E.C. Jordan Co. performed a Task 2 Field Investigation Program Addendum at the Ithaca-First Street Site.

438.  In April of 1990, NYSEG, through its consultant Remediation Technologies, Inc., prepared an evaluation entitled "MGP Site Groundwater POTW Co-Treatment Evaluation" with respect to the Ithaca-First Street Site.

439.  In August 1990, E.C. Jordan Co. completed a Task 4 Risk Assessment in connection with the Ithaca-First Street Site.

440.  Between August 3, 1998 and October 27, 1998, NYSEG performed a Stockpiled Coal Tar Contaminated Soil Removal and Disposal IRM at the Ithaca-First Street Site.  That IRM entailed the removal and disposal of 12,610 tons of stockpiled coal tar soil and debris. The 1998 IRM was performed pursuant to a Work Plan approved by the DEC on July 31, 1998.

441.  FirstEnergy challenges the construction of a nature trail as part of NYSEG's remedial efforts at the Ithaca-First Street Site.  NYSEG undertook this work because it learned that the City of

116

Ithaca was planning a  nature trail, and elevated PAH levels in surface

soils along the proposed trail attributed to MGP contamination needed to

be  addressed before the City could construct the trail in that area.

442.  An RI Work Plan was completed for the Ithaca-

First Street Site on August 24, 2009.

443.  Preparation of an RI and an FS are now both in

process at the Ithaca-First Street Site.  NYSEG typically would wait until

after DEC approval of the RI to begin preparation of an FS; because the

City of Ithaca contemplates construction on the site, however, NYSEG is

undertaking the RI and FS preparation simultaneously.  The DEC has

indicated to NYSEG that it is satisfied with the scope of NYSEG's

investigation.

444.  NYSEG incurred a total of $41,641.43 in response

costs which are now claimed in this action at the Ithaca-First Street Site

between 1994 and 2009.

10.   Mechanicville - Central Avenue

a.   Ownership and Operation

445. The Mechanicville MGP Site is located in the City

of Mechanicville, Saratoga County, New York and covers approximately

117

1.8 acres.

446.  The Mechanicville Site is bordered on the east by North Central Avenue (formerly the Champlain Canal), on the south by Ferris Lane, on the west by a railroad right-of-way, and on the north by the Anthony Kill River.

447.  The Halfmoon Light, Heat and Power Company began gas manufacturing operations at the Mechanicville Site in 1901, and owned the facility until late 1925.[25]

448.  The common stock of Halfmoon Light, Heat and Power Company was acquired principally as a result of a contract executed on April 11, 1924 between Mange and Hopson, for the Associated system, and William L. Howland of Mechanicville, New York.

449.  On December 31, 1925, Eastern New York Electric & Gas Company, Inc. acquired the franchises, works and systems of Halfmoon Light, Heat and Power Company.

450.  On December 31, 1926, Eastern New York Electric

---

[25]      There is conflicting evidence in the record regarding the corporate history at Mechanicville.  One document in evidence reflects that the Mechanicville Electric Light & Gas Company was incorporated on May 26, 1902.  *See* Exh. P-191 at NYS 17581.  That document further reflects that on March 1, 1919 the Mechanicville Electric Light & Gas Company was acquired by Halfmoon Light, Heat and Power Company.  *Id.*

& Gas Company, Inc. merged into the Plattsburgh Gas & Electric

Company, and transferred all of Eastern's franchises, works and systems

into that utility company.  Plattsburgh Gas & Electric Company later

adopted the name Eastern New York Electric & Gas Company, Inc. on

April 4, 1928.

451.  On December 31, 1928, Eastern New York Electric

& Gas Company, Inc. merged into NYSEG.

452.  NYSEG currently owns the Mechanicville Site.

453.  The Mechanicville MGP facility produced

manufactured gas from 1901 until 1954.  During the time of its operation

approximately 1,568.8 million cubic feet of gas was produced at the

Mechanicville plant. Between 1922 and 1940, a total of 630.9 million cubic

feet of gas was produced at the facility.  From the earliest time, according

to the proof at trial, that Mechanicville became a part of the AGECO

system on April 11, 1924 through 1940 a total of 579.5 million cubic feet of

gas was produced there.

b.    Investigation and Remediation

454.  In 1981, NYSEG collected soil samples from the

filter bed area and the gas relief holder foundation at the Mechanicville

119

Site.  A sample from the filter beds reflected that it exceeded the threshold

for the characteristic of re-activity, indicating that the soil should be

considered to be a hazardous waste.

455.  In August 1986, E.C. Jordan Co. prepared a Task

1 Preliminary Site Evaluation Report with respect to the Mechanicville

Site.

456.  In December 1987, E.C. Jordan Co. prepared a

Task 2 Initial Field Investigation Report concerning the Mechanicville MGP

facility.

457.  In September 1989, E.C. Jordan Co. prepared a

Task 3 Report addressing the site.

458.  In August 1990, E.C. Jordan Co. prepared a Task

4 Risk Assessment Report for NYSEG with respect to the Mechanicville

Site.

459.  The results of the four task investigations were

consolidated into a summary document entitled "Investigation of the

Former Coal Gasification Site at Mechanicville, New York; Phase II

Remedial Investigation Report and Work Plan for Phase IIA Supplemental

Remedial Investigation and Feasibility Study," which was in the turn

submitted to the DEC in June of 1992.  Those investigations revealed that

portions of the surface and subsurface soils at the Mechanicville Site are

contaminated with PAHs, cyanide, and VOCs.  In addition, they establish

that the groundwater in the vicinity of the site is contaminated and that

MGP contaminants are migrating into the surface waters of the Anthony

Kill.

460.  In February of 1993, NYSEG entered into an Order

on Consent with the DEC relating to the Mechanicville Site.  That Consent

Order required the preparation of a supplemental RI and the submission

of a report of that investigation to the DEC, together with the concurrent

submission of an FS to consider remedial actions for the elimination, to

"the maximum extent practicable", of all health and environmental

hazardous and potential hazards attributable to the site.

461.  In December of 1993, NYSEG, through its

consultant ABB Environmental Services, Inc., finalized a Phase IIA

Supplemental RI and FS Report for the Mechanicville Site.  The report

summarized the supplemental investigation undertaken at the site

between May and July 1993.

462.  From October 18, 1999 through September 27,

2000, NYSEG performed an IRM at the Mechanicville Site pursuant to a

Work Plan entitled "Interim Remedial Measures Work Plan" that was

approved by the DEC.

463.  That IRM involved 1) removal of the contents of

a gas relief holder foundation; 2) removal of a filter bed; and 3) removal of

all associated piping encountered during excavation.  Overall, a total of

7,264.33 tons of material was removed and either thermally or chemically

treated or placed in a landfill.  The IRM was performed to address coal tar

sheens observed in the Anthony Kill, a river immediately adjacent to the

site.

464.  As part of the IRM a NAPL collection system was

installed on top of the bedrock along the bank of the Anthony Kill.

465.  Between April 2001 and January 2003, NYSEG,

through its consultant URS Corporation, investigated the extent of MGP

related residuals in the bedrock and soil at the Mechanicville Site as part

of an SRI.

466.  During the course of the SRI, a total of 123 soil

borings, eighteen surface soil samples, fifty-six subsurface soil samples,

two samples of NAPL, seven sediment samples from the Anthony Kill, five

122

sediment samples from the Hudson River near the confluence with the

Anthony Kill, and ninety-two groundwater samples were collected.

NYSEG also evaluated the then-current conditions in the Anthony Kill

upstream (both along and downstream of the Mechanicville Site) and the

impacts upon the local fish and wildlife communities.

467.  A report of that SRI was submitted to the DEC and,

after revisions were made, was approved in September 2004.

468.  Between October 2001 and July 18, 2003,

approximately 513 liters of NAPL were recovered from the Mechanicville

Site.

469.  In December of 2005, NYSEG, through its

consultant URS Corporation, submitted a Final FS regarding the

Mechanicville Site to the DEC.

470.  The DEC issued a PRAP for the Mechanicville Site

in February 2006.

471.  In March 2006, the DEC issued its ROD

for the Mechanicville Site.

472.  Under the ROD, the prescribed remedy included

removal and either treatment or off-site disposal of all soil to the top of

123

bedrock containing PAH concentrations greater than five hundred parts per million or soil containing visual tar or NAPL, removal of purifier waste remaining in or near the North Central Avenue embankment, and installation of a NAPL recovery system for the bedrock.

473.  Beginning in July 2008, pre-remediation soil sampling and analysis was undertaken at the Mechanicville Site.

474.  Commencing in October of 2008, NYSEG, through its consultant Sevenson Environmental Services, Inc., excavated over 25,600 tons of material, including the relief holder foundation, below grade structures, and piping.  All soil removed from the Mechanicville Site was sent to ESMI in Fort Edward, New York and thermally treated; approximately 4,787 tons of treated soil was later returned to the site as fill.

475.  A long-term NAPL recovery test is currently underway to determine the extent of recovery of any NAPL presented in the fractured bedrock below the Mechanicville Site.

476.  NYSEG incurred a total of $7,795,809.35 in response costs which are now claimed in this action at the Mechanicville Site between 1993 and 2009.

124

11.   Newark

a.   Ownership and Operation

477.  The Newark Site is located in Newark, New York and is situated west of Route 88 between the New York State Barge Canal and the old railroad grade (north of Water Street) behind the Quality Inn Hotel.

478.  The Newark Site is presently occupied by a Quality Inn hotel and a parking lot, as well as a NYSEG gas regulator building surrounded by open vegetated land.

479.  From 1899 until 1910, Newark (N.Y.) Gas Light & Fuel Company owned the Newark Site.

480.  On June 24, 1910, Newark (N.Y.) Gas Light & Fuel Company merged with the New Light, Heat and Power Company of Newark, NY, the Lyons Gas Light Company, and the Palmyra Gas and Electric Company to form Wayne County Gas & Electric Company (which was incorporated on the same date).

481.  On March 7, 1911, Wayne County Gas & Electric Company was merged into or consolidated with Geneva-Seneca Electric Company to form Central New York Gas & Electric Company.

125

482.  On August 8, 1916, the franchises, works, and systems of Central New York Gas & Electric Company were acquired by Empire Gas & Electric Company.

483.  On December 31, 1936, Empire Gas & Electric Company was merged into NYSEG.

484.  From 1937 until 1974, NYSEG owned the Newark Site.

485.  The Newark facility operated between 1899 and sometime prior to 1929.  The plant originally produced gas utilizing the coal carbonization process, but in about 1917 was converted to a carbureted water gas manufacturing facility.  During the time of its operation approximately 77.7 million cubic feet of gas was produced at the Newark MGP facility.  All of that reported production occurred prior to 1922, and before the earlier of either NYSEG's acquisition of the facility or the onset of AGECO's dominance of Empire Gas & Electric Company on May 1, 1929.

b.    Investigation and Remediation

486.  In 1990, Atlantic Environmental Services, Inc. prepared a site screening report for NYSEG regarding the Newark Site.

126

487.  On April 2 and 3, 2008, NYSEG collected indoor air and sub-slab soil vapor samples at the Quality Inn.  From those samples NYSEG concluded that no vapor intrusion is occurring at the Newark Quality Inn.

488.  In December of 2009, NYSEG, through its consultant Arcadis, presented the DEC with a conceptual work scope for conducting a site characterization at the Newark Site.  Following revision, the Work Plan submission was approved by the DEC on May 25, 2010.

489.  NYSEG incurred a total of $19,596.28 in response costs which are now claimed in this action at the Newark Site between 1997 and 2008.

12.   Norwich

a.   Ownership and Operation

490.  The Norwich Site consists of approximately one acre of land located at 20 Birdsall Street, west of the intersection of Birdsall and Ross Streets.

491.  By 1877 the MGP facility was operated by Norwich Gas Light Company.

492.  From 1892 until 1917, Norwich Illuminating Co.

and/or Norwich Light Co. owned the Norwich Site.

493. Norwich Illuminating Co. later became Norwich Gas & Electric Company. In or about May of 1907 the stock of Norwich Gas & Electric Company was transferred into AGECO.

494. The stock of Norwich Gas & Electric Company was acquired by Ithaca Gas & Electric Company, NYSEG's predecessor, from AGECO in 1916.

495. NYSEG is the current owner of the Norwich Site.

496. The Norwich MGP facility produced gas from approximately 1863 until 1952. During the time of its operation, 1,978.5 million cubic feet of gas was produced at the Norwich MGP facility. Between 1922 and 1940, 793.6 million cubic feet of gas was produced at the plant.

b.    Investigation and Remediation

497. In the fall of 1990, NYSEG, through its consultant Engineering Science, began a five-part Site Screening and Priority-Setting System ("SSPS") at the Norwich Site. The SSPS included a literature and records search, on-site evaluation, a site survey with mapping, sampling and analysis, and preparation of a report. The SSPS Report was finalized

128

in September of 1991.

498.  During January through April of 1992, Engineering-Science conducted a Task 2 investigation of the Norwich Site.

499.  In July 1992, Engineering-Science began Task 3 work at the Norwich Site, leading ultimately to the preparation of a Task 3 Investigation Report for the site in July of 1993.

500.  NYSEG conducted work at the Norwich Site from 1993 through 1997.  Whether this work qualified as an IRM for purposes of cost recovery in this action is a matter of dispute between the parties. For convenience purposes, this work will be referred to as the "Norwich IRM".  NYSEG does not seek recovery of the costs associated with the Norwich IRM in this action.

501.  Phase One of the Norwich IRM commenced in 1993 and ended in the last quarter of 1994, and involved excavation of the former distribution holder area and stockpiling of the soil.

502.  In May 1996, Fluor Daniel GTI, Inc. prepared a Work Plan calling for the transportation of the stockpiled soils at the Norwich Site to the Geneva-Border City Site for processing by means of crushing and screening.

129

503.  The second phase of the Norwich IRM, which was completed in September 1996, involved transporting 1,600 tons of the stockpiled material from the first phase to the Geneva-Border City Site for processing and ultimate destruction at NYSEG's Hickling Station in East Corning, New York.

504.  The final phase of the Norwich IRM, which was completed in August 1997, involved the excavation of several source areas, including the former relief holder, the former tar well, and process piping associated with the former Norwich MGP facility and in the location of the former purifier house.  Phase Three also included the excavation of the top two feet of surface soil throughout the site.  In total, approximately 11,000 to 12,000 tons of soil was excavated and removed; of that amount, 6,800 tons of the soil removed was considered source material.

505.  An AS/SVE system was installed on the north side of the former Aero Products building at the Norwich Site, and was activated on December 17, 1999.  The system initially operated from 1999 until 2001 in order to reduce subsurface VOCs and SVOCs at the Norwich Site.  Due to high continuing groundwater concentrations on the south side of the former Aero Products building, the system was enlarged and

additional AS/SVE wells were installed in 2001.

506.  The third phase of the IRM, which was approved by the DEC, was performed in and prior to August of 1997 due to the anticipated construction of a supermarket to be built immediately adjacent to the site and to avoid the potential for exposure of persons to contamination in the event that remediation occurred later.  That phase of the IRM cost less than $2 million, and took approximately four months to accomplish.

507.  In March of 2004, URS Corporation recommended to NYSEG that the AS/SVE system be shut down, as it was no longer providing any significant contaminant removal.

508.  Beginning in October of 2004, NYSEG, through its consultant Ish, Inc., performed an SRI of the Norwich Site.

509.  During the Summer of 2006, NYSEG demolished the former Aero Products building at the Norwich Site.

510.  In November of 2007, NYSEG, through its consultant Ish, Inc., prepared an FS Report in connection with the Norwich Site.

511.  In February 2008, the DEC issued a PRAP

for the Norwich Site.

512.  In March 2008, the DEC issued a ROD

for the Norwich Site.  In that ROD the DEC directed NYSEG to conduct

ISS of on-site source areas and off-site soils from portions of two adjacent

properties, and to remove and dispose of off-site MGP waste, coal tar, or

contaminated soils meeting specified criteria.  The ROD also directed the

collection of NAPL and highly contaminated groundwater at off-site areas

south of Front Street.

513.  On February 23, 2009, NYSEG, through its

consultant AECOM, submitted a revised Remedial Design Work Plan to

the DEC.  The DEC approved the Remedial Design Work Plan, as

revised, on March 27, 2009.

514.  In July 2009, NYSEG submitted a Remedial

Design 50% Report to the DEC, describing the first of three phases of the

Remedial Design.

515.  NYSEG is currently implementing the planned

remediation at Norwich.

516.  NYSEG incurred a total of $1,835,874.47 in

response costs which are now claimed in this action at the Norwich Site

132

between 1993 and 2009.

       13.   Oneonta

         a.     Ownership and Operation

        517.  The Oneonta Site is a two-acre parcel located in the City of Oneonta, Otsego County, New York, and is comprised of two parcels divided by James Georgeson Avenue.   The portion of the Oneonta Site west of James Georgeson Avenue, referred to as the "western plant area", contained a majority of the former MGP buildings and operations associated with that facility.  The segment of the Oneonta Site situated east of James Georgeson Avenue, referred to as the "eastern plant area", was used primarily to house storage tanks during the final years of MGP operation.

        518.  The land immediately south of the Oneonta Site is known as Damaschke Field, a minor league baseball field complex that has existed since 1937.  Damaschke Field is part of Neawah Park, a public city park.

        519.  From 1881 until 1887, the Oneonta Gas Light Company owned the Oneonta Site.

        520.  In 1887, the Oneonta Gas Light Company merged

into Oneonta Electric Power & Light Company.

521.  Prior to 1916, the stock of Oneonta Light & Power Company was held by J.G. White and Montgomery Clothier & Tyler.

522.  In or about August of 1916, the stock of Oneonta Light & Power Company was acquired by Ithaca Gas & Electric Corporation.

523.  On June 1, 1918, Ithaca Gas & Electric Corporation acquired Oneonta Light & Power Company by merger.

524.  From 1918 until 1966, NYSEG owned the Oneonta Site.

525.  In 1966, NYSEG sold the real property associated with the Oneonta Site to the City of Oneonta, the current owner of the property.

526.  The Oneonta Site produced manufactured gas from approximately 1881 until approximately 1952.  During the time of its operation the Oneonta plant produced 2,478.3 million cubic feet of gas was produced at the facility.  Between 1922 and 1940, at total of 1,043 million cubic feet of gas was produced at the facility.

b.   Investigation and Remediation

134

527.  TRC Environmental Consultants, Inc. ("TRC"), one of NYSEG's consultants, began a Task 1 Preliminary Site Evaluation of the Oneonta Site on April 21, 1986.  The results of that evaluation were set out in a report dated August 20, 1986.

528.  TRC began work on a Task 2 investigation of the site in August 1986.

529.  In November of 1987, NYSEG, through its consultant E.C. Jordan Co., conducted a soil gas survey at the Oneonta Site.

530. TRC completed a Task 3 Report for NYSEG regarding the Oneonta Site on November 28, 1989.

531.  A Task 4 Risk Assessment regarding the Oneonta Site was completed by TRC in early 1990.

532.  In 1990, NYSEG, through its consultant Remediation Technologies, Inc., conducted laboratory treatability testing of site soils from the Oneonta Site.

533.  In July of 1991, NYSEG, through its consultant Atlantic Environmental Services, Inc., summarized for the DEC the previous studies and existing data regarding the Oneonta Site.

534.  In November 1991, NYSEG, through its consultant Remediation Technologies, Inc., issued a report entitled "Evaluation of Remedial Options" regarding the Oneonta Site.

535.  In 1994 or early 1995, NYSEG, through its consultant Atlantic Environmental, conducted a Supplemental Site Investigation of the Oneonta Site as an IRM.  The intent of that measure was to help reduce the amount of groundwater contamination leaving the site by introducing air into the subsurface.  The results of the Supplemental Site Investigation were published in a report dated January 28, 1993.

536.  In March of 1995, NYSEG, through its consultant GT Engineering/Flour Daniel GTI, Inc., installed an air sparging/vapor extraction ("AS/SVE") system at the Oneonta Site.  After initial studies and tests, the system was activated in July 1997, and operated until November 2001.

537.  In February 2001, in reaction to a plan by the City of Oneonta to install a new water line at the Oneonta Site as part of a Neahwa Park Improvement Project, NYSEG proposed a test pit program to the DEC to monitor and sample the soil and air around the proposed

136

waterline installation location.  The DEC approved the proposed test pit program.

538.  In August 2001, NYSEG submitted a Work Plan to the DEC in connection with the Oneonta Site, proposing a source removal IRM to be conducted in October 2001.  The DEC did not approve the proposed IRM Work Plan, which was then withdrawn by NYSEG.[26]

539.  In March 2002, NYSEG submitted to the DEC a draft scope of work proposal for an SRI to be conducted at the Oneonta Site.  NYSEG supplemented the March 2002 scope of work outline with an accelerated groundwater investigation at the Oneonta Site, which was completed in May 2002.

540.  NYSEG, through its consultant Blasland, Bouck & Lee, Inc., submitted an SRI Work Plan regarding the Oneonta Site to the DEC in October 2002.  That revised Work Plan was approved by the agency on or about October 18, 2002.

541.  In November of 2004, NYSEG published a draft

---

[26]   Because the DEC ultimately rejected the August 2001 proposed IRM Work Plan, the expenses associated with the proposal were not presumptively necessary and NCP compliant.  I am unable to determine from the record, however, precisely what portion of the expenses now sought by NYSEG in connection with the Oneonta Site, if any, are directly attributable to the proposal and therefore have not made any reduction in the amount sought based upon the DEC's rejection of the plan.

FS, addressing subsurface source materials, groundwater, and sediments at the Oneonta Site.

542.  The DEC issued a PRAP concerning the Oneonta Site in February 2005.

543.  In March 2005, the DEC issued a ROD for the Oneonta Site.  The remedy prescribed under the ROD included excavation and removal of on-site soils containing tar or elevated levels of PAHs, as well as tar-contaminated sediments in the Mill Race Creek, and the construction of a biosparge system on the outside limits of the MGP site excavation area to accelerate the degradation of MGP-related contaminants in groundwater.  The ROD also prescribed the drilling of a series of tar collection wells to recover tars still present in subsurface areas outside of the MGP excavation region.

544.  On May 5, 2005, NYSEG submitted a Remedial Design Work Plan for the eastern plant area of the Oneonta Site to the DEC.  Between May 2005 and May 2007, NYSEG implemented the portion of the remedy set forth in the ROD for soil and sediment.

545.  In June 2006, the Remedial Action Design for the western plant area off-site disposal of coal tar impacted soil for the

138

Oneonta Site was finalized.  The DEC approved the Remedial Action

Design on June 23, 2006.

546.  In September of 2007, NYSEG, through its

consultant Earth Tech, submitted a Draft Work Plan addendum to the

DEC regarding installation of a permeable wall as part of the eastern plant

area remediation.  The DEC approved the Work Plan on November 28,

2007.

547.  In December 2007, NYSEG completed a draft

Remedial Action Construction Certification Report for removal and off-site

disposal of coal tar impacted soil from both the eastern and western plant

areas of the Oneonta Site.  The report was finalized in May 2008, and was

approved by the DEC on May 12, 2008.

548.  NYSEG finalized a Site Management Plan for the

Oneonta Site in April of 2009; that plan was approved by the DEC.

549.  Remediation is substantially complete at

the Oneonta Site.  An AS/SVE system was constructed at the site, due to

a concern that dissolved phase constituents of coal tar could threaten a

public drinking water well.

550.  The remediation specified in the DEC's ROD for

139

the Oneonta Site impacted portions of a minor league baseball facility located at the site.  The ROD for the site noted that in order to eliminate or mitigate threats to human health or the environment "[m]ost of the on-site buildings [at the site] will be demolished."  The ROD specifically required removal of three buildings associated with the stadium – the souvenir booth, restroom building, and concession stand – because they were situated atop the most heavily contaminated soils and structures.

551.  Because of the high cost of replacing the facility to current minor league standards, NYSEG attempted to convince the DEC to move the excavation line, without success.

552.  During the course of remediation at the Oneonta Site, NYSEG demolished the designated portions of the baseball facility and later replaced them with new buildings, constructed to meet contemporary minor league standards.

553.  NYSEG incurred a total of $14,664,190.45 in response costs which are now claimed in this action at the Oneonta Site between 1994 and 2009.

14.   Owego

a.   Ownership and Operation

140

554.  The Owego Site consists principally of approximately one acre of land configured in a triangular shape and located at the intersection of Erie Street and East Main Street in Owego, New York.  The site also includes portions of the nearby Susquehanna River and a pipe outfall acting as a preferential pathway for the migration of coal tar.

555.  The Owego Gas Light Company acquired the Owego Site from George W. Hollenbeck in 1856.

556.  In December 1923, the Owego Gas Corporation purchased the properties and business of the Owego Gas Light Company.

557.  Some shares of the Owego Gas Corporation were acquired by AGECO prior to May 1, 1929.  Control of Owego Gas Corporation was acquired by AGECO on that date.

558.  On December 31, 1939, the Owego Gas Corporation was merged into NYSEG.

559.  The Owego MGP facility manufactured gas from 1856 until 1935.  During the time of its operation, 481.0 million cubic feet of gas was produced at the Owego MGP facility.  Between 1922 and the close of operations in 1935, a total of 209.2 million cubic feet of gas was

141

produced at the plant.  Between the time of commencement of AGECO's

domination of the Owego Gas Corporation on May 1, 1929, through the

end of production in 1935, a total of 21.1 million cubic feet of gas was

produced at the Owego MGP facility.[27]

b.    <u>Investigation and Remediation</u>

560.  OU-1 of the one-acre Owego Site is located on a

triangular piece of land bordered by East Main Street to the north, the

Conrail railroad tracks to the southwest, and a lumber mill to the east.

561.  In September of 1986, NYSEG, through its

consultant E.C. Jordan Co., conducted a Preliminary Site Evaluation of

the Owego Site, and prepared a Task 1 Report dated October 1986.

562.  In 1987, E.C. Jordan Co. conducted a Task 2 Initial

Field Investigation regarding the Owego Site.

563.  In 1988, E.C. Jordan Co., conducted a Task 4 Risk

Assessment and Evaluation at the Owego Site, and prepared a report of

that investigation in August of 1988.

---

[27]   I have selected the date proposed by NYSEG, May 1, 1929, as the beginning date with respect to AGECO's domination over the Owego Gas Corporation. While, as was previously indicated, some stock of Owego Gas Corporation or its predecessors was transferred into AGECO in 1907, and additionally in 1924, there is no indication that the transfer of those shares resulted in the degree of dominance by AGECO over the corporation that began on May 1, 1929.

564.  E.C. Jordan Co. conducted a Task 3 Supplemental Field Investigation in connection with the Owego Site in 1990.

565.  On or about January 6, 1991, the DEC issued an Order on Consent relating to remediation of the landside portion of the Owego Site.  In that consent order the DEC noted that the Owego Site was listed in the Registry of Inactive Hazardous Waste Disposal as a classification 2 site, presenting a "significant threat to the public health or environment-action required. . ."– a determination with which NYSEG disagreed – and directed the preparation of an SRI and an FS to address the health and environmental potential hazardous attributable to the site.

566.  An IRM was carried out at the Owego Site, with DEC approval, and was completed in November of 1992.  That IRM consisted of the installation of an extraction well in a gasholder and dewatering of the holder foundation, followed by temporary capping of the ground surface overlying the gasholder with an impermeable material.

567.  In January of 1993, NYSEG, through its consultant ABB Environmental Services, Inc., prepared an RI Summary and FS with respect to the Owego Site.

568.  In January 1994, the DEC issued a PRAP

143

for the Owego Site.

569.  In March of 1994, the DEC issued a ROD

for OU-1 of the Owego Site.  Pursuant to the ROD, the Susquehanna

River was defined as OU-2 of the Owego Site.  The remedy prescribed

under that ROD included excavation of surface soil from a majority of the

site to a depth of two feet and excavation of the contents of the

abandoned underground relief holder filled with coal tar wastes.

570.  Between September 12, 1994 and July 1995,

NYSEG, through its consultant Atlantic Environmental Services, Inc.,

performed remedial activities at OU-1 of the Owego Site.  The remediation

included excavation of a below-grade holder, removal of impacted

subsurface soils adjacent to the holder to the depth of groundwater, and

removal of surface soils (from zero to two feet in depth).  As part of the

project, NYSEG shipped the 13,155 tons of soil excavated to the NYSEG

Hickling and/or Jennison power plants for thermal destruction.

571.  Up until the time of remediation of OU-1, there had

been no investigation of coal tar impacts to the Susquehanna River,

located approximately 1,000 feet from the main portion of the site.

572.  In September of 1996, NYSEG, through its

144

consultant Blasland, Bouck & Lee, Inc., began an investigation of the

Susquehanna River to determine what effects, if any, the Owego Site had

or was having on the river.  That investigation included a visual

reconnaissance of the bank down-gradient from the Owego Site and a

temperature gradient survey of the surface water of the river.  Evidence of

coal tar impact on the sediment was observed in the river about fifteen to

eighteen feet from the shoreline and in a limited area, approximately one

foot below non-impacted sediment.  The DEC was notified of the

discovery of coal tar sediments in the river by letter dated October 15,

1996.

573.  In July of 1997, NYSEG prepared a Focused

RI/FS Work Plan to address OU-2 of the Owego Site.

574.  In 1998, while conducting the Focused RI, NYSEG

discovered a pipe in the vicinity of the coal tar deposit.  The pipe outfall

identified appeared to be acting as a preferential pathway for the migration

of coal tar.

575.  From 1998 until 2001, NYSEG, through its

consultant, O'Brien & Gere Engineers, Inc., conducted the Focused RI of

OU-2, and in February of 2002 issued an FS Report for the area.

145

576.  From December 1999 through June of 2001,

NYSEG, through its consultants META Environmental, Inc. and Ish, Inc.,

performed a focused investigation of cyanide in groundwater at the

Owego Site.  The investigation concluded that cyanide in groundwater

presented no significant risk to human health or the environment.

577.  In February 2002, the DEC issued a PRAP

for OU-2.

578.  In March 2002, the DEC issued a ROD

for OU-2.  The remedy specified in the ROD included isolation and

excavation of coal tar contaminated sediments to a minimum depth of one

foot, and deeper where necessary, removal of excavated sediment, and

hydraulic dredging in two small isolated areas of coal tar impacted

sediments.  The ROD also required the removal of approximately 400

linear feet of a former discharge pipeline as well as an evaluation of any

remaining pipe leading back to the former MPG facility.

579.  NYSEG, through its consultant Earth Tech

Northeast, Inc., began the remediation of OU-2 specified in the ROD in

October 2003, and completed the required remediation in November

2003.  All sediment excavated from OU-2 of the Owego Site was disposed

of as RCRA non-hazardous soil at the Ontario County Landfill in Seneca, New York, and a report reflecting the remedial measures performed was approved by the DEC.

580.  NYSEG incurred a total of $1,192,122.76 in response costs which are now claimed in this action at the Owego Site between 1996 and 2009.[28]

15.    Penn Yan-Water Street

a.    Ownership and Operation

581.  The Penn Yan Site consists of 0.815 acres of land located in the Village of Penn Yan, Town of Milo, Yates County, New York. The Penn Yan Site is bordered on the west by Liberty Street and on the east by a granary.  Water Street forms the northern border of the site, and the Keuka Lake Outlet forms the southern boundary.

582.  Industrial activity at the Penn Yan Site began with the H. Tuttle and Son Malt House and Wool Storage.  The Malt House existed until July of 1899, when Penn Yan Gas Light Company purchased the property.

583.  The former coal gasification plant was built on the

---

[28]    NYSEG does not seek recovery in this action of expenses incurred in connection with investigation and remediation at the Owego Site prior to 1996.

Penn Yan Site between 1899 and 1900.

584.  From 1899 until 1926, Penn Yan Gas Light Company owned the Penn Yan Site.

585.  On April 2, 1926, New York Central Electric Corporation acquired the franchises, works, and systems of Penn Yan Gas Light Company.

586.  At some time during 1930 or 1931, New York Central Electric Corporation converted the gas relief holder at the facility into a garage and storage area.

587.  On December 31, 1936, New York Central Electric Corporation was merged into NYSEG.

588.  On August 16, 1943, NYSEG sold the Penn Yan Site to Penn Yan Wine Cellars Inc., but retained a four hundred square foot parcel for use as a gas regulator house.

589.  From 1943 until 1990, Penn Yan Wine Cellars Inc. owned the Penn Yan Site.

590.  In 1990, NYSEG re-purchased the Penn Yan Site, and continues to own the parcel.

591.  The Penn Yan MGP facility operated between

1899 and 1929.  During the time of its operation approximately 317.3 million cubic feet of gas was produced at the Penn Yan MGP facility. Between 1922 and the close of operations in 1929, a total of 126.2 million cubic feet of gas was produced at the plant.  No statistically significant amount of gas was produced at the facility subsequent to commencement of AGECO's dominance over New York Central Electric Corporation on May 1, 1929.

b.    Investigation and Remediation

592.  On August 13, 1986, TRC Environmental Consultants, Inc. ("TRC"), began preparation of a preliminary site investigation of the Penn Yan Site, on behalf of NYSEG, and prepared a Task 1 Final Report of that investigation on December 19, 1986.

593.   TRC performed Task 2 field investigation activities at the Penn Yan Site in November 1986, January, April and July 1987, and May of 1989 on behalf of NYSEG, and issued a Task 2 Final Report on February 21, 1990.

594.  TRC conducted a Task 4 Risk Assessment of the Penn Yan Site in 1990, and issued a Task 4 Final Report in October 1990.

595.  In 1992, NYSEG removed a tar tank and cleaned a

149

tar holder located at the Penn Yan Site.  The DEC was not involved in that project, and NYSEG is not pursing recovery of costs associated with that activity.

596.  NYSEG, through its consultant Geraghty & Miller, Inc., performed a Task 3 Supplemental Investigation and Risk Assessment with respect to the Penn Yan Site in 1994.  A report of that evaluation was generated in June 1994.

597.  In 2008, NYSEG, through its consultant AECOM, performed a Remedial Investigation to obtain data regarding the nature and extent of the MGP-related residues identified at the Penn Yan Site and adjacent areas and to evaluate risks posed to human health and the environment by those residuals.  The DEC approved the draft RI Report on March 19, 2009.  The final RI Report was subsequently approved by the DEC on August 13, 2009.

598.  NYSEG incurred a total of $291,997.00 in response costs which are now claimed in this action at the Penn Yan Site between 1994 and 2009.

16.   Plattsburgh-Saranac Street

a.   Ownership and Operation

599.  The Plattsburgh Site encompasses approximately eleven acres of land located on Saranac Street, in the City of Plattsburgh, Clinton County, New York, and situated on the inside of a bend in the Saranac River, southeast of downtown Plattsburgh.  The Saranac River forms most of the southern, western and northern Plattsburgh Site boundaries.

600.  The Plattsburgh Site is comprised of six separate parcels of land.

601.  In 1890, the Plattsburgh Light Heat & Power Company acquired the first parcel of the site, consisting of 2.20 acres.

602.  In 1901, the Plattsburgh Light Heat & Power Company acquired the second parcel, which is 0.56 acres in size.

603.  On August 14, 1909, the Plattsburgh Light Heat & Power Company was consolidated with Lozier Light and Power Company to form the Plattsburgh Gas & Electric Company.

604.  In 1909, the Plattsburgh Gas & Electric Company acquired the third parcel, consisting of 10.50 acres of land.  As of 1909, Plattsburgh Gas & Electric Company owned parcels one, two, and three, totaling 13.26 acres.

151

605.  In 1924, the Plattsburgh Gas & Electric Company acquired parcel number five.  As of 1924, the Plattsburgh Gas & Electric Company therefore owned parcels one through three and five.

606.  In September of 1924, a contract was executed between George M. Cole and Mange under which Mange agreed to purchase for AGECO the outstanding stock of Plattsburgh Gas & Electric Company.

607.  In 1928, the Plattsburgh Gas & Electric Company acquired the fourth parcel, a piece of land 0.24 acres in size.  As of 1928, the Plattsburgh Gas & Electric Company therefore owned parcels one through five.

608.  In April 4,1928 the Plattsburgh Gas & Electric Company merged with various other companies to form Eastern New York Electric & Gas Company, Inc.  As of 1928, Eastern New York Electric & Gas Company, Inc., thus owned parcels one through five.

609.  In December of 1928, NYSEG acquired the franchises, works and systems of Eastern New York State Electric & Gas Company, Inc.

610.  In 1962, NYSEG conveyed a portion of the

152

Plattsburgh Site to the City of Plattsburgh by quitclaim deed, in exchange for $2,500.00.

611.  In 1966, NYSEG acquired parcel number six, consisting of 0.22 acres of property.

612.  In April of 2008, parcel number one, which at the time was owned by NYSEG, was acquired by the City of Plattsburgh through eminent domain. Parcel number two, which was owned by City of Plattsburgh, was conveyed to NYSEG; and parcel three was listed as still being owned by NYSEG.

613.  Currently, the Plattsburgh Municipal Lighting District ("PMLD") owns the strip of land between NYSEG's property and the Saranac River.  NYSEG owns the remaining portions of the Plattsburgh Site.

614.  The Plattsburgh MGP facility manufactured gas over a period beginning sometime between 1892 and 1896 and ending in 1959 or 1960.  During the time of its operation approximately 4,222.6 million cubic feet of gas was produced at the Plattsburgh MGP facility. Between 1922 and 1940, 1,319.7 million cubic feet of gas was produced at the plant.  Approximately 1,108.4 million cubic feet of gas was produced

there from the earliest discernable point when AGECO began its

domination of Eastern New York Electric & Gas Company, Inc., in

September of 1924, through 1940.

b.     Investigation and Remediation

615.   The Lowe carbureted water gas process was

utilized at the Plattsburgh MGP facility to produce gas throughout its

operational life.

616.  As a result of operations at the Plattsburgh MGP

facility, coal tar was discharged into a lagoon located between Saranac

Street and the Saranac River, across the street from the plant.  That

lagoon was located approximately thirty feet from the Saranac River.

617.  Tar was discharged to the lagoon as a tar/water

emulsion, and this mixture was held in the lagoon to allow the tar to settle

to the bottom.  Once that process was completed, the remaining water

was discharged without further treatment into the Saranac River.

618.  Environmental concerns at the Plattsburgh Site

came to the attention of NYSEG in the 1970s, and of the DEC in mid-

1980.  During that period coal tar was observed reaching the Saranac

River, which was adjacent to the site.  The source of the coal tar was

154

believed to be the existing tar lagoon on the premises, which is separate from the MGP portion of the site and as was previously noted was used for approximately sixty years from the late 1800s until 1960 to store tar.

619.  In 1975, NYSEG, through its consultant Gilbert Associates, Inc., investigated seepage of coal tar into the Saranac River as well as the former tar ponds on the Plattsburgh Site.

620.  In 1979, Acres American Inc. conducted an investigation of the discharge of coal tar into the Saranac River along the northwestern and northern Plattsburgh Site boundaries.  As a result of that investigation Acres American found tar seeping into the Saranac River in several locations along the riverbank.

621.  In December of 1979, NYSEG's consultant, Acres American Inc. prepared a report entitled "Investigation and Development of Solutions to Coal Tar Problem at Plattsburgh Service Center" setting forth nine remedial alternatives developed to address on-site contamination at the Plattsburgh Site.

622.  The DEC and NYSEG ultimately agreed to pursue on-site soil containment and isolation of coal tar to stem further releases into the Saranac River as the selected remedy.

623.  In 1981, NYSEG consented to the entry of an order by the DEC with regard to the Plattsburgh Site (the "1981 Consent Order"), under which NYSEG was to "voluntarily undertake a remedial project that is acceptable to DEC."  Under the 1981 Consent Order NYSEG was directed to take steps to prevent coal tar from reaching the Saranac River from the tar lagoon and to remove coal tar from the river.

624.  In 1981, NYSEG commenced physical on-site construction at the Plattsburgh Site to effectuate the selected remedy, installing a bentonite-soil slurry wall to isolate contamination in the wastewater pond and prevent it from entering the Saranac River.

625.  In 1982, NYSEG excavated coal tar-contaminated riverbed sediment and bank soils from a five hundred foot-long portion of the Saranac River.  The area was backfilled, and the excavated materials were placed into a second containment area abutting the coal tar pond containment to the south.  A bentonite-soil slurry wall was constructed around this containment area, and both containment cells were capped and covered with topsoil.

626.  At the time work was performed by NYSEG under the 1981 Consent Order, the DEC took the position that excavated

materials should not be removed from the site, out of concern that by removing coal tar wastes to another location NYSEG would be creating a second hazardous waste site.

627.  The work performed under the 1981 Consent Order did not involve the area where the former MGP plant was located. While early testing at the Plattsburgh Site, such as that performed by Acres American, Inc., included samples taken from the plant site area, those samples did not reveal any contamination at the time they were taken.

628.  NYSEG constructed a bentonite-concrete slurry wall adjacent to the Saranac River in order to halt further migration of coal tar that had already passed the limits of the bentonite-soil barrier.  A drainage line was installed upgradient of that wall and directed to a holding tank with a manhole cover and a discharge outlet to the Saranac River.

629.  In 1984 and 1985, investigations commissioned by NYSEG at the Plattsburgh Site revealed that the performance and quality of the slurry walls were poor and that the 1981-82 containment remedy had failed to prevent tar migration to the Saranac River.

630.  In the early 1990s, tar was once again reportedly located in the Saranac River.

631.  In September of 1993, NYSEG, through its consultant GEI Consultants, Inc., removed an unknown volume of tar from ponds near the Plattsburgh Site; however, tar re-appeared shortly thereafter.

632.  Between October 1997 and November of 2000, NYSEG conducted multi-task field programs at the Plattsburgh Site.

633.  In August of 2002, NYSEG, through its consultant GEI Consultants, Inc., finalized the Final RI Report for the land side portion of the Plattsburgh Site's OU-1.

634.  Between April 22, 2002 and August 12, 2002, NYSEG carried out an IRM at Plattsburgh Site OU-1 involving the excavation and removal of wastes from three gas holder foundations, coal tar-containing process pipe, and other MGP associated structures, including an area of purifier waste disposal.  A report concerning that work was approved by the DEC in June of 2003.

635.  The work performed as part of the 2002 IRM did not need to be revisited as NYSEG confirmation samples, the taking of

which was observed by the DEC, satisfied the agency that the plant area of the site was remediated.  The availability of that portion of the site then allowed NYSEG to relocate structures from other areas of the site requiring remediation.

636.  In September of 2003, NYSEG, through its consultant GEI Consultants, Inc., prepared a Final Revised FS for OU-1.  That report was approved by the DEC.

637.  The DEC issued a PRAP for OU-1 of the Plattsburgh Site in February 2004.

638.  The DEC issued a ROD for OU-1 on March 31, 2004, selecting "Alternative 3B - Excavation of Source Material, with Stabilization of Perimeter," as the prescribed response.  That remedy included excavation of the former MGP tar lagoon and surrounding areas where coal tar was found to have migrated to the subsurface as well as contaminated sediments and portions of the Saranac River immediately adjacent to the site, and of sub-surface soils in a small area near the Broad Street Bridge across the Saranac River from the MGP site, with excavated contaminated materials to be removed off-site for treatment and/or disposal.

159

639.  In May of 2006, NYSEG, through its consultant URS Corporation, prepared a Remedial Action Design for OU-1 of the Plattsburgh Site.  The DEC approved that Remedial Action Design.

640.  A Work Plan for the remediation of OU-1 was prepared for NYSEG by Earth Tech in June of 2007.

641.  The OU-1 land-side remediation at the Plattsburgh Site was performed between 2006 and 2009.  As part of that work, NYSEG paid the City of Plattsburgh approximately $900,000 to move a substation and associated electrical lines owned by the city's municipal power company and located in the northeast part of the former MGP Site. Additionally, NYSEG relocated a twenty-one inch sewer crossing at the Plattsburgh Site, and realigned a portion of Caroline Street.  The land-side remediation also included construction of a stabilized soil barrier wall and removal of 150,816 tons of soil down to till or bedrock inside the wall.

642.  In September of 2009, NYSEG, through its consultant Arcadis of New York, Inc., prepared a draft Revised Remedial Action Design Report outlining an approach to dewater the Saranac River channel to allow for the excavation of coal tar-containing sediment.

643.  NYSEG has implemented Phase I of a three- year

160

remedial effort with respect to the river, and will be implementing Phase II in 2011.

644.  NYSEG commenced the RI/FS process for OU-2 of the Plattsburgh Site in 1997, and submitted a draft RI Report concerning that operative unit to the DEC on April 13, 2001.

645.  NYSEG performed subsequent remedial investigations at the Plattsburgh Site during the Fall of 2003.  Those investigations involved additional characterization and ecological studies of OU-2, primarily addressing the Cumberland Bay portion.

646.  In April 2004 and December 2005, NYSEG, through its consultant GEI Consultants, Inc., prepared revised RI Reports for OU-2 of the Plattsburgh Site.

647.  In 2007, NYSEG presented FS Reports to the DEC regarding OU-2.

648.  In January 2008, NYSEG submitted to the DEC a Focused Feasibility Study for OU-2, including a study of remedial alternatives ranging in estimated cost from $1.2 million to $125 million.

649.  The DEC is monitoring the OU-1 remedy before it makes a determination of what actions to direct with respect to OU-2.

650.  NYSEG has incurred a total of $29,086,329.86 in response costs which are now claimed in this action at the Plattsburgh Site between 1994 and 2009.

F.    Cost Recovery and Allocation

651.  NYSEG incurred $94,277,153 in costs responding to releases and  threatened releases of hazardous substances at the sixteen MGP sites at issue in this action from 1994 through December 31, 2009, excluding certain costs incurred during that time period but not claimed in this action.   NYSEG expects it to cost an additional $144 million to investigate and  remediate the sites in issue.

652.  Recovery of expenses incurred by a public utility such as NYSEG from ratepayers in New York is governed by the New York PSC.  Under the current NYSEG rate recovery plan approved by the PSC, a fixed portion of rate revenue is placed into a deferral account.  To expend money from that account NYSEG must demonstrate that it has prudently incurred the costs, and the PSC retains the right to review expenditures and determine whether or not they are recoverable.

653.  As a condition of recovering environmental remedial costs from ratepayers, NYSEG is required to pursue cost

162

recovery from other potentially responsible parties as well as insurance companies, where appropriate.  If NYSEG recovers money from other potentially responsible parties or insurance  companies, that money ultimately inures to the benefit of NYSEG's customers, and not to NYSEG itself.

654.   NYSEG has recovered $20 million in insurance proceeds based upon its remediation efforts at MGP sites.  That payment was made to cover the costs of remediating all thirty-eight known NYSEG MGP sites, as well as any additional sites discovered  in the future.  Under the settlement which resulted in that payment, all third party property damage claims against the settling insurer were extinguished.  There is no evidence that an allocation of the settlement amount was made as between the various specific sites.

655.   For allocation purposes, the quantity of gas produced at each MGP facility provides a reasonable measure for use in apportioning liability, since the amount of gas produced or generated by an MGP facility is roughly proportional to the amount of tar and other hazardous waste generated and leaked into sub-surfaces and groundwater at each site.

II.   PROCEDURAL HISTORY

NYSEG commenced this action on April 8, 2003.  Since its inception the matter has had a rich procedural history, due in no small part to the evolution of CERCLA caselaw, particularly as it relates to the interplay between § 113(f) and § 107(a) claims asserted by one party responsible under CERCLA for the costs of remediating a hazardous waste site against another potentially liable party.[29]

Following the Supreme Court's issuance of its decision in *United States v. Atlantic Research Corp.,* 551 U.S. 128, 127 S. Ct. 2331 (2007), signaling the availability of a cause of action under § 107(a) to a party having voluntarily remediated a hazardous waste site against other potentially responsible parties, and a subsequent remand of the matter to this court by the United States Court of Appeals for the Second Circuit with instructions to permit NYSEG to amend its complaint to assert a § 107(a)(4)(b) claim for cost recovery, NYSEG filed a second amended complaint on July 3, 2009.  Dkt. No. 165.  NYSEG's most recent pleading asserts a single cause of action under that section, and requests

---

[29]     Because most of the procedural history of the case is only marginally relevant to the issues now before the court, I have abbreviated the recitation to include only those details necessary to place discussion of my findings in context.

reimbursement of past costs and a declaration of its entitlement to recover

a proportionate, equitable share of future costs of remediating twenty-four

MGP sites.  Dkt. No. 165.  In response to plaintiff's complaint, *inter alia*,

FirstEnergy counterclaimed for contribution pursuant to § 113(f), and in

addition, with leave of the court, *see* Dkt. No. 183, joined I.D. Booth, the

ICSD, the City of Ithaca ("Ithaca"), and the City of Oneonta ("Oneonta"),

current owners of a portion of the Cortland-Homer Site (I.D. Booth), a

portion of the Elmira-Madison Avenue Site (I.D. Booth), the Ithaca-Court

Street Site (ICSD), the Ithaca-First Street Site (Ithaca) and the Oneonta

Site (Oneonta), as third-party defendants, asserting claims against them

for contribution under § 113(f).[30]

Following completion of additional discovery conducted subsequent

to the Second Circuit's remand, seven motions for complete or partial

summary judgment were filed by the parties.[31]  Dkt. Nos. 224, 225, 232,

233, 236, 237, and 238.  Those motions were decided partly by oral

---

[30]     Prior to trial FirstEnergy resolved its third-party claims against Ithaca, the ICSD, and Oneonta, leaving only I.D. Booth as a third-party defendant.  *See* Dkt. Nos. 263, 296 and 304.

[31]     The additional discovery was necessitated, in part, by virtue of the fact that while the parties originally contemplated trying the case only with regard to six test sites, the scope of the trial was later expanded to encompass all twenty-four sites although, as was previously observed, only sixteen now remain in play.

decision rendered at the time of argument and memorialized in a subsequent short form order, Dkt. No. 258, and in connection with one motion by written decision and order dated November 5, 2010.  Dkt. No. 266.  By virtue of those determinations, 1) NYSEG's motions for summary judgment on the question of NCP compliance and, based upon the *RG&E* decision, seeking to preclude FirstEnergy from relitigating the veil-piercing issues decided in that case were denied; 2) FirstEnergy's motion for partial judgment finding that it was not responsible as an owner of any of the facilities in issue between 1906 and 1922 was granted; 3) FirstEnergy's motion for summary judgment dismissing portions of NYSEG's claims on the basis of statute of limitations and finding that it was not an operator of any of the sixteen facilities in issue between 1906 and 1922, nor was there any basis to find liability on the part of FirstEnergy during the post-bankruptcy period from 1940 to 1942, was denied; 4) FirstEnergy's motion seeking a determination that no reasonable factfinder could conclude that there was a basis to pierce the NYSEG corporate veil prior to 1922 was denied; and 5) motions of Ithaca and Oneonta for dismissal of FirstEnergy's third-party claims based upon the third-party defense and/or innocent landowner defense were denied.

The claims and defenses in this case were tried to the court beginning on December 6, 2010.  Since the close of evidence the parties have submitted proposed findings of fact and conclusions of law, and oral argument was heard on May 9, 2011 with regard to the issues presented.

III.   DISCUSSION

A.   CERCLA Liability Generally

Prompted by the notorious Love Canal disaster, Congress enacted CERCLA in 1980 as a broad, remedial statute to address the environmental and health risks presented by industrial pollution.[32]  *United States v. Bestfoods*, 524 U.S. 51, 55, 118 S. Ct. 1876, 1881 (1998). Unfortunately, CERCLA is generally regarded as anything but a model of clarity; "CERCLA, which was hastily enacted on the eve of the lame-duck session of the 96th Congressional term, is known neither for its concinnity nor its brevity".  *W.R. Grace & Co.-Conn. v. Zotos Int'l, Inc.,* 559 F.3d 85, 88 (2d Cir. 2009) (citations omitted); *see also Carson Harbor Vill., Ltd. v.*

---

[32]      The history of Love Canal, which involved the dumping of toxic waste in an abandoned canal near Niagara Falls in the late 1930s or early 1940s by Hooker Chemical Company, resulting in pervasive human health consequences, is recounted in both the legislative history of CERCLA and an article authored by Michael H. Brown entitled *Love Canal and the Poisoning of America*, published in the ATLANTIC MONTHLY, Dec. 1979 at 33.  *See Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.,* 596 F.3d 112, 120 n.5 (2d Cir. 2010).

167

*Unocal Corp.*, 270 F.3d 863, 883 (9th Cir. 2001) (en banc) ("[c]learly, neither a logician nor a grammarian will find comfort in the world of CERCLA."), *cert. denied*, 535 U.S. 971, 122 S. Ct. 1437 (2002).  To make matters worse, given the circumstances surrounding the passage of CERCLA there is an unfortunate dearth of legislative history to aid courts in gleaning Congressional intent and interpreting the Act's provisions. *Carson Harbor Vill.*, 270 F.3d at 885 (observing that "[a]ny inquiry into CERCLA's legislative history is somewhat of a snark hunt.").  In light of its inartful drafting many of the controlling provisions of CERCLA have mystified the courts, resulting in extended confusion and controversy regarding the statute's key provisions, including over the interplay between the various provisions permitting recovery of hazardous waste response costs.  *New York v. Solvent Chem. Co., Inc.,* 685 F. Supp. 2d 357, 422 (W.D.N.Y. 2010).

Despite the statute's shortcomings, courts have attributed two primary goals to CERCLA, including to 1) encourage timely cleanup of hazardous waste sites, and 2) assign the cost of such cleanups to those responsible for creating or maintaining the hazardous conditions presented.  *Id.*  (citing, *inter alia, Consol. Edison v. UGI Utils. Inc.,* 423

F.3d 90, 94 (2d Cir. 2005)).  As the Second Circuit has noted:

> CERCLA is a remedial statute; it reaches as
> far back into the past as necessary to identify both
> the hazardous wastes present at a site and those
> responsible for them under the statute.  The logic
> is straightforward and simple – Congress wanted
> owners and polluters to identify and clean-up all
> the hazardous waste they discover.  To further this
> goal, Congress made past and present owners,
> and others, liable for the hazardous materials they
> contributed.

*Niagara Mohawk Power Corp.,* 596 F.3d at 130.  In light of its remedial

nature, CERCLA's provisions are construed liberally in order to give effect

to those twin objectives giving rise to its enactment.  *See, e.g., Prisco v. A*

*& D Carting Corp.,* 168 F.3d 593, 602 (2d Cir. 1999) (citing *Schiavone v.*

*Pearce*, 79 F.3d 248, 253 (2d Cir. 1996)); *see also B.F. Goodrich Co. v.*

*Murtha,* 958 F.2d 1192, 1198 (2d Cir. 1992).

To fulfill its manifest purposes, CERCLA imposes strict liability on

four categories of covered parties, on occasion referred to as "potentially

responsible parties" or "PRPs"; as is relevant to this case, those parties

potentially exposed to strict liability under the Act include 1) the present

owner and operator of the facility in question, and 2) a person who at the

time of disposal of any hazardous substance owned or operated it.  42

U.S.C. § 9607(a); *see Niagara Mohawk Power Corp.,* 596 F.3d at 121,

n.6; *Bedford Affiliates v. Sills*, 156 F.3d 416, 423 (2d Cir. 1998), *overruled on other grounds by W.R. Grace & Co.-Conn.,* 559 F.3d 85; *B.F. Goodrich v. Betkoski,* 99 F.3d 505, 514 (2d Cir. 1996).  The Act also provides for a limited number of defenses available to a PRP.  In keeping with the strict liability imposed upon PRPs under CERCLA and its broad remedial reach, those available defenses, which are set forth in § 107(b), are subject to narrow construction.  *United States v. Honeywell Int'l, Inc.,* 542 F. Supp. 2d 1188, 1199 (E.D. Cal. 2008) (citing *Lincoln Prop., Ltd. v. Higgins,* 823 F. Supp. 1528, 1537, 1539 (E.D. Cal. 1992)).

CERCLA affords a right of recovery to those who have incurred expenses in responding to releases of hazardous substances under three distinct provisions:  §§ 107(a), 113(f)(1) and 113(f)(3)(B).  *United States v. Atl. Research Corp.,* 551 U.S. 128, 138-39, 127 S. Ct. 2331, 2337-39 (2007); *Niagara Mohawk Power Corp.,* 596 F.3d at 120-21.  Although the imprecise drafting of CERCLA has led the courts down a tortured path in attempting to reconcile the two sections, it is now clear that under CERCLA's statutory scheme § 107(a), one of the Act's original provisions, and § 113, which was added through the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), Pub. L. No. 99-499, 100 Stat.

1613, *see Atl. Research Corp.*, 551 U.S. at 131-32, 127 S. Ct. at 2333-34,

apply in distinctly different settings.  *Niagara Mohawk Power Corp.*, 596

F.3d at 120-21; *W.R. Grace & Co.-Conn.,* 559 F.3d at 89.  Section 107(a)

permits a party that has incurred necessary environmental response costs

consistent with the NCP to seek reimbursement for those costs from any

other PRP.  *W.R. Grace & Co.-Conn.,* 559 F.3d at 89.  Under § 113(f)(1) a

PRP that has been sued and exposed to cost recovery liability under §

107(a) may seek contribution from any PRP, including the plaintiff.  *Id.*

Section 113(f)(3)(B) confers a right of contribution upon a PRP that has

settled its CERCLA liability with a state or the United States through either

an administrative or judicially approved settlement.  *Id.*

     The parties appear to be in agreement that NYSEG's claims in this

action arise under § 107(a)(4)(B) of CERCLA.   Although this was less

than clear prior to 2004, in its decision in *Cooper Industries, Inc. v. Aviall

Services, Inc.,* the Supreme Court squarely held that a party may assert a

contribution claim under § 113(f)(1) only if that party itself has been sued

civilly for cost recovery.  543 U.S. 157, 166-68, 125 S. Ct. 577, 583-84

(2004).  Because NYSEG was not subject to such a suit prior to

commencement of this action, it is foreclosed from asserting a contribution

171

claim under § 113(f)(1) against FirstEnergy.[33]

Section 107(a)(4) permits a PRP that has incurred removal or remedial costs associated with hazardous materials to recover those costs.  To establish liability for response costs under § 107(a) a plaintiff must prove that 1) the defendant is a PRP; 2) the site in question is a facility;[34] 3) there was a release or threatened release of hazardous

---

[33]    I have considered whether under the circumstances now presented NYSEG could also present a cognizable claim under § 113(f)(3)(B).  Under that section a "person who has resolved its liability to the United States or a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement may seek contribution from any person who is not a party to a settlement. . .." 42 U.S.C. § 9613(f)(3)(B).  The 1994 Consent Order issued by the DEC provides, in relevant part, as follows:

> A.    Nothing contained in this Order shall be construed as barring, diminishing, adjudicating, or in any way affecting any of the Department's [DEC] rights.
>
> B.    Nothing contained in this Order shall be construed to prohibit the Commissioner or his duly authorized representative from exercising any summary abatement powers.

Exh. P-0006 at p. 18.  The consent order did not explicitly release NYSEG from CERCLA liability, nor did it indicate that any completed portions of NYSEG's remedial activities at the covered sites would resolve its liability to the State.  Moreover, the language of the 1994 Consent Order allows the DEC to retain all of its inherent authority to address hazardous waste.  The controlling DEC Consent Order is therefore akin to the agreements found in other cases to allow for the possibility that the DEC could hold those parties liable under CERCLA, including the voluntary clean-up agreement in *Consolidated Edison,* 423 F.3d at 96-97, and the consent order in *W.R. Grace & Co.-Conn.,* 559 F.3d at 91, thus precluding assertion of a claim under § 113(f)(3)(B).  *See Niagara Mohawk Power Corp.*, 596 F.3d at 124-25.

[34]    Under CERCLA a facility is defined to mean, *inter alia*, "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; . . .".  42 U.S.C. § 9601(9)(B).

172

substances at the facility; 4) the plaintiff incurred costs in responding to

the release or threatened release; and 5) the costs and corresponding

response actions were both necessary and in substantial conformity with

the NCP.  *Murtha,* 958 F.2d at 1198; *United States v. Alcan Aluminum*

*Corp.,* 990 F.2d 711, 719-20 (2d Cir. 1993); *see also Niagara Mohawk*

*Power Corp.,* 596 F.3d at 130; *Schenectady Indus. Corp. v. Upstate*

*Textiles, Inc.,* 689 F. Supp. 2d 282, 293 (N.D.N.Y. 2010) (citing *Murtha,*

958 F.2d at 1198).

    Generally speaking, § 107(a) provides for joint and several liability

among PRPs; under that section one PRP can be potentially responsible

for the entire amount expended to remove or remediate hazardous

materials.  *Niagara Mohawk Power Corp.,* 596 F.3d at 121 (citing

*Schaefer v. Town of Victor*, 457 F.3d 188, 195 (2d Cir. 2006)).  This does

not mean, however, that there is no apportionment to be made between

PRPs under section 107(a).  A PRP may avoid joint and several liability by

proving that the harm caused by that party is distinct from the harm

caused by other PRPs and additionally "proffer[ing] a reasonable basis for

determining the proportional contribution . . . . to what may be conceived

of as a single harm at each site."  *United States v. Alcan Aluminum*, 315

173

F.3d 179, 186 (2d Cir. 2003), *cert. denied,* 540 U.S. 1103, 124 S. Ct. 1039 (2004).  The Second Circuit has observed that factors such as the "relative toxicity, migratory potential, degree of migration, and synergistic capacit[y]"of the hazardous substances at issue are potentially relevant to establishing divisibility of harm.[35]  *Id.* (quoting *Alcan Aluminum Corp.*, 990 F.2d at 722) (alteration in original).

The debate regarding the joint and several nature of the liability imposed under § 107(a) is purely academic in this case.   A party such as FirstEnergy that is sued for cost recovery under § 107(a) is permitted under CERCLA to counterclaim for contribution under § 113(f)(1).  *Atl.*

---

[35]      In *Burlington Northern & Santa Fe Ry. Co. v. United States*, the Supreme Court delineated the analysis to be employed when apportioning liability under § 107(a) based upon divisibility of harm. ___ U.S. ___, 129 S. Ct. 1870 (2009).  In that case the Court cited, with approval, "[t]he seminal opinion on the subject of apportionment in CERCLA actions," penned by the Chief Judge of the United States District Court for the Southern District of Ohio, Carl Rubin, in *United States v. Chem-Dyne Corp.*, 572 F. Supp. 802 (S.D. Ohio 1983). *Id.* at 1880. As Judge Rubin wrote, the fact that CERCLA imposes a "strict liability standard" does not mean it mandates "joint and several" liability in every case. *Id.* (quoting *Chem-Dyne Corp.*, 572 F. Supp. at 805-07). Rather, Judge Rubin reasoned that "Congress intended the scope of liability to 'be determined from traditional and evolving principles of common law[.]'" *Id.* (quoting *Chem-Dyne Corp.*, 572 F.Supp at 808) (alteration in original).  It should be noted that the Supreme Court indicated that "[e]quitable considerations [applicable to allocation under § 113(f)] play no role in the apportionment analysis; rather, apportionment is proper only when the evidence supports the divisibility of the damages jointly caused by the PRPs." *Burlington N. & Santa Fe Ry. Co.,* 129 S. Ct. at 1882 n.9.

*Research Corp.,* 551 U.S. at 140, 127 S. Ct. at 2339; *Niagara Mohawk*

*Power Corp.,* 596 F.3d at 121.  FirstEnergy has asserted such a

counterclaim, effectively converting the action into one for apportionment

of liability.  *Niagara Mohawk Power Corp.,* 596 F.3d at 121, n.8; *see also*

*Consol. Edison,* 423 F.3d at 100 n.9.

Addressing the issue of contribution, "§113(f) provides: 'Any person

may seek contribution from any other person who is liable or potentially

liable under [§ 107(a)]. . ..   In resolving contribution claims, the court may

allocate response costs among liable parties using such equitable factors

as the court determines are appropriate.'" *Goodrich Corp. v. Town of*

*Middlebury*, 311 F.3d 154, 168 (2d Cir. 2002) (citing and quoting 42

U.S.C. § 9613(f)(1)), *cert. denied*, 539 U.S. 937, 123 S. Ct. 2577 (2003).

"Thus, the statute envisions a two-part inquiry: First, the court must

determine whether the defendant is 'liable' under CERCLA § 107(a);

Second, the court must allocate response costs among liable parties in an

equitable manner."  *Id.* (citing *Kalamazoo River Study Grp. v. Menasha*

*Corp.*, 228 F.3d 648, 656-57 (6th Cir. 2000)). "The party seeking

contribution bears the burden of proof at both prongs of the court's

inquiry." *Id.*

175

B.    Summary of NYSEG Claims and FirstEnergy Defenses

NYSEG maintains that after coming to the realization that the retired

MGP facilities in issue, as well as others within its portfolio, carry with

them a legacy of hazardous waste releases, including coal tar – which

only came to be appreciated as a hazardous substance in the late 1980s

or early 1990s – it responsibly undertook a program of considered and

prudent investigation and remediation of the MGP sites in cooperation

with the DEC, an agency whose policies regarding MGP remediation were

in the formative stages when the task of surveying the sites was

undertaken.  That process led to careful and exhaustive investigations,

and responses conducted both as IRMs, with DEC approval, and pursuant

to RODs issued by that agency detailing more complete remedial plans.

NYSEG contends that its actions were responsible, necessary, and NCP

compliant, and that it is entitled to recover an equitable portion of those

costs from FirstEnergy based upon AGECO's roles at the various facilities

and FirstEnergy's succession to AGECO's liabilities.

At trial, FirstEnergy raised a host of issues in defense of NYSEG's

claim of liability under CERCLA.  FirstEnergy maintains that recovery of

certain of the costs sought is precluded based upon the governing statute

176

of limitations under CERCLA.  FirstEnergy further asserts that many of the

costs incurred by NYSEG were either unnecessary or not in substantial

compliance with the NCP or, in some instances, both.  Relatedly, in

reliance upon one of its experts, Dr. Neil Shifrin, FirstEnergy argues that

contamination at the former MGP sites should have been addressed by

NYSEG much more expeditiously, and at times when remediation would

have been far less expensive, and that FirstEnergy should not bear any

increased costs associated with the delays.

One of the main focuses of the proof at trial was upon whether

AGECO, as FirstEnergy's predecessor, is properly considered as a

covered person for purposes of CERCLA and specifically whether, at

times when hazardous wastes were released, it was an owner or operator

of the MGP facilities in question.  NYSEG's claims in this action relate

back to periods of time when the MGP facilities in issue were owned by its

various corporate predecessors, including the Ithaca Gas Light Company,

all of which eventually came under the control of AGECO.  Plaintiff urges

two alternative bases for attributing CERCLA liability to FirstEnergy

resulting from releases that occurred at those facilities, one in which its

liability is direct as an actual owner or operator of the plants in issue, and

177

the other dependent on a finding of derivative liability under a corporate veil-piercing theory.

To support its claim of direct liability, NYSEG exhorts the court to find that while it may not have owned the facilities in question, AGECO in fact operated them, either itself or through management contracts with third parties properly regarded as agents of AGECO, during all or portions of the periods of their MGP production.  In the event that it does not succeed in establishing defendant's direct liability under CERCLA, NYSEG nonetheless maintains that there are grounds on which liability under CERCLA can be derivatively assigned to FirstEnergy.  NYSEG argues that based upon the control exercised by AGECO over its subsidiary utility companies, the court is justified in piercing the corporate veil of NYSEG and the other utility companies that owned the various MGP facilities in dispute and attributing their actions as the owners and/or operators of hazardous waste sites to AGECO as the parent corporation.

FirstEnergy counters that it is not directly liable either as an owner or as an operator of any of the sixteen facilities in question.  FirstEnergy further contends that the record does not provide a basis to pierce the corporate veil of Ithaca Gas Light Company and the other utility

178

companies held by AGECO at any time, and particularly for the period

prior to 1922, when Hopson acquired control of AGECO, and after 1940,

when AGECO filed for bankruptcy protection.[36]

>     C.     Analysis of FirstEnergy's Liability Under CERCLA

In order to prevail on its cost recovery claim in this action, NYSEG

must establish that FirstEnergy is a covered person under CERCLA.[37]  In

this case, resolution of that issue hinges upon whether FirstEnergy can be

properly regarded either as an owner or an operator of the facilities in

question when the hazardous discharges occurred.  *See Yankee Gas*

*Servs. Co.,* 2011 WL 1395260, at *1-2.  Regrettably, CERCLA provides

little guidance concerning this element, unhelpfully defining the phrase

"owner or operator" as "any person owning or operating" a facility.

*Bestfood*s, 524 U.S. at 66, 118 S. Ct. at 1887 (citing 42 U.S.C. §

9601(20)(A)(ii)).  Fortunately, as will be seen, intervening case law since

the enactment of CERCLA has helped immensely to bring into focus the

intended meaning of these terms, particularly the somewhat elusive

---

[36]     *In RG&E* FirstEnergy's counterpart, defendant GPU, Inc., maintained the
New York law prohibits self-piercing of a subsidiary's corporate veil to reach a parent
corporation.  That argument was found to be without merit in that case, *see Rochester
Gas & Electric*, 355 Fed. Appx. at 551, and is rejected in this case for similar reasons.

[37]     As a corporation, FirstEnergy meets the definition of "person" for
purposes of CERCLA.  *See* 42 U.S.C. § 9601(21).

concept of operating a facility.

NYSEG urges the court to find that AGECO itself was either an owner or an operator, or both, with regard to the MGP sites in question at times when hazardous waste was discharged, and that as AGECO's successor FirstEnergy is therefore liable to pay its proportionate share of the qualified response costs incurred at the sites in question. Alternatively, NYSEG maintains that FirstEnergy may properly be held indirectly liable by virtue of a theory in which NYSEG's corporate veil, and the corporate veils of other related utility operating and holding companies owning and operating the MGP plants in issue at the relevant times, are pierced to reach AGECO, the ultimate parent corporation.

### 1.    Direct Owner Liability

Among the theories under which FirstEnergy could be liable to NYSEG for cost recovery is as the successor to an owner of the sites at a time of discharge of a hazardous substance.  Liability of FirstEnergy for disposal of hazardous substances at the MGP facilities under this theory depends, in the first instance, upon whether AGECO actually held title to any of those facilities.  *Ceramicas Industriales, S.A. v. Metro. Life Ins.*, *Co.*, No. 08 Civ 5114, 2009 WL 331262, at *3 (S.D.N.Y. Feb. 11, 2009).

180

No evidence was adduced by NYSEG at trial to show that AGECO formally held title to any of the MGP facilities in question. Accordingly, FirstEnergy does not bear direct liability as an owner of any of the facilities in question during the relevant time periods.

## 2.    Direct Operator Liability

FirstEnergy could also bear direct liability in this case if it can properly be regarded as the successor to an operator of a facility at a time of hazardous waste discharge. Analysis of the liability of AGECO, as a parent corporation, under a direct operator liability theory for the actions of its subsidiary utility operating companies under CERCLA implicates two potentially competing considerations. On the one hand, for purposes of 42 U.S.C. § 9607(a)(2) the term "operator" is broadly defined. *See Bestfoods,* 524 U.S. at 65-66, 118 S. Ct. 1886; *Niagara Mohawk Power Corp.,* 596 F.3d at 135. Offsetting that principle is the equally well-established tenet that a parent corporation is ordinarily not liable for the acts of its subsidiary, notwithstanding that it controls the subsidiary through stock ownership and the prerogatives that flow from that control. *Bestfoods*, 524 U.S. at 61, 118 S. Ct. 1876 ("it is a general principle of corporate law deeply 'ingrained in our economic and legal systems' that a

181

parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries.") (citations omitted).

In a situation in which a parent company actually operates a facility owned by its subsidiary, and at which hazardous substances are released, it is unnecessary to look beyond the corporate structure; under such circumstances the parent is properly regarded as a direct participant in a CERCLA violation.  *Id.* at 64-67, 118 S. Ct. at 1876-87.  As the Supreme Court has explained,

> [u]nder the plain language of the statute, any person who operates a polluting facility is directly liable for the costs of cleaning up the pollution. See 42 U.S.C. § 9607(a)(2).  This is so regardless of whether that person is the facility's owner, the owner's parent corporation or business partner, or even a saboteur who sneaks into the facility at night to discharge its poisons out of malice.  If any such act of operating a corporate subsidiary's facility is done on behalf of a parent corporation, the existence of the parent-subsidiary relationship under state corporate law is simply irrelevant to the issue of direct liability.

*Bestfoods,* 524 U.S. at 65, 118 S. Ct. at 1886 (citations omitted).

For purposes of conducting the direct operator analysis, the focus is upon the relationship between the parent and the facility, rather than the

182

parent and the subsidiary corporation.  *See id.* at 66-67, 118 S. Ct. at

1887; *see also AMW Materials Testing, Inc. v. Town of Babylon*, 584 F.3d

436, 443-44 (2d Cir. 2009); *City of New York v. N.Y. Cross Harbor R.R.*

*Terminal Corp.*, No. 98CV7227ARRRML, 2006 WL 140555, at *5

(E.D.N.Y. Jan. 17, 2006).  Significantly, in *Bestfoods* the Court

meticulously distinguished between a parent's oversight of its subsidiary

and operation of the subsidiary's facility, stressing that "[t]he question is

not whether the parent operates the subsidiary, but rather whether it

operates the facility, and that operation is evidenced by participation in the

activities of the facility, not the subsidiary."  *Bestfoods,* 524 U.S. at 68, 118

S. Ct. at 1876.  As the district court in *Yankee Gas Services* noted,

"control of the subsidiary, if it is extensive enough, may give rise to indirect

liability via piercing of the corporate veil, but it does not give rise to direct

liability as an operator under CERCLA."  *Yankee Gas Servs. Co.,* 616 F.

Supp. 2d at 241.

In *Bestfoods* the Supreme Court went on to clarify that "[u]nder

CERCLA, an operator is simply someone who directs the workings of,

manages, or conducts the affairs of a facility."  *Bestfoods,* 524 U.S. at 66-

67, 118 S. Ct. at 1887; *see also Atlanta Gas Light Co. v. UGI Utils. Inc.,*

No. 3:03-CV-614-J-20MMH, 2005 WL 5660476, at *6 (M.D. Fla. Mar. 22,

2005).  To be considered an operator within the context of CERCLA, a

party "must manage, direct, or conduct operations specifically related to

pollution, that is, operations having to do with the leakage or disposal of

hazardous waste, or decisions about compliance with environmental

regulations."  *Bestfoods*, 524 U.S. at 66-67, 118 S. Ct. at 1887; *see also*

*Niagara Mohawk Power Corp.,* 596 F.3d at 135.  Under a theory of direct

operator liability, CERCLA responsibility can be established if an agent of

the parent corporation manages or directs activities at the facility.[38]  *In re*

*Harper Holdings,* 398 B.R. 736, 751 (S.D.N.Y. 2008) (citing *Bestfoods,*

524 U.S. at 71, 118 S. Ct. at 1889); *Atlanta Gas Light,* 2005 WL 5660476,

at *7.

Turning to the facts of this case and applying these guiding

principles, I note initially the existence of various service agreements

conferring responsibility at some level for operation of the AGECO utility

---

[38]     When addressing direct operator liability it is important to note that for
purposes of CERCLA there can be more than one operator of a facility at any given
time.  *Browning-Ferris Indus. of Illinois, Inc. v. Ter Maat,* 13 F. Supp. 2d 756, 765 (N.D.
Ill. 1998) ("Nothing in CERCLA, or the case law interpreting it, prohibits a  finding of
more than one operator liable for a site."), *rev'd on other grounds,* 195 F.3d 953 (7th
Cir. 1999); *see also United States v. B.C.F. Oil Ref., Inc.,* No. CV-05-0562; 2007 WL
81933, at *4 (E.D.N.Y. Jan. 9, 2007) (citing *Geraghty and Miller, Inc. v. Conoco Inc.,*
234 F.3d 917, 928 (5th Cir. 2000)).

companies, including NYSEG and its predecessors, upon service

companies such as W.S. Barstow & Co. and J.G. White & Co., Inc., and,

in one instance, AGECO itself.  There is also some evidence to suggest

an affiliation between the principals of AGECO and those two other

service companies.  Additionally, as NYSEG argues, the avowed purpose

for the formation of AGECO was to bring together the various subsidiary

operating companies "under one common control and management."  *See*

Exh. P-171, at NYS 05839.

Yet, despite CERCLA's broad reach and entitlement to generous

construction, courts do not lightly disregard corporate structure.

*Bestfoods*, 524 U.S. at 61, 118 S. Ct. at 1884.  In this instance, neither the

evidence related to AGECO's operation of the subsidiary utility

companies, particularly in the years between 1906 and 1922, nor the use

of the service agreements, reveal the type of management and control

over polluting activities envisioned by *Bestfoods* as necessary to support a

finding of direct operator liability.  *See Yankee Gas Servs. Co.*, 616 F.

Supp. 2d at 253-56.  While AGECO, either directly or through its service

companies, undeniably maintained some oversight with respect to the

operations of the utility companies within the AGECO system, each MGP

185

facility retained its own superintendent on site who was responsible for the day-to-day activities, and there is no evidence that the superintendent reported to and was controlled by AGECO and the service companies, as distinct from the corporate management and board of directors of NYSEG and those of other subsidiary utility companies.

In *Bestfoods*, the Supreme Court noted three circumstances under which a parent company could be held liable as a direct operator of a subsidiary's facilities, including 1) "when the parent operates the facility in the stead of its subsidiary or alongside of the subsidiary in some sort of a joint venture"; 2) under circumstances "when a dual officer or director departs so far from the norms of parental influence"; and 3) when "an agent of a parent with no hat to wear but the parent's hat . . . manage[s] or direct[s the] activities at the facility." *Bestfoods,* 524 U.S. at 71, 118 S. Ct. at 1889; *see also Yankee Gas Servs. Co.,* 616 F. Supp. 2d at 242. Considering these potential scenarios, the court has been presented with no evidence in this case that would support disregarding the corporate structures and attributing actions of such companies as W.S. Barstow & Co. and J.G. White & Co., Inc. to AGECO.

Clearly, during the period in question, and in particular between

186

1922 and 1940, AGECO exercised a high degree of control over its

subsidiary utility operating companies.  That AGECO took affirmative

actions to monitor and control the activities of its subsidiaries, including to

arrange for such service agreements, however, is not inconsistent with the

prerogatives enjoyed by AGECO as a parent corporation seeking to

closely monitor the activities of its subsidiary, and does not provide a

basis to disregard corporate boundaries.  *Yankee Gas Servs. Co.*, 616 F.

Supp. 2d at 246.

Even assuming the service agreements at issue could be viewed as

authorizing AGECO to provide services to its subsidiaries, as in fact the

five-year agreement between NYSEG and AGECO in evidence did,

stipulating that AGECO was retained to provide such services as general

operator and financial manager of NYSEG's properties, those agreements

do not link AGECO, as the parent corporation, directly to release of

hazardous substances, and do not specifically relate to "operations having

to do with the leakage or disposal of hazardous waste, or decisions about

compliance with environmental regulations."[39]  *Bestfoods,* 524 U.S. at 66-

---

[39]     On January 8, 1926, a written agreement was entered into between
NYSEG and AGECO under which AGECO was retained for a period of five years to
provide services as general operator and financial manager of NYSEG's properties.
That agreement authorized AGECO "to plan, and to direct and supervise the carrying

67.

In sum, I find that the evidence adduced at trial reflects that throughout the entire period of their operations each of the MGP facilities in question was overseen by a supervisor employed by the utility company operating the facility, and under whose control day-to-day operations of the facility remained.  Simply stated, the evidence does not support a finding that AGECO's actions directed to the facilities in question alone are "eccentric, or contrary to the ordinary corporate norms as recognized in *Bestfoods*" such as to support a finding of direct operator liability. *Yankee Gas Servs. Co.,* 616 F. Supp. 2d at 245.

### 3. Indirect Liability as an Owner and/or Operator

While not liable as a direct owner or operator of any of the sites in dispute, FirstEnergy could nonetheless still be responsible for an equitable share of response costs incurred by NYSEG at the various sites as the corporate successor to an owner and/or operator under an indirect theory

---

out of, financial and operating programs of [NYSEG]", and specified that in doing so the authority was conferred upon AGECO to hire employees and to direct their activities.  While at first blush that agreement appears to cover all of NYSEG's properties including its MGP sites, it goes on to define the properties covered to "include the properties of any corporation engaged in the generation and/or distribution for supply of electric energy, now or hereafter controlled by [NYSEG]"; accordingly, that agreement does not appear to confer authority on AGECO to operate MGP sites, and therefore does not support the finding of direct liability under *Bestfoods*.

188

of liability.  Such a theory looks beyond the formalities of corporate

structure and in narrow circumstances, guided by governing legal

principles, permits veil-piercing to reach beyond a subsidiary to its

shareholders, including a parent corporation holding its stock.  *See*

*Ceramicas Industriales, S.A.,* 2009 WL 331262, at *3.

　　　In contrast to direct operator liability, the question of indirect liability

in a parent-subsidiary setting centers upon the relationship between the

two corporations.  The analysis of indirect liability must commence with

recognition of the fundamental tenet of corporate law, including in New

York, that a parent corporation and its subsidiary corporation are distinct

legal entities, and that ordinarily liability on the part of the parent

corporation cannot be found premised solely upon its ownership of a

controlling interest in the subsidiary.  *Pfohl Bros. Landfill Site Steering*

*Comm. v. Allied Waste Sys., Inc.,* 255 F. Supp. 2d 134, 160-61 (W.D.N.Y.

2003) (citing *Billy v. Consol. Mach. Tool Corp.,* 51 N.Y.2d 152, 432

N.Y.S.2d 879 (1980)).  Under both New York law and CERCLA, such

corporate boundaries are not lightly cast aside.  *See Yankee Gas Servs.*

*Co.,* 616 F. Supp. 2d at 243-44; *Pfohl Bros. Landfill*, 255 F. Supp. 2d at

179 (citing *Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l, Inc.,* 2

189

F.3d 24, 26 (2d Cir. 1993)); *Gorrill v. Icelandair/Flugleidir*, 761 F.2d 847,

853 (2d Cir. 1985).

Despite these firmly entrenched principles, a parent corporation can

be held derivatively liable under CERCLA for the acts of its subsidiary if,

under governing law, consideration of the relevant factors warrants

piercing the subsidiary's corporate veil.  *See Bestfoods,* 524 U.S. at 63-

64, 118 S. Ct. at 1885-86.  The Court in *Bestfoods* noted that as an

exception to the general rule requiring respect for the corporate form is

the

> equally fundamental principle of corporate law, applicable to
> the parent-subsidiary relationship as well as generally, that the
> corporate veil may be pierced and the shareholder held liable
> for the corporation's conduct when, *inter alia*, the corporate
> form would otherwise be misused to accomplish certain
> wrongful purposes, most notably fraud, on the shareholder's
> behalf.

*Bestfoods,* 524 U.S. at 62, 118 S. Ct. at 1885 (citations omitted).

In *Bestfoods* the Supreme Court made it clear that as an alternative

basis for finding liability on the part of a parent for the environmental sins

of its subsidiaries a court could conclude, applying relevant controlling

corporate principles, that the corporate veil of the subsidiary should be

pierced in order to permit a finding of liability against the parent company.

190

*Bestfoods,* 524 U.S. at 65, 118 S. Ct. at 1886.  NYSEG urges this as an

alternative basis for the finding of liability on the part of FirstEnergy,

advancing, at least in part, an alter ego theory.

The veil-piercing theory alternatively espoused by NYSEG raises

several issues upon which, unfortunately, there is a paucity of clear

authority.  A certain degree of confusion results from NYSEG's somewhat

indiscriminate use of the terms "veil-piercing" and "alter ego".  To be sure,

it seems that "[t]he phrases 'piercing the corporate veil' and 'alter ego

liability' generally are used interchangeably for the purposes of New York

law." *In re Parmalat Sec. Litig.,* 375 F. Supp. 2d 278, 291 n.74 (S.D.N.Y.

2005) (citing *Wm. Passalacqua Builders, Inc. v. Resnick Developers S.,*

*Inc.*, 933 F.2d 131, 138 (2d Cir. 1991)); *In re M/V Rickmers Genoa Litig.,*

622 F. Supp. 2d 56, 76 n.9  (S.D.N.Y. 2009) (*citing Passalacqua* for the

proposition that "under *New York law*, the piercing the corporate veil and

alter-ego theories are 'indistinguishable.' ") (emphasis in original).

Another element of uncertainty results from the question of whether

New York or federal common law applies when determining whether to

pierce a corporate veil in the context of CERCLA liability, an issue not

addressed by either party.  In *Bestfoods* the Supreme Court side-stepped

the issue, specifically noting "[s]ignificant disagreement among courts and commentators over whether, in enforcing CERCLA's indirect liability, courts should borrow state law, or instead apply a federal common law of veil-piercing."  *Bestfoods*, 524 U.S. at 63, n.9, 118 S. Ct. at 1886 n.9. The Second Circuit likewise has yet to definitively stake out a position regarding the issue, though signaling in *State of New York v. Nat'l Serv. Indus., Inc.*, 460 F.3d 201 (2d Cir. 2006), that it would not necessarily displace state common law in favor of federal common law.  When presented with the question in *National Service Industries, Inc.,* the court concluded that it need not decide the choice of law issue because the result in the case before it would be the same whether it applied state law or a national rule derived from traditional common law principles.  *Id.* at 203.  In doing so, the court paused to observe that "[t]he choice of law question is a complicated one that has led our sister circuits to reach different answers[,]" *id.* at 207, and that application of the three-part test emanating from the Supreme Court's decision in *United States v. Kimbell Foods, Inc.* would "appear to favor the absorption (non-displacement) of state law."[40]  *Id.* at 208.

---

[40]    Under the test enunciated in *Kimbell Foods,* 440 U.S. 715, 727, 99 S. Ct. 1448 (1979), a court determining whether it should adopt a nationwide federal rule, or

To yet further complicate matters, courts within this circuit seem to disagree as to whether New York and federal common law standards for piercing the corporate veil materially differ.  *Compare Holborn Oil Trading Ltd.*, 774 F. Supp. 840, 844 (S.D.N.Y 1991) (stating that "[a] comparison of the standards for piercing the veil under New York and federal common law thus reveals that the two standards converge . . .. ") *with Status Int'l S.A. v. M&D Mar.*, 994 F. Supp. 182, 186 n.4 (S.D.N.Y. 1998) ("The prerequisites for proving an alter ego theory under New York law have since been revised to require a showing of *both* (I) domination and control, *and* (ii) use of domination to commit fraud or a wrong injuring the party seeking to pierce the corporate veil[,]" whereas federal common law requires one or the other.) (emphasis in original).  Some more recent authorities seem to suggest a divergence between New York and federal common law, with New York law being regarded as more restrictive and requiring domination and control to commit a wrong and federal law

---

"apply traditional common law" over state law must consider,

> (1) whether the federal program, by its very nature, requires uniformity;
> (2) whether application of state law would frustrate specific objectives of
> the federal program; and (3) whether application of a uniform federal rule
> would disrupt existing commercial relationships based on state law.

*Nat'l Serv. Indus., Inc.*, 460 F.3d at 207 (citations omitted).

requiring only that the "a corporation dominated and disregarded its subsidiary's corporate form such that it was actually carrying on the subsidiary's business." *See Ceramicas Industriales*, *S.A.,* 2009 WL 331262, at *3; *see also* Stephen B. Presser, FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS § 3.4 ("The federal common law of veil-piercing in the Second Circuit has, on occasion, gone beyond the limits to which the doctrine is normally restricted under state common law, particularly that of New York, a fairly conservative veil-piercing jurisdiction.") .  On the other hand, two very recent decisions in the CERLCA arena suggest otherwise. *See Rochester Gas & Electric,* 335 Fed. App'x 547, 550 n.3; *see also Frontier Commc'ns Corp. v. Barrett Paving Materials, Inc.,* No. 1:07-CV-00113-GZS, 2010 WL 4193054, at *8 (D. Me. Oct. 19, 2010) (finding no "critical distinction between state and federal law" when applying a veil-piercing analysis.).  In this instance, both NYSEG and FirstEnergy have asked the court to apply the law of New York regarding veil-piercing, which the court finds appropriate.[41]

In *Passalacqua*, the seminal and often-cited veil-piercing case in the

---

[41]     Consistent with this position, the court's research suggests that the recent trend in case law is to apply New York common law and has uncovered no case in which liability was premised solely upon a parent's domination of a subsidiary without requiring proof that the domination was used to commit a fraud or a wrong.

Second Circuit, the court "pointed out that under, New York law, where the corporation is essentially an alter ego of [its owner], the veil may be pierced." *Statharos v. N.Y. Taxi and Limousine*, 198 F.3d 317, 324 (2d Cir. 1999) (citing *Passalacqua*, 933 F.2d at 138). The inquiry as to whether the corporate distinction should be disregarded in any given circumstance is intensely fact specific.

Liability may be imposed under an alter ego or corporate veil-piercing theory, and the parent-subsidiary relationship distinction overlooked, where a plaintiff shows that 1) the parent corporation dominates the subsidiary in such a way as to make it a "mere instrumentality" of the parent, 2) the parent company exploits its control to commit a fraud or other wrong, and 3) the plaintiff suffers an unjust loss or injury as a result of the fraud or wrong. *Passalacqua,* 933 F.2d at 138 (citations omitted). In considering the first prong, examining the degree of domination, courts look to what are commonly referred to as the ten *Passalacqua* factors. *Two Kids From Queens, Inc. v. J & S Kidswear, Inc., R.B.K.*, No. 09-3690, 2010 WL 475319, at *3 (E.D.N.Y. Feb. 8, 2010). The second prong " 'may be satisfied either upon a showing of fraud, or upon complete control . . . that leads to a wrong against third

parties.' " *Id.* (quoting *D. Klein & Son Inc. v. Good Decision, Inc.*, 147 Fed. App'x 195, 198 (2d Cir. Feb. 15, 2005) (summary order)).  In the context now presented, where liability under CERCLA is sought to be assigned to FirstEnergy's predecessor on a veil-piercing theory, this test requires that the parent corporation's domination led to the contamination that triggered CERCLA liability.  *Bedford Affiliates*, 156 F.3d at 431-32 (citing, *inter alia*, *Am. Fuel Corp. v. Utah Energy Dev. Co.,* 122 F.3d 130, 134 (2d Cir. 1997)).

The *Passalacqua* factors that are considered as tending to show that a subsidiary is a dominated corporation include,

> (1)    the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, *i.e.,* issuance of stock, election of directors, keeping of corporate records and the like,
>
> (2)    inadequate capitalization,
>
> (3)    whether funds are put in and taken out of the corporation for personal rather than corporate purposes,
>
> (4)    overlap in ownership, officers, directors, and personnel,
>
> (5)    common office space, address and telephone numbers of corporate entities,

(6)    the amount of business discretion displayed by the allegedly dominated corporation,

(7)    whether the related corporations deal with the dominated corporation at arms length,

(8)    whether the corporations are treated as independent profit centers,

(9)    the payment or guarantee of debts of the dominated corporation by other corporations in the group, and

(10)  whether the corporation in question had property that was used by other of the corporations as if it were its own.

*Passalacqua*, 933 F.2d at 139 (citations omitted).  These ten factors are not exhaustive, and their application to any particular situation is flexible; there is no requirement that a certain number of factors be present in any given case.  *Marketplace LaGuardia Ltd. P'ship v. Harkey Enters., Inc.*, No. 07-CV-1003, 2008 WL 905188, at *4 (E.D.N.Y. 2008) (citing *William Wrigley Jr. Co. v. Waters*, 890 F.2d 594, 600-01 (2d Cir. 1989)) (other citation omitted).  Instead, these factors are liberally applied, considering the totality of circumstances and recognizing that an "infinite variety of situations. . .might warrant disregarding the corporate form" in order to achieve equity.  *Passalacqua*, 933 F.2d at 139.

For purposes of the veil-piercing analysis, there are three distinct

197

relevant time periods involved in this action, including 1) beginning in 1906, when AGECO was formed and shortly thereafter acquired a controlling interest in NYSEG's predecessor, Ithaca Gas Light Company, and ending in 1922, when Hopson came into power with the parent company; 2) from 1922 until the filing of a petition seeking bankruptcy protection in 1940; and 3) the period between 1940 and 1942, when the record firmly discloses that all control of NYSEG's facilities had been clearly wrested from AGECO. [42]

a.    Pre-1922

Analysis of the relationship between AGECO and the various successor utility companies to NYSEG during the pre-1922 era fails to support a basis to invoke the extraordinary remedy of veil-piercing.  While it is true that AGECO was formed for the manifest purpose of orchestrating common ownership and management of the various subsidiary companies comprising its portfolio, and did carry out general oversight by exercising its prerogative as a parent corporation, there is no evidence of its abuse of that position during the 1906 to 1922 period.

_____

[42]    FirstEnergy's motion for summary judgment dismissing plaintiff's cost recovery claims related to the period between July 1942 and 1946 was granted in October of 2004.  *See* Dkt. No. 66.

Corporate formalities of the Ithaca Gas Light Company and the various other predecessor corporations to NYSEG were honored, and regular board of directors and annual shareholder meetings appear to have been conducted during that period.  While certain of the operations of the utility operating companies were contracted out through service companies affiliated loosely with AGECO, there is no evidence that prior to 1922 the service agreements were abusive or utilized to exact exorbitant fees siphoned off from the operating companies.

I note further that no evidence of inadequate capitalization of the various utility companies held by AGECO was presented concerning the 1906 through 1922 period.  While there was undeniably some overlap in the identity of directors of AGECO and its various subsidiary operating companies during this period, the evidence shows that corporate separateness was maintained, and there is no evidence that the parent and subsidiary corporations did not deal with each other on an arms length basis.  The presumption in corporate law when there are overlapping officers or directors is that a director with dual loyalties is acting solely on behalf of the interests of the corporation on the board of which he or she sits when serving as a director of that particular company.

*Bestfoods*, 524 U.S. at 69, 118 S. Ct. at 1888.

Having carefully reviewed the limited available evidence related to the period between 1906 and 1922, I find no basis to pierce the corporate veil of NYSEG and its predecessor companies to assign liability to AGECO for discharges occurring during that period.

b.    <u>1922-1940</u>

Analysis of the corporate relationship between AGECO and both NYSEG and the other operating companies within the AGECO Empire covering the period between 1922 and 1940, and whether that relationship should give rise to corporate veil-piercing, presents a close question.  It is entirely true, as Judge Jonathan Feldman concluded in *RG&E,* that abuses by Hopson and his cronies of the AGECO system during the period between 1922 and 1940 were both legion and well-documented, and that during that period Hopson siphoned off large sums of money to finance his own personal ventures and interests.  *See Rochester Gas & Electric,* slip op. at 61-65.  While this may provide a basis for piercing the AGECO corporate veil to assign its liabilities to Hopson, standing alone it does not provide a basis to reach down the corporate chain and pierce the NYSEG veil in order to reach AGECO.  For this, more is required.

200

Careful consideration of the *Passalacqua* factors in the context of the relationship between AGECO and its affiliated operating utility companies nonetheless convinces me that NYSEG has satisfied its burden and established that veil-piercing should occur.  My findings of fact reveal that while some corporate formalities were honored during the 1922-1940 time period, many were not.  While each of the utility companies had its own board of directors, Hopson exerted a great deal of control and leverage over the directors of the subsidiary companies by holding their undated, signed resignations in hand.  It is true, as Professor Torchio concluded, that evidence of inadequate capitalization of NYSEG during the period in question is weak, at best, a factor which potentially distinguishes this case from *RG&E.*  It is equally true, however, when examining the third relevant factor, that funds were transferred in and out of AGECO and its subsidiary corporations at the whim of Hopson, and that the various subsidiary corporations were treated as "mere pockets" of AGECO.

Addressing the next grouping of factors, it is clear that there was substantial overlap in ownership, officers and directors, and personnel of AGECO and its subsidiary operating companies, and that in large part

201

AGECO corporate offices were utilized for director and shareholder meetings of the subsidiaries.  It is equally apparent that AGECO and NYSEG did not deal with each other as corporations at arms length and that very little business discretion of NYSEG and other AGECO subsidiary corporations was demonstrated during that time period.  Additionally, there is evidence that AGECO loaned money to NYSEG during the relevant time period, and guaranteed debts by others to NYSEG.

Considering the evidence as a whole, particularly given the abuses inherent in the pyramidal structure through which the AGECO system was operated as well as Hopson's complete dominance of that structure during the 1922-1940 timeframe, it seems clear that the two corporations, AGECO and NYSEG, became "so inextricably confused that it is impossible or impractical to identify the corporation that participated in the [conduct] attacked."  *Two Kids from Queens, Inc.,* 2010 WL 475319, at *3 (quoting *D. Klein & Son, Inc.,* 147 Fed. App'x at 197).  Put differently, given AGECO's domination, the actions of NYSEG became the actions of AGECO, thus establishing a "direct nexus" between AGECO's domination and the operation of the MGP facilities, which resulted in the contamination at issue.  *See Rochester Gas & Electric Corp.*, slip op. at

202

68.  For these reasons, I conclude that under the circumstances equity requires piercing of the NYSEG corporate veil as well as the other operating companies within the AGECO Empire and ultimately folded into NYSEG.  Accordingly, AGECO should properly be regarded as having indirect liability as an owner and operator of the MGP facilities in question during the times between 1922 and 1940 when AGECO acquired domination and control over the various subsidiary operating utility companies owning those facilities.

Painting with overly broad brush strokes, NYSEG seems to contend that AGECO's liability with regard to facilities owned and operated by NYSEG and its sister operating companies should extend back to the date on which veil-piercing is first found to be appropriate, regardless of when the facility in question was actually acquired by NYSEG or the respective other subsidiary.  In other words, the court having now concluded that veil-piercing is warranted commencing in 1922, NYSEG maintains that FirstEnergy bears liability for all hazardous substances deposited dating back to that time, even in the case of facilities not falling under AGECO control until later.  Not surprisingly, considering the recognized confusion in this area of law, the precise contours of NYSEG's argument in this

regard are not entirely clear; it seems this contention is premised upon an expansive application of the alter ego theory, or principles of successor liability, or perhaps a combination of both.

At the outset, NYSEG's assertion fails under CERCLA, which imposes liability upon a former owner or operator "*who at the time of disposal* of any hazardous substances owned or operated any facility of which such hazardous substances were disposed of. . ."  42 U.S.C. § 9607(a)(2) (emphasis added).  As a result, for the period between 1922 and 1940 FirstEnergy can only be held liable for environmental contamination that actually occurred at a time when each facility was actually owned or operated by NYSEG or the other AGECO affiliate whose corporate veil is subject to piercing.

To the extent that NYSEG urges the court to conclude that once NYSEG's corporate veil is pierced AGECO, as the parent corporation, becomes the company's "alter ego" and succeeds to all of its liabilities, I reject this position as an unduly broad application of the alter ego theory.[43]

---

[43]    Insofar as NYSEG's argument invites the court to apply federal common law over New York common law, I decline to do so for the reasons stated above.  *See* pp. 191-94, *ante.*

NYSEG has cited no authority supporting its sweeping proposition.[44]  To

the contrary, case law is consistent in holding that the alter ego theory

requires that the domination of the subsidiary led to the commission of a

wrong against the plaintiff which proximately caused its injuries.  *See, e.g.*

*Waterville Inv., Inc. v. Homeland Sec. Network, Inc.*, No. 08-CV-3433,

2010 WL 2695287, at *8 (E.D.N.Y. Jul. 2, 2010) (citing and quoting *Am.*

*Protein Corp. v. AB Volvo*, 844 F.2d 56, 60 (2d Cir. 1998) (parenthetical

omitted); *Bedford Affiliates*, 156 F.3d at 431; *Passalacqua*, 933 F.2d at

138.  Accordingly, veil-piercing is an equitable doctrine specific to the

wrong perpetrated through corporate domination, exposing the parent only

to liability based upon the particular wrong committed by the subsidiary

under the influence of the dominant parent corporation.  *See Morris v.*

*N.Y. Dep't of Taxation and Fins.,* 82 N.Y.2d 135, 142-43, 603 N.Y.S.2d

--------

[44]      Each of the three cases upon which it relies as support for its position in
this regard is readily distinguishable.  NYSEG cites *Comm'r of Internal Revenue v.*
*White's Estate*, a 1944 decision of the Second Circuit that had nothing to do with
piercing a corporate veil; the only mention of the term "alter ego" in that case is in a
footnote to a dissenting opinion, in which it is merely noted that that phrase is
frequently used when a court holds a parent company liable for the debts or torts of its
subsidiary.  144 F.2d 1019, 1022 n.2 (2d Cir. 1944) (Frank, J. dissenting).  The other
two cases relied upon, *Martinez v. Plaza Prospect Apt., Inc.*, 25 A.D.3d (1st Dept'
2006) and *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.,* 98 F.3d 13 (2d
Cir. 1996), are equally inapposite.  In each of these cases, the courts disregarded the
corporate form to hold third party corporations (and in *Martin* an individual owner)
responsible for a related entity's breach of contract.

807 (1993).

Finally, NYSEG also seems to argue that AGECO is liable for all of NYSEG's liabilities that were incurred beginning in 1922 because it forced five mergers into NYSEG, including of Eastern New York Electric & Gas Corporation, Elmira Light Heat & Power Corporation, New York Central Electric Corporation, Empire Gas & Electric Company, and Owego Gas Corporation, and NYSEG's acquisition of Federal-New York Company, Inc., and maintains that as a result NYSEG assumed all of the liabilities of these companies including liability arising under CERCLA.  As the court understands NYSEG's position, it argues that since it assumed all liabilities as a successor in interest to these operating companies during a time in which AGECO acted as its alter ego, AGECO is liable as well. Addressing the issue of successor liability in *National Service Industries, Inc.,* the Second Circuit stated that,

> [u]nder both New York law and traditional common law, a corporation that purchases the assets of another corporation is generally not liable for the seller's liabilities. *See Gen. Battery*, 423 F.3d at 305 (applying traditional common law principles); *Schumacher v. Richards Shear Co.*, 59 N.Y.2d 239, 244-45, 464 N.Y.S.2d 437, 451 N.E.2d 195 (1983) (applying New York law). Both New York law and traditional common law, however, recognize certain exceptions to this rule. *Gen.*

> *Battery*, 423 F.3d at 305; *Schumacher*, 59 N.Y.2d
> at 245, 464 N.Y.S.2d 437, 451 N.E.2d 195.
> Hence, as noted above, a buyer of a corporation's
> assets will be liable as its successor if: "(1) it
> expressly or impliedly assumed the predecessor's
> tort liability, (2) there was a consolidation or merger
> of seller and purchaser, (3) the purchasing
> corporation was a mere continuation of the selling
> corporation, or (4) the transaction is entered into
> fraudulently to escape such obligations."
> *Schumacher*, 59 N.Y.2d at 245, 464 N.Y.S.2d 437,
> 451 N.E.2d 195; *accord N. Shore Gas Co.*, 152
> F.3d at 651 (traditional common-law principles).

*Nat'l Serv. Indus., Inc.*, 460 F.3d at 209.  Despite NYSEG's bald assertion

that the above identified transactions constituted mergers and

acquisitions, it has adduced no evidence to sustain its burden of proving

those facts or that successor liability is warranted under any one of the

other three exceptions for each of the transactions at issue.  As a result,

even if AGECO assumed all of NYSEG's liabilities by becoming its alter

ego, a premise that seems doubtful at best, NYSEG has failed to

demonstrate in the first instance that it was a successor in interest with

regard to all of the facilities that it eventually acquired, thereby assuming

all of their liabilities regardless of when they occurred.

Based upon the foregoing, I have assigned liability to FirstEnergy,

as the successor to AGECO, on an indirect theory of owner and operator

207

liability from the date upon which NYSEG and the various other holding or operating companies owning the MGP facilities in issue first fell under AGECO's control or 1922, whichever is later.

c.   1940-1942

NYSEG urges the court to conclude that notwithstanding the filing of bankruptcy in 1940 and appointment of bankruptcy trustees for both AGECO and AGECORP, the domination of those corporations over their subsidiary operating utility companies extended for up to two more years. In support of that contention NYSEG cites an isolated excerpt of a report suggesting that it was not until 1942 that the trustees were able to divorce the corporations from the abusive service contracts at issue.

As my findings of fact reveal, the evidence in the record fails to substantiate that after the filing of bankruptcy the appointed trustees were not able to take measures to avoid the abusive practices of syphoning off profits through the use of service agreements and put in place safeguards to insure that this occurred.  To the contrary, the presumption is that the trustees were able to implement safeguards to guard against the abuses that preceded the bankruptcy filing, including oversight of Utility Management Corporation, which at that point was performing the bulk of

208

the functions for the various operating companies under the existing

service agreements.

Based upon the evidence now before the court, I find NYSEG has

failed to prove a basis for veil-piercing and a finding of indirect

owner/operator liability for the period following AGECO's bankruptcy filing.

I have therefore included 1940 in the time period during which veil-

piercing is to be found, but have excluded the years 1941 and 1942 based

upon my findings that AGECO's domination and the abusive practices

existing with respect to the various subsidiary utility operating companies

ended by that time period, and there is no further basis for corporate veil-

piercing beyond that point.

D.    <u>Affirmative Defenses</u>

In addition to opposing NYSEG's claims for cost recovery under §

107(a), FirstEnergy has asserted several affirmative defenses to those

claims.  Initially, FirstEnergy asserts that any claims to be brought under

CERCLA were discharged in the AGECO bankruptcy, despite the fact that

CERCLA was not enacted until several decades after the culmination of

the bankruptcy proceeding.  FirstEnergy next argues that the claims now

brought by NYSEG are precluded under a covenant not to sue given by

209

NYSEG in 1945, also pre-dating enactment of CERCLA.  Lastly,

FirstEnergy asserts that certain of NYSEG's claims are barred by the

governing statute of limitations under CERCLA.

## 1.   Bankruptcy Discharge

FirstEnergy contends that NYSEG's CERCLA claims were

extinguished as a result of the AGECO bankruptcy, and therefore cannot

now be revived and pursued in this action.  This issue was previously

litigated in *RG&E,* a case to which FirstEnergy was a party, resulting in a

finding that potential CERCLA liabilities were not discharged through the

AGECO bankruptcy.  *See Rochester Gas & Electric*, slip op. at 78-79.

The district court's finding with regard to the interplay between CERCLA

and a pre-CERCLA bankruptcy was affirmed by the Second Circuit, which

noted the court's "precedent holding that a defendant may be liable for

claims that did not exist pre-bankruptcy, as where a statute enacted after

the bankruptcy creates a new cause of action, even if the claim relates to

pre-petition activity."  *Rochester Gas & Electric*, 355 Fed. App'x at 552

(citing, *inter alia, In re Chateaugay Corp.,* 53 F.3d 478, 497 (2d Cir.

1995)).  Given this determination, FirstEnergy is estopped from relitigating

the issue and arguing for a different result in this action.[45]  *See McKithen*,

481 F.3d at 105.

### 2.   1945 Covenant Not to Sue

FirstEnergy next argues that it is entitled to protection from

NYSEG's cost recovery claims by virtue of a covenant not to sue executed

in 1945 by NYSEG.

The issue of allocation of CERCLA liability by contract is governed

by § 107(e)(1) of the Act, which provides as follows:

> No indemnification, hold harmless, or similar
> agreement or conveyance shall be effective to
> transfer from the owner or operator of any vessel
> or facility or from any person who may be liable for
> a release or threat of release under this section, to
> any other person the liability imposed under this
> section.  Nothing in this subsection shall bar any
> agreement to insure, hold harmless, or indemnify a
> party to such agreement for any liability under this
> section.

42 U.S.C. § 9607(e)(1).  From this section is it clear that private parties

may agree by contract to apportion CERCLA liability as between

themselves.  *See Olin Corp. v. Consol. Aluminum Corp.,* 5 F.3d 10, 14 (2d

Cir. 1993); *see also Buffalo Color Corp. v. Alliedsignal, Inc.,* 139 F. Supp.

---

[45]      This issue was decided in NYSEG's favor on motion for summary
judgment by bench decision issued on October 27, 2004 and memorialized in a
resulting order dated October 28, 2004.  *See* Dkt. Nos. 66, 69.

2d 409, 419 (W.D.N.Y. 2001).  The validity of a release of a federal cause

of action, including under CERCLA, is governed by federal law.  *Olin*

*Corp.,* 5 F.3d at 15 (citing *Dice v. Akron, Canton & Youngstown R.R. Co.*,

342 U.S. 359, 361, 72 S. Ct. 312, 314 (1952); *Mardan Corp. v. C.G.C.*

*Music, Ltd.*, 804 F.2d 1454, 1457 (9th Cir. 1986)).  The necessary context,

however, including discerning the intent of the parties, is a matter

informed by state contract law principles.  *Olin Corp.,* 5 F.3d at 15;

*Consol. Edison,* 153 Fed. App'x at 752.

When the covenant not to sue was given by NYSEG, CERCLA did

not exist, and the covenant makes no reference to environmental

liabilities.  These facts, however, do not necessarily preclude its

application in this instance; a pre-CERCLA release or indemnification

agreement may be effective to shift CERCLA liability if it is either specific

enough to include such liabilities or general enough to encompass any

and all environmental liabilities.  *Olin Corp.,* 5 F.3d at 15-16 (holding that

the language in question was sufficiently broad to encompass strict liability

under CERCLA, evidencing "the parties' 'clear and unmistakable intent'

that [defendant] indemnify [plaintiff] for all liabilities related to the [site in

dispute] even future unknown liabilities."); *see also Consol. Edison*, 153

Fed. App'x at 752.  ("We cannot conclude that the release was an explicit,

unequivocal statement releasing *all* liability, or *contingent* liability, or

*environmental* liability.") (emphasis in original) (citation omitted).

In this instance, although relatively little evidence exists concerning

the intent of the NYSEG board of directors in giving the 1945 covenant, its

language makes no reference to environmental liabilities, and is not

sufficiently broad to be construed as a clear and unambiguous reference

to such liability, instead seemingly addressing very specific potential

claims against the bankruptcy estates of AGECO and AGECORP.

Accordingly, I find that the 1945 covenant does not preclude NYSEG's

claims in this action against FirstEnergy arising under CERCLA.  *See*

*Buffalo Color Corp.,* 139 F. Supp. 2d at 421.

### 3.    Statute of Limitations

Defendant FirstEnergy next argues that recovery of certain of the

costs incurred by NYSEG in remediating the MGP sites in issue is

precluded by the governing statute of limitations.  Specifically, FirstEnergy

asserts that actions of a remedial nature were commenced at Plattsburgh,

Owego, Ithaca–Court Street, and Norwich more than six years prior to the

filing of this action, and that NYSEG's claims for recovery of costs

213

associated with those sites are therefore time-barred.  NYSEG counters

that the efforts in question at those four sites constituted removal rather

than remedial actions, and while the costs associated with those

preliminary measures may not now be recoverable they did not trigger the

applicable statute of limitations and thus do not foreclose recovery of any

costs incurred at those sites.[46]

The amendments effected through the enactment of the SARA in

1986 altered CERCLA in several important respects.  Among the

landscape changes brought about by those amendments was inclusion of

a statute of limitations applicable to cost recovery actions such as this,

providing in relevant part as follows:

> An initial action for recovery of the costs referred to
> in section 9607 of this title must be commenced–
>
> (A) for a removal action, within 3 years after
> completion of the removal action, except that such
> cost recovery action must be brought within 6
> years after a determination to grant a waiver under
> section 9604(c)(1)(C) of this title for continued
> response action; and (B) for a remedial action,
> within 6 years after initiation of physical on-site
> construction of the remedial action, except that, if
> the remedial action is initiated within 3 years after

---

[46]    NYSEG does not seek recovery for what it characterizes as removal actions completed more than three years prior to commencement of this action at those four sites.

> the completion of the removal action, costs
> incurred in the removal action may be recovered in
> the cost recovery action brought under this
> subparagraph.

42 U.S.C. § 9613(g)(2); *see Colorado v. Sunoco, Inc.,* 337 F.3d 1233,

1239 (10th Cir. 2003).  As can be seen, a cost recovery cause of action

under § 107(a) arising out of a removal action must be brought within

three years of its completion; such a claim associated with a remedial

action, by contrast, must be interposed within six years following initiation

of physical on-site construction.  42 U.S.C. § 9613(g)(2); *see also*

*Schaefer v. Town of Victor,* 457 F.3d 188, 195-96 (2d Cir. 2006).

Because the time limitations prescribed in § 113(g) are in the nature of an

affirmative defense, FirstEnergy bears the burden of proving that recovery

of the costs implicated in connection with this defense is precluded by the

statute of limitations.  *Yankee Gas Servs. Co.,* 616 F. Supp. 2d at 269

(citing *Chimblo v. Comm'r*, 177 F.3d 119, 125 (2d Cir. 1999)).

A determination as to whether any of NYSEG's cost recovery claims

under CERCLA are time-barred turns in the first instance upon whether

the response at issue represented a remedial action, or instead a removal

215

action.[47]  42 U.S.C. § 9613(g)(2); *see Yankee Gas Servs. Co.,* 616 F.

Supp. 2d at 269.  Included with CERCLA are the following detailed

definitions of the terms "remedial" and "removal":

> (23) The terms "remove" or "removal" means the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release. The term includes, in addition, without being limited to, security fencing or other measures to limit access, provision of alternative water supplies, temporary evacuation and housing of threatened individuals not otherwise provided for, action taken under section 9604(b) of this title, and any emergency assistance which may be provided under the Disaster Relief and Emergency Assistance Act [42 U.S.C.A. § 5121 et seq.].

> (24) The terms "remedy" or "remedial action" means those actions consistent with permanent remedy taken instead of or in addition to removal

---

[47]    Under certain circumstances work performed at a hazardous waste site may in the end be considered as neither remedial in nature nor a removal action, instead representing a mere preliminary measure which does not trigger the statute of limitations under either alternative provision.  *Yankee Gas Servs. Co.,* 616 F. Supp. 2d at 271.

actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances and associated contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, onsite treatment or incineration, provision of alternative water supplies, and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment. The term includes the costs of permanent relocation of residents and businesses and community facilities where the President determines that, alone or in combination with other measures, such relocation is more cost-effective than and environmentally preferable to the transportation, storage, treatment, destruction, or secure disposition offsite of hazardous substances, or may otherwise be necessary to protect the public health or welfare; the term includes offsite transport and offsite storage, treatment, destruction, or secure disposition of hazardous substances and associated contaminated materials.

42 U.S.C. § 9601 (23) & (24).

Pivotal to this threshold question is the purpose for which each

217

particular response action was taken.  This inquiry presents a question of

law, though dependent upon circumstances which are inherently fact

specific.  *See OBG Technical Servs., Inc. v. Northrup Grumann Space &*

*Mission Sys., Corp.,* 503 F. Supp. 2d 490, 524 (D. Conn. 2007); *City of*

*Moses Lake v. United States,* 458 F. Supp. 2d 1198, 1211 (E.D. Wash.

2006) *(citing Carson Harbor Vill., Ltd.,* 287 F. Supp. 2d at 1157.

Unfortunately, the overlap in the definitions of the two terms, in

combination with the complexity of most CERCLA quality cleanups, can

tend to blur the dividing line between the two types of responses, making

it difficult to distinguish between the two and discern which is involved in a

particular instance.  *See Yankee Gas Servs. Co.,* 616 F. Supp. at 270-71.

One thing does seem to be clear, however; most courts addressing the

issue appear to be in agreement that while by its language CERCLA

contemplates the use of both types of responses at a site, there may be

only a single removal action and a single remedial action for each, even

though a particular site may be sub-divided and remediated in phases.

*See, e.g., Colorado v. Sunoco, Inc.,* 337 F.3d at 1241; *Yankee Gas*

*Servs., Co.,* 616 F. Supp. 2d at 270-71; *but see United States v. Manzo*,

182 F. Supp. 2d 385, 399-404 (D.N.J. 2001) (where the EPA has divided

a site into separate operable units, each may have a separate trigger date depending upon the work performed).[48]

Analysis of which of the two forms of response has occurred at a particular site is generally informed by the purpose of or motivation for the action and nature of the work, and specifically whether it appears calculated to represent a long term or permanent containment or disposal program, or instead a short term cleanup arrangement intended to address an imminent release or threat of release.  *Colorado v. Sunoco, Inc.,* 337 F.3d at 1240 (citations omitted); *New York v. Shore Realty Corp.,* 759 F.2d 1032, 1040 (2d Cir. 1985); *OBG Technical Servs., Inc.,* 503 F. Supp. 2d at 523-24; *Yankee Gas Servs. Co.*, 616 F. Supp. 2d at 270 (citing *Shore Realty Corp.*, 759 F.2d at 1040); *see also Schaefer,* 457 F.3d at 195.  Frequently, though not always, removal actions represent interim responses to emergent or time sensitive threats, whereas remedial

---

[48]      In support of its contention that separate operable units may have different statute of limitations trigger dates, NYSEG places heavy reliance upon the court's decision in *Manzo*.  In addressing the issue, which it recognized had not been the subject of considerable judicial attention, the court in *Manzo* focused upon the involvement of the United States as the plaintiff in the case – a factor not present in this action – and invoked the judicial presumption that a statute of limitations should be "construed in favor of the United States to avoid hindering important public rights and policies."  *Manzo*, 182 F. Supp. 2d at 401 (citations omitted).  The court, however, also took note of the general principle that as a remedial statute CERCLA should be liberally construed in order to achieve its remedial purposes, a consideration which applies in this instance as well.  *Id.*

actions are generally considered as more permanent responses to

hazardous releases.  *City of Moses Lake,* 458 F. Supp. 2d at 1212.  For

guidance a court may consider not only the length of time over which the

response program took place, but also the "extended and protracted

nature of the cleanup" as well as whether there is an imminent threat to

human health or safety.  *Sherwin-Williams Co. v. City of Hamtramck*, 840

F. Supp. 470, 475-76 (E.D. Mich. 1993).

Certain of the actions taken at various of NYSEG's MGP sites,

including those at the heart of FirstEnergy's statute of limitations defense,

were performed with approval of the DEC as IRMs.  At the relevant times,

such IRMs were governed by Technical and Administrative Guidance

Memorandum ("TAGM") 4048, promulgated by the DEC on December 9,

1992.[49]  *See* Exh. P-4.  That guidance memorandum provided, in relevant

part, as follows:

> An IRM means a discrete set of activities to
> address both emergency and non-emergency site
> conditions, which can be undertaken without
> extensive investigation and evaluation, to prevent,
> mitigate, or remedy environmental damage or the
> consequences of environmental damage
> attributable to a site, including but not limited to the

---

[49]     TAGM 4048 and various other earlier related provisions have been
superseded by DER-10, issued by the DEC in May of 2010.

> examples listed under types of IRMs.  It addresses
> one portion of a remedial site and can usually be
> addressed independently of other site
> issues/problems.  While IRMs may be temporary
> solutions to an environmental problem, they may
> become the final remedy in certain cases.  IRMs
> should not prevent or significantly hinder
> permanent remedial measure that may be required
> in the Record of Decision (ROD).  Regardless if
> temporary or permanent, they will be discussed as
> part of the ROD process.  IRMs can and will
> proceed both with and without consent orders.

TAGM 4048 (Exh. P-4) at p. 2. TAGM 4048 went on to list seven factors

for consideration when determinating the appropriateness of a proposed

IRM, including:

> Actual or potential exposure to nearby human
> populations, animals, or the food chain from
> hazardous waste, pollutants or contaminants;

> Actual or potential contamination of drinking water
> supplies or sensitive ecosystems;

> Hazardous wastes in drums, barrels, tanks, piles
> or other bulk storage containers that may pose a
> threat of release;

> High levels of hazardous substances, pollutants or
> contaminants in soils, largely at or near the
> surface, that may migrate;

> Weather conditions that may cause hazardous
> substances or pollutants or contaminants to
> migrate or be released;

221

Threat of fire or explosion;

Other situations or factors that may pose threats to public health or welfare or the environment bearing in mind that [the New York State Department of Health] concurrence is required  for threats to public health.

*Id.*  The DEC's standards for determining the appropriateness of an IRM substantially coincide with requirements under the NCP for removal actions.  *See* 40 C.F.R. § 300.415(b)(1)(b)(2)(i)-(viii).

Although TAGM 4048 recites that an IRM may ultimately become a final remedy in appropriate circumstances, there are significant distinctions between responses performed as IRMs and remedial actions conducted under the auspices of the DEC, to which the EPA may delegate responsibility for carrying out CERCLA response actions. *Niagara Mohawk Power Corp.,* 596 F.3d at 126 (citing 40 C.F.R. § 300.515(a)(i)).  The rules regarding implementation of non-time critical removal actions and IRMs are significantly more flexible and less involved than the standards applicable to remedial actions.  While removal actions performed as IRMs and more comprehensive remedial actions both require focused study and evaluation as well as consideration of alternatives, the comprehensive process envisioned under CERCLA for a

222

remedial action, including RI/FS preparation, is not generally required for

a removal action.  *See Tri-County Bus. Campus Joint Venture v. Clow

Corp.,* 792 F. Supp. 984, 991-92 (E.D. Pa. 1992).

When an IRM is undertaken to address an emergency site

condition, such as the imminent release of a hazardous substance, it is

readily susceptible of characterization as a removal action under CERCLA

and corresponding regulations.  *See Inc. Vill. of Garden City v. Genesco,

Inc.,* 596 F. Supp. 2d 587, 602 (E.D.N.Y. 2009) (citations omitted),

*modified by*, 2009 WL 3081724 (E.D.N.Y. Sept. 23, 2009); *see also Shore

Realty Corp.* 759 F.2d at 1040; *Commonwealth of Massachusetts v.

Blackstone Valley,* 867 F. Supp. 78-82-83 (D. Mass. 1994) ("[N]either the

size of the operation nor the amount of time that separates identification

from clean up are dispositive of the classification of a response operation.

. . .") (citations omitted).  As TAGM 4048 expressly notes, however, the

use of non-time critical IRMs is permitted,  just as CERCLA and the NCP

allow for the implementation of non-time critical removal actions.  *See Tri-

County Bus. Campus Joint Venture*, 792 F. Supp. at 991-92.  Actions

falling into this latter category present the more difficult challenge in terms

of determining whether they should be regarded under CERCLA as

removal or remedial in nature.  *See Blackstone Valley Elec. Co.*, 867 F. Supp. at 82-83.

The distinction between remedial and removal actions is illustrated by the court's decision in *Yankee Gas Services Co.*  The plaintiff in that case sought to hold defendant UGI Utilities, Inc. liable for cleanup costs incurred at the sites of thirteen former manufactured gas plants operated from 1884 until 1941.  *See* 616 F. Supp. 2d at 231. The court held, in part, that activities at one particular location were remedial in nature and recovery of the costs associated with plaintiff's activities at that site was time-barred. *Id.* at 272. Several factors influenced the court's determination.  First, the action was undertaken to construct a new building on the property, not because an emergency existed. *Id.* Second, Yankee Gas completed five years of research before implementing a plan, further evidencing a lack of urgency. *Id.*  Additionally, $2.5 million was expended on the initial project, as compared to the estimated $3.5 to $4.4 million to be spent in the future, strongly suggesting that the initial action was the first phase of a larger remedial plan. *Id.* Lastly, a Yankee Gas official described the action as "remedial". *Id.*

With these guiding principles as a backdrop, I now turn to the

224

specifics of FirstEnergy's statute of limitations defense.

a.    Plattsburgh

Exploration of coal tar contamination at the Plattsburgh MGP Site began as early as 1975, fueled by complaints from fishermen and others concerning visible coal tar deposits in the adjacent Saranac River.  A formal investigation of the site was commissioned by NYSEG in 1979 for the avowed purpose "to investigate the coal tar problem at the site and to estimate costs for remedial measures."  As a result of that assessment a report was released in December of 1979 by NYSEG's consultant, Acres American, Inc., describing nine alternative means of addressing coal tar contamination at the site.  Exh. P-946.  Those nine alternatives listed included 1) no treatment; 2) excavation and replacement of contaminated soil; 3) on-site isolation of contaminated soil; 4) area grouting; 5) contamination plume management; 6) chemical immobilization of contaminated soil; 7) biological reduction; 8) injection and recovery; and 9) rerouting of the Saranac River.  *Id.*  The Acres-American report referred to the objective as "remedial", but noted that "coal tar is considered a 'nuisance' only, *i.e.,* not toxic."  *Id.* at NYE27310.

After consulting with the DEC, NYSEG selected a response that

225

involved on-site containment.  According to a published report, that

alternative was selected with an eye toward eliminating further coal tar

contamination of the Saranac River and insuring "the long term integrity of

the remedial method."  Exh. P-1036 at NYE26701.  The study ultimately

ripened into a consent order entered into with the DEC in 1981, under

which NYSEG agreed to "voluntarily undertake a remedial project that is

acceptable to [the] DEC" and to commence construction of on-site

remedial measures by September 1, 1981.   *See* Exh. P-951.

In briefing notes prepared on June 2, 1981 concerning the project

NYSEG officials described the work to be performed under the 1981 DEC

Consent Order as intended to halt the discharge of coal tar to the Saranac

River and cleanup the contaminated area of that body of water.  Exh. P-

949.  A report prepared later by Dennis O'Dea, of NYSEG, and Stewart N.

Thompson and Dr. A.S. Burgess, from Acres-American, characterized the

work performed as follows:

> The Plattsburgh project clearly demonstrates that a
> comprehensive understanding of the geotechnical
> and hydrologic conditions of a hazardous waste
> site is required to engineer a cost effective
> remedial solution.  All too frequently industry is
> misled into the belief that slurry walls are the
> answer to a site contamination problem and that
> engineering cost can be minimized by reducing

226

> front-end expenditure for site investigations and
> studies.  When the scheme is later found not to be
> functioning properly, large additional costs are
> frequently incurred to insure containment.
>
> The Plattsburgh project shows a systemic
> approach to a complex contamination problem.
> The close working relationship with the City of
> Plattsburgh and the NYSDEC provided for open
> exchange of information and assistance in
> designing and implementing a mutually acceptable
> remedial scheme.  P-1036 at NYE26711.  The
> 1981 DEC consent order concerning Plattsburgh
> references coal tar migration into the Saranac
> River, alleges a violation of N.Y. Environmental
> conservation Law § 17-1501, and refers to the
> study of "alternative remedial measures", and the
> "implementation of the remedial project."

Exh. P-951.

Acting under the terms of the DEC Consent Order, NYSEG began

the prescribed on-site response work in 1981.  The multi-faceted project

involved construction of a slurry wall surrounding the former tar/water

separation lagoon, removal of contaminated river sediments and their

placement in the on-site containment area, capping of the containment

cell, construction of a slurry wall along the Saranac River, installation of a

water collection system behind the slurry wall, and construction of a

system for treating the water collected from behind the slurry wall.  In total,

NYSEG expended in excess of $2 million in response costs associated

with the project undertaken pursuant to the 1981 DEC Consent Order.[50]

FirstEnergy argues that the actions undertaken at Plattsburgh pursuant to the 1981 Consent Order were remedial in nature and, accordingly, those actions having been initiated more than six years prior to commencement of this action, NYSEG's cost recovery claims associated with the Plattsburgh Site are time-barred.[51]  In response, NYSEG attempts to avoid FirstEnergy's statute of limitations defense by arguing that the early actions taken at Plattsburgh pursuant to the 1981 Consent Order addressed violations of state clean water laws, and were not intended to represent a comprehensive remediation of the site as contemplated by Congress when enacting CERCLA, even though the

---

[50]    Although the measures undertaken in the early 1980s at Plattsburgh appear to have been viewed at the time as a lasting measure, in the end for a variety of reasons they failed even to contain the migration of coal tar residues into the Saranac River, and were followed by a far more rigorous course of action conducted on a much larger scale at the site.  If the court were to find that the early response at Plattsburgh was intended as being remedial, the fact that it failed would not negate its triggering effect for purposes of the statute of limitations since the statute defining remedial actions does not indicate that the initial construction must be successful. *United States v. Navastar Int'l Transp. Corp.,* 152 F.3d 702, 713 (7th Cir. 1998).

[51]    When enacted in December of 1980 CERCLA did not contain a statute of limitations governing cost recovery actions under § 107(a).  The controlling limitations provision was added by virtue of enactment of the SARA amendments in 1986.  For purposes of the Plattsburgh Site, I therefore deem the statute of limitations to have commenced running when the SARA amendments took effect on October 17, 1986. *Velsicol Chem. Corp. v. Enenco, Inc.,* 9 F.3d 524, 529 (6th Cir. 1993); *T&E Indus. Inc. v. Safety Light Corp.,* 680 F. Supp. 696, 704 (D.N.J. 1988).

228

statute had by then been adopted and taken effect.  Unfortunately, neither party has been able to cite to the court any cases addressing this specific issue.

The manifest purpose of underlying the 1981 Consent Order, though issued after enactment of CERCLA, was to address migration of coal tar, predominantly emanating from the tar lagoon located on the site, into the Saranac River under authority of New York Environmental Conservation Law § 17-501.[52]   Neither the DEC nor NYSEG appear to have envisioned that the project would address the human health and environmental concerns associated with the mere presence of coal tar contaminated soil at the site, particularly since in 1981 coal tar impacted soil was not

---

[52]   That section provides that

> [i]t shall be unlawful for any person, directly or indirectly, to throw, drain, run or otherwise discharge into such waters organic or inorganic matter that shall cause or contribute to condition in contravention of the standards adopted by the department pursuant to section 17-0301.

N.Y. ENVTL. CONSERV. § 17-0501.  It should be noted that while the consent order states that "[t]he [DEC] alleges that the migration of the coal tar constitutes a violation of the Environmental Conservation Law, Section 17-0501," see Exh. P. 951 at NYE30058, judicial decisions issued subsequent to issuance of the consent order have rejected the position that migration is the equivalent of a discharge under this section.  See, e.g., State v. Schenectady Chems., Inc., 103 A.D.2d 33, 35-37, 479 N.Y.S.2d 1010 (3d Dep't 1984).

regarded by state and federal environmental agencies as a hazardous

substance.  The work performed at Plattsburgh under the 1981 Consent

Order, then, cannot properly be regarded as consistent with the EPA's

remedial plan under CERCLA based upon more modern notions regarding

the hazards presented by the presence of coal tar and soils contaminated

with coal tar, and thus the actions taken at Plattsburgh did not commence

the running of the statute of limitations.  *Cf. Yankee Gas Servs. Co.,* 616

F. Supp. 2d at 271 ("measures that are 'inconsistent with the Federal

EPA's remedial plan' do not start the statute of limitations on a remedial

action") (citing and quoting *Schaefer*, 457 F.3d at 204 n.20).

In the event that the court is required to categorize the work

performed under the 1981 Consent Order at Plattsburgh as either a

removal action or a remedial action in order to resolve the statute of

limitations issue, I find it to have been far more akin to a removal action.

The project addressed work performed at a discrete portion of the site,

which was significantly removed from the location of the former MGP

facility, for the purpose of resolving a specific problem, namely the

adverse affects upon  the Saranac River due to migration of coal tar from

the lagoon on the site.  Such work falls within the definition of a removal

action.  42 U.S.C. § 9601(23); *see Shore Realty*, 759 F.2d at 1040 n.8.

Moreover, "'[t]he mere fact . . . that what would otherwise be a removal

action effects a permanent remedy does not convert that action into a

remedial action.'" *Tri-County Bus. Campus Joint Venture,* 792 F. Supp. at

991 (quoting *BCW Assocs., Ltd. et al. v. Occidental Chem. Corp.*, No. 86-

5947, 1988 WL 102641 (E.D. Pa. 1988)).

In sum, while recovery of the costs associated with the work

performed under the 1981 Consent Order would be barred by the statute

of limitations, having been completed more than three years prior to

commencement of this action, claims associated with subsequent

remedial work at the site are not.[53]

### b.    Owego

Beginning in September of 1994 and ending in July 1995, following

the preparation of a supplemental RI and an FS pursuant to a 1991

Consent Order, steps were taken to address MGP waste at what has

been designated as OU-1 at the Owego Site.  Those efforts included

removal of approximately 13,000 tons of coal tar contaminated soil that

was ultimately shipped to NYSEG's Hickling and/or Jennison plants for

---

[53]    NYSEG does not seek recovery of costs associated with the work
performed at the Plattsburgh Site under the 1981 Consent Order.

thermal destruction, and were performed pursuant to a ROD issued by the DEC in 1994.  The measures required under the ROD included follow-up groundwater monitoring due to the fact that several on-site wells revealed concentrations of cyanide above drinking water standard levels.

While NYSEG does not claim costs associated with the responses at Owego in 1994 and 1995, it does now seek the cost of groundwater monitoring and later work performed at OU-2, which included pipe and sediment removal in an effort to stem migration of coal tar into the Susquehanna River.  The actions taken included removal of approximately 1,200 tons of sediment as well as thirty feet of pipeline, with the coal tar impacted soil being transported off-site for disposal.

For the reasons previously outlined, I find persuasive those cases in which courts have concluded that regardless of the number of operating units at a site, there can be only one remedial action for any given facility. *See, e.g., Yankee Gas Servs. Co.,* 616 F. Supp. 2d at 270; *see also Sunoco,* 337 F.3d at 1241.  Moreover, even if one could properly sub-divide a facility into separate operable units for purposes of the statute of limitations, in this instance the two operable units are insufficiently distinct to support the application of separate limitations periods.  In the early

232

years of investigatory and remediation activities at Owego, including at the time the 1991 Consent Order was issued, NYSEG did not distinguish between the two operating units; OU-2 was not carved out and separately identified until preparation of the ROD in 1994.  The operable units, however, are affected by the same source and constituent contamination, originating from the Owego MGP site and migrating toward the Susquehanna River.

The work performed at Owego pursuant to the 1991 Consent Order was in accordance with a ROD, rather than being implemented as an IRM, and was plainly envisioned as being remedial in nature.  Accordingly, because remedial work at the Owego site began in 1994, more than six years prior to commencement of this action, all cost recovery claims associated with that site are now time-barred.   *Yankee Gas Servs. Co.,* 616 F. Supp. 2d at 274.

c.      Ithaca-Court Street

Of the sixteen sites in issue, with the possible exception of Plattsburgh, Ithaca-Court Street has seemingly presented the most challenge to NYSEG in its cleanup efforts, and has produced the largest array of response actions to contamination originating at the former MGP

233

facility.  Contributing to the complexity is the fact that the site includes not only the normal structures associated with a typical MGP facility, but in addition a tar conduit system comprised of two wooden ducts and two clay pipes constructed to deliver coal tar from the MPG plant to the Cayuga Inlet Site for delivery onto barges or railroad cars.

Work on the Ithaca-Court Street duct system commenced in 1995 when a portion of it was excavated, extending from the west side of Meadow Street to the east side of Fulton Street, as part of a New York DOT infrastructure project, and both ends were capped.  That work was accomplished on short notice, and with no apparent involvement of the DEC, and additional remediation is planned in the future for the portion of the duct system and surrounding soils in the segment between Meadow Street and Fulton Street.[54]

In 2000, another portion of the wooden duct system, attached to a tar separator in close proximity to the Markles Flat building, was removed at the site.  As part of that effort, which also included removal of a tar storage tank, 225 tons of solid material was excavated and 26,916 gallons

---

[54]     A second portion of the sub-surface duct system was removed from the Cayuga Inlet back to the east side of the site in 1999, and again capped.  That segment of the duct system is considered as part of the Cayuga Inlet Site, which is not involved in this action.

of water and liquified tar was gathered and sent off site for disposal or treatment.  The work in 2000 was performed, with DEC approval, as an IRM.

It is clear that the IRM performed at the Ithaca-Court Street Site in 2000 was not intended as a comprehensive remediation of the site, but rather was regarded as an interim measure calculated to stem potential migration of hazardous substances pending a more thorough investigation.  The work performed at that time preceded the preparation of an RI in 2001, leading ultimately to the DEC's issuance of a ROD in September 2003 specifying a comprehensive remedial scheme for OU-1, encompassing the bulk of the original MGP plant and corresponding structures.  Since construction pursuant to the OU-1 ROD did not commence until September 2008, NYSEG's claim for recovery of expenses associated with that remediation is not time-barred.  However, because the remedial action pursuant to the ROD was not initiated within three years of completion of the work performed under the 2000 IRM, plaintiff is precluded from recovering the costs associated with that removal action.[55]  42 U.S.C. § 9613(g)(2)(B); *see Sunoco,* 337 F.3d at

---

[55]     From NYSEG's summary of costs sought, segregated by site, which does not reflect any expenditures in 2000 with regard to the Ithaca-Court Street Site, it

235

1239.

d.    <u>Norwich</u>

Efforts to address MGP contamination at the Norwich Site commenced in the early 1990s and are ongoing pursuant to a ROD issued in 2008.  In 1997, an IRM was carried out at the site, entailing excavation of primary MGP source areas, including the inside of a tar well and relief holder foundations; removal of a former relief holder, tar well and related piping as well as impacted soils; and the installation of an air sparge/soil vapor extraction system.  During the process, approximately 11,500 tons of contaminated soil was removed, 6,800 tons of which was considered as source material.

The work performed in the 1990s at Norwich has several earmarks of a remedial action.  While it is true that the project in Norwich took place in three phases, *see* Exh. D-373 at NYSDEC 15309, the plan as a whole was remedial in nature, and in fact is referred to as a remediation project by NYSEG.  *See* Exh. D-55 (Interoffice Memorandum From B.Finch to C. Wentlent, RE: Norwich MGP Remediation Project, at NYE470955).  The first phase involved only shallow excavation.  The last phase, however,

does not appear that recovery of the expenses associated with the 2000 IRM is now sought in this action.   *See* Exh. P-1041A.

236

entailed excavation a former relief holder, tar well, and MGP pipe.  While the excavation appears to have been prompted by the anticipated construction of a grocery store on an adjacent lot, it was part of a larger overall remedial plan.  In its Task 3 Investigation Report regarding the site, NYSEG noted that through risk assessment analysis it was concluded that neighboring properties did not contain BTEX or cyanide, and the levels of PAH present were acceptable.  *See* Exh. P-0685 at NYE07776.  Thus, immediate action by NYSEG was not required to address high levels of toxic chemicals, a circumstance that would justify classification of the project as a removal action.

I note also that the United States EPA determined in a preliminary assessment in 1987 that the Norwich Site represented only a medium priority for further action rather than a high priority, demonstrating a lack of necessity for an emergency removal action.  Exh. D-352 at NYE138052.  Like the responses at issue in *Yankee Gas Servs. Co.,* phase one of NYSEG's actions at the Norwich Site was conducted as part of a larger three phase plan.  *See* 616 F. Supp. 2d at 272.  The plan took three years to execute, a far greater period of time than removal actions seen in other cases.  *See, e.g., Sunoco,* 337 F.3d at 1244 (fourteen months).

The evidence adduced at trial shows that steps taken at Norwich between 1994 and 1997, which included the excavation of soil on a site-wide basis down to a depth of two feet, was precipitated by a proposed new building on an adjacent property.  This finding lends support to First Energy's assertion that the excavation was part of a long term remediation strategy, rather than a removal action prompted an imminent, threatened release of a hazardous substance.  *Yankee Gas Servs. Co.,* 616 F. Supp. 2d at 272.  The actions taken were not time critical and did not represent a typical removal action designed to swiftly eliminate a source of potential hazard to human health and the environment.  That the early work performed at Norwich was intended to be remedial in nature is evidenced by a 1994 memorandum from NYSEG's senior environmental specialist, in which he referred to the work at Norwich as remedial in nature, writing that

> [t]he remedial objective in addition to demonstrating [the clean soil process] technology, will be to remove all heavily contaminated soil within limits determined by property lines and existing structures. . . I *do not want to have to do additional excavation on the site when this project is complete, but expect to do some type of ground water treatment in the future*.

Exh. D -363 at p. 1. (emphasis added).

Having considered the evidence presented, I conclude that

FirstEnergy has carried its burden of demonstrating, by a preponderance of the evidence, that the actions taken by NYSEG at Norwich beginning in 1993 were remedial in nature, and are thus sufficient to trigger commencement of the applicable six-year limitation period with respect to cost recovery claims and preclude NYSEG's recovery of response costs incurred at the site.

> E.     Analysis of I.D. Booth's CERCLA Liability

Having been sued for cost recovery under § 107(a), FirstEnergy in turn now asserts a third-party claim for contribution toward past costs under § 113(f)(1) against I.D Booth.[56]   As an owner of portions of the Cortland-Homer and Elmira Sites, I.D. Booth is a PRP potentially exposed under § 107(a)(1) to strict liability for discharges occurring on the property, even though it is not alleged to have operated the MGP facilities in issue, or to have been responsible for the deposit of hazardous waste at the site.[57]   *See Niagara Mohawk Power Corp.,* 596 F.3d at 120.   I.D. Booth,

---

[56]     FirstEnergy also seeks a declaration regarding I.D. Booth's responsibility for a share of future costs, pursuant to § 113(g)(2).

[57]     While CERCLA is silent with respect to the proper date upon which to assess owner and operator status for purposes of  § 107(a)(1), courts have generally held that the status attaches at the time cleanup costs are incurred, rather than when a cost recovery suit seeking reimbursement is filed.  *See California Dep't of Toxic Substances Control v. Hearthside Residential Corp.*  613 F.3d 910, 914-15 (9th Cir. 2010); *see also Elementis Chems., Inc. v. T H Agric. & Nutrition, L.L.C.*, 373 F. Supp.

can avoid the strict liability assigned under CERCLA, however, by

demonstrating that under the circumstances presented it qualifies for one

or more of the statutory defenses set out in the Act.  *Kerr-McGee Chem.*

*Corp. v. Lefton Iron and Metal Co.,* 14 F.3d 321, 325 (7th Cir. 1994).   In

defense of FirstEnergy's contribution claim I.D. Booth attempts to avail

itself of the third-party defense embodied in § 107(b)(3).

    To ameliorate the potential harshness of the strict liability rules of

CERCLA Congress enacted a safety valve defense available to an owner

of property where the offending releases of hazardous substances were

caused solely by the acts or omissions of a third-party.  42 U.S.C. §

9607(b)(3).[58]  To establish entitlement to this defense a PRP must prove

---

2d 257, 268-69 (S.D.N.Y 2006).

[58]     That section provides that

        an act or omission of a third party other than an employee
        or agent of the defendant, or than one whose act or
        omission occurs in connection with a contractual
        relationship, existing directly or indirectly, with the
        defendant (except where the sole contractual arrangement
        arises from a published tariff and acceptance for carriage
        by a common carrier by rail), if the defendant establishes by
        a preponderance of the evidence that (a) he exercised due
        care with respect to the hazardous substance concerned,
        taking into consideration the characteristics of such
        hazardous substance, in light of all relevant facts and
        circumstances, and (b) he took precautions against
        foreseeable acts or omissions of any such third party and
        the consequences that could foreseeably result from such

that 1) the third-party's act or omission giving rise to CERCLA liability did not occur in connection with a contractual relationship with the PRP; 2) the PRP took precautions against foreseeable acts or omissions of the third-party and the foreseeable consequences of those acts or omissions; and 3) the PRP exercised due care with respect to the hazardous substance in question.  42 U.S.C. § 9607(b); *State of New York v. Lashins Arcade Co.,* 91 F.3d 353, 359 (2d Cir. 1996); *see also United States v. Honeywell Int'l, Inc.,* 542 F. Supp. 2d at 1199.  The burden of establishing entitlement to the protections of § 107(b)(3) by a preponderance of the evidence rests with I.D. Booth.  *United States v. Timmons*, No. CIV103CV-00951 RFT, 2006 WL 314457, at *10 (N.D.N.Y. Feb. 8, 2006).

The first element of the third-party defense requires that the act or omission giving rise to CERCLA liability did not occur "in connection with a contractual relationship, existing directly or indirectly, with the defendant." 42 U.S.C. § 9607(b)(3).  The Act defines the term "contractual relationship", in relevant part, as follows:

> (35)(A) The term "contractual relationship", for purposes of [§ 107(b)(3)] includes, but is not

---

acts or omissions; or . . .

42 U.S.C. § 9607(b)(3).

>limited to, land contracts, deeds, easements,
>leases, or other instruments transferring title or
>possession, unless the real property on which the
>facility concerned is located was acquired by the
>defendant after the disposal or placement of the
>hazardous substance on, in, or at the facility, . . .

42 U.S.C. § 9601(35)(A).  To qualify for this narrow innocent owner

exception under § 101(35), a party must demonstrate that "[a]t the time [it]

acquired the facility the [purchaser] did not know and had no reason to

know that any hazardous substance which is the subject of the release or

threatened release was disposed of on, in or at the facility."[59]  42 U.S.C. §

9601(35)(A)(i).  Given the interplay between § 107(b)(3) and § 101(35),

one could therefore argue that in order to satisfy the first prong of the

third-party defense under § 107(b)(3) a party like I.D. Booth that has

purchased contaminated property, with no involvement in the discharge of

hazardous waste on the site, must satisfy the requirements of § 101(35),

including the necessity of making appropriate inquiries at the time of

purchase.

    The courts that have addressed the question of whether the

---

[59]    The section goes on to sharpen the definition of "reason to know",
requiring a purchaser to make appropriate inquiries and to take reasonable measures
to stop any continuing release and to prevent or limit human or natural resource
exposure to previously released hazardous substances.  42 U.S.C. § 9601(35)(B).

exclusionary contractual relationship element of the third-party defense potentially applies to a purchase of contaminated property where the buyer did not participate in the discharge of hazardous waste at the site have arrived at differing views.  The Ninth Circuit has taken the position that in general the third-party defense is unavailable to a purchaser who acquires land from a polluting owner or operator.  *Carson Harbor Vill., Ltd.,* 270 F.3d at 887; *see also Honeywell Int'l, Inc.,* 542 F. Supp. 2d at 1201.  In *Carson Harbor Village* that court went on to note, however, that with enactment of § 101(35)(a)(i) as part of the 1986 SARA amendments, defining the term "contractual relationship", Congress signaled that despite this general proposition a truly innocent purchaser who did not cause or contribute to the release of any hazardous substance can nonetheless invoke the third-party defense.[60]  *Carson Harbor Vill.,* 270 F.3d at 887; *see also State v. Delmonte*, No. 98-CV-0649E, 2000 WL

_____

[60]    The intent of Congress in enacting § 101(35), and specifically whether it provides a separate defense or instead is an element of the third-party defense afforded under § 107(b)(3), is a question that has caused considerable confusion among the courts, and has led to differing views.  *See, e.g.,Timmons Corp.,* 2000 WL 314457, at *11-12 (characterizing the third-party defense under § 107(b)(3) and the innocent landowner defense under § 101(35) as separate defenses); *Delmonte,* 2003 WL432838, at *2 (referring to the innocent landowner defense as a "variant of third-party defense."); *Town of New Windsor v. Tesa Tuck, Inc.,* 935 F. Supp. 310, 313 n.2 (S.D.N.Y. 1996) (describing the innocent landowner defense as a "special case" of the third-party defense.).

432838, at *3 (W.D.N.Y. Mar. 31, 2000).

The Second Circuit appears to take a different view than the Ninth Circuit regarding the availability of the third-party defense to a purchaser of a contaminated site, concluding that a land purchase agreement is not the type of contract contemplated as precluding assertion of the third-party defense; instead, in that court's view "for the landowner to be barred from raising the third-party defense under such circumstances, the contract between the landowner and the third party must either relate to the hazardous substances or allow the landowner to exert some element of control over the third party's activities." *Lashins Arcade Co.,* 91 F.3d at 360.  As the Second Circuit observed in *Westwood Pharmaceuticals, Inc. v. National Fuel Gas Distribution Corp.,* 964 F.2d 85 (2d Cir. 1992), a case pre-dating *Lashins Arcade,*

> [t]he mere existence of a contractual relationship between the owner of land on which hazardous substances are or have been disposed and a third party whose act or omission was the *sole* cause of the release or threatened release of such hazardous substances into the environment does not foreclose the owner of the land from escaping liability, provided that the owner satisfies the additional requirements of § 107(b)(3)(a) and (b).

*Id.* at 89 (emphasis in original).  The court in that case therefore issued

244

the following pronouncement regarding the issue:

> We agree with the district court that a
> landowner is precluded from raising the third-party
> defense only if the contract between the landowner
> and the third party somehow is connected with the
> handling of hazardous substances.[61]

*Id.*

Another judge of this court has followed *Westwood Pharmaceuticals*

and, upon determining that the defendant landowner acquired property

from a PRP, has held that this fact alone does not preclude that defendant

from asserting the section 107(b)(3) third-party defense, without

addressing the requirements of § 101(35).  *Major,* 2006 WL 2640622, at

*27.  Other courts from within this circuit, however, have found it

necessary to ascertain whether the requirements of §101(35) have been

met before applying the § 107(b)(3) defense, disregarding what appears

to be a categorical rule announced in *Westwood Pharmaceuticals* and

------------------------

[61]       In 2003 Congress amended CERCLA to add a bona fide prospective
purchaser defense.  *See Small Business Relief and Brown Fields Revitalization Act*,
Pub. L. 107-118, § 222, 115 Stat. 2356 (2002), codified at 42 U.S.C. §§ 9601(40),
9607(r).  *See City of Witchita, Kansas v. Tr. of the APCO Oil Corp. Liquidating Trust,*
306 F. Supp. 2d 1040, 1051-52 (E. Kan. 2003).  With enactment of this new bona fide
prospective purchaser defense, which is applicable to property owners acquiring title to
a facility after January 11, 2002, Congress appears to have abrogated this portion of
the court's decision in *Westwood Pharmaceuticals* and *Lashins Arcade.  Major v.
Astrazeneza, Inc.,* No. 5:01-CV-615 (FJS/GJD)*,* 2006 WL 2640622, n.18 (N.D.N.Y.
Sept. 13, 2006).

*Lashins Arcade.  See, e.g., Delmonte,* 2000 WL 432838, at *2-3; *see also Town of New Windsor*, 935 F. Supp. at 313 n.2 (in *dictum,* explaining that the requirements of § 101(35)(a) must be met by a purchaser in order to qualify for exception to the "no contractual relationship" requirement of the third-party defense under section 107(b)(3)).

The Second Circuit's position as articulated in *Lashins Arcade* and *Westwood Pharmaceuticals* is not universally held and has been criticized by at least one court as essentially rendering academic the requirements of § 101(35).  *See Goe Eng'g Co., Inc., v. Physicians Formula Cosmetics, Inc.,* No. CV 94-3576-WDK, 1997 WL 889278, at *10 n.7 (C.D. Cal. June 4, 1997).  The Second Circuit's view also appears to be squarely at odds with the Ninth Circuit's posture as set forth in *Carson Harbor Village*.

If satisfaction of the requirements of § 101(35)(A) is a predicate to meeting the first element of the third-party defense, then I.D. Booth has failed to sustain its burden of proof with respect to this issue.  The evidence at trial revealed that at the time of its purchase of both the Elmira and Cortland-Homer properties, I.D. Booth did not make even a single inquiry into the past uses of the sites and therefore cannot show that it neither knew nor had reason to know that any hazardous substance

246

was disposed of at the property.  42 U.S.C. § 9601(35)(B); *see Niagara Mohawk Power Corp. v. Consol. Rail Corp.,* 291 F. Supp. 2d 105, 128 (N.D.N.Y. 2003) (concluding that one defendant was not entitled to innocent landowner defense since it failed to produce evidence of even a single inquiry prior to purchasing a portion of the contaminated property in dispute), *modified by*, 596 F.3d 112 (2d Cir. 2010).

Despite criticisms of its position, the Second Circuit's determination concerning the first element of the third-party defense, as articulated in *Lashins Arcade* and *Westwood Pharmaceuticals,* has not been reversed or overruled, and appears to permit a purchaser of polluted property to avail itself of the third-party defense regardless of whether it knew or should have known of the existence of hazardous substances on the property at the time of purchase or its inability to otherwise meet the requirements of § 101(35)(a).  Because I am bound by those decisions, I therefore conclude that I.D. Booth has met the first element of the § 103(b)(3) defense.  *Major*, 2006 WL 2640622, at *27.

The second element of the third-party defense under section 107(b)(3) examines whether the defendant has taken adequate precautions against actions by any third-party that would lead to the

247

release of hazardous waste.  *Lashins Arcade,* 91 F.3d at 360.  Since none

of the releases in issue occurred subsequent to I.D. Booth's acquisition of

the two sites in question, this element does not come into play.

Central to whether the third-party defense is available in this case,

then, is the question of whether I.D. Booth exercised due care in

connection with the hazardous substances in question.  *Lashins Arcade,*

91 F.3d at 360-61.  While CERCLA does not amplify upon this

requirement, the relevant legislative history suggests that to qualify for the

defense "the defendant must demonstrate that [it] took all precautions with

respect to the particular waste that a similarly situated reasonable and

prudent person would have taken in light of all relevant facts and

circumstances."  H.R. Rep. No. 1016, 96th Cong., 2d Sess., Pt. 1, at 34

(1980), reprinted in 1980 USCCAN 6119, 6137.  The due care component

of the § 107(b)(3) defense requires a party to take steps necessary to

protect against threats to human health or the environment, *Lashins*

*Arcade,* 91 F.3d at 361 (citing, *inter alia*, *United States v. A&N Cleaners &*

*Launderers, Inc.,* 854 F. Supp. 229, 238 (S.D.N.Y. 1994)), and in plain

terms demands a showing that upon acquiring contaminated property a

purchaser has not exacerbated environmental problems at the site.  *Goe*

*Eng'g,* 1997 WL 889278, at *14.

Following the Second Circuit's decision in *Lashins Arcade*, another district court within this circuit was faced with interpreting the newly settled law regarding due care in *Idylwoods Assocs. v. Mader Capital, Inc.*, 956 F. Supp. 421 (W.D.N.Y. 1997).  The defendants in that case learned of the existence of hazardous waste issues on their land and "rather than taking affirmative steps to prevent continued contamination of site,. . . . [they] attempted to distance themselves from the property, going so far as to cease paying property taxes on the site, in the hope that town and county officials would foreclose on the property and take it off their hands." *Id.* at 424-25.  As a result of the defendants' actions, the court was asked to consider whether their failure to undertake an affirmative response that would have avoided both health and environmental repercussions constituted a "failure to take due care and precaution" under the third-party defense.   *Id.* at 424.

Under the framework established by the Second Circuit, the court in *Idylwoods Associates* held that a defendant must take affirmative action to avoid liability under the innocent owner defense.  956 F. Supp. at 424.  In rendering its decision, the court relied on the holding in *Lashins Arcade*,

249

which requires an innocent landowner take "those steps necessary to protect the public from a health or environmental threat." *Id.* (citing *Lashins Arcade*, 91 F.3d at 361).

Undeniably, the discharges in this case occurred long before I.D. Booth's acquisition of the two sites in question, as was the case in *Lashins Arcade,* and there is nothing the third-party defendant could have done to prevent the original MPG releases at the sites.  Nonetheless, upon becoming aware of the existence of a hazardous substance on its property, it was incumbent upon I.D. Booth to take precautions with respect to that hazardous substance that "a similarly situated reasonable and prudent person would have taken in the light of all relevant facts and circumstances."  *Lashins Arcade*, 91 F.3d at 361 (citing H.R. Rep. No. 1016, 96th Cong.2d Sess., pt. 1, at 34).  I am unable to conclude that I.D. Booth has established, by a preponderance of the evidence, its exercise of due care at least with respect to the Cortland-Homer Site.

To be sure, in *Lashins Arcade* the Second Circuit held that where another responsible party is engaged in investigation and potential remediation of hazardous waste on its property a third-party purchaser is not obligated to duplicate those efforts by commencing an investigation of

250

its own.  *Lashins Arcade,* 91 F.3d at 361 ("it would have been pointless to require [the defendant] to commission a parallel investigation once it acquired the [property] and became more fully aware of the environmental problem.")  Clearly by the time I.D. Booth became cognizant of the existence of hazardous substances on its property, NYSEG was well under way in its investigation of the two sites.  Accordingly, as I.D. Booth has argued, it was under no statutory obligation to independently investigate and remediate the two sites being addressed by NYSEG.

While the due care prong of the § 107(b)(3) defense does not require that I.D. Booth replicate NYSEG's response efforts at the two sites, the statute does require its cooperation in efforts of others to protect human health and the environment.  *See Interfaith Cmty. Org. v. Honeywell Int'l, Inc.,* 263 F. Supp. 2d 796, 864-65 (D.N.J. 2003), *aff'd*, 399 F.3d 248 (3d Cir. 2005).  Yet, despite the awareness of the problem and its severity, and the need for NYSEG to acquire portions of the Cortland-Homer property in order to effectuate a proper remediation, including removal of two former gasholders located below the I.D. Booth building, the third-party defendant engaged in protracted negotiations for the sale of the property at issue.  The delay associated with the

251

negotiations, which extended over a period of two years, is attributable in large part both to I.D. Booth's untimeliness in responding to NYSEG proposals and its aggressive price demand, leading NYSEG ultimately to acquiesce and strike a deal under which it purchased contaminated property appraised at $350,000 for $1.8 million and agreed to convey the property back to Booth after remediation, if NYSEG chooses to sell the property, for one dollar.  As a result of that delay, the Cortland-Homer Site was divided into two separate operable units, with OU-1 comprised of the former MGP area, including the I.D. Booth building and the former gasholders and purifying house buried below the surface, as well as off-site contaminated soils under Route 11, and OU-2 representing a downgradient parcel of land between the Tioughniouga River and Route 11, downgradient.  Given the inability of NYSEG to obtain control of the building to implement of remedy for OU-1, both NYSEG and the DEC contemplated implementing the OU-2 remedy first even though this did not represent a technically sound sequence.

    The evidence at trial supports FirstEnergy's assertion that I.D. Booth's negotiation posture and lack of responsiveness caused delay in remediation of the site, including in the DEC's issuance of a PRAP for the

site.  According to Dr. Neil Shifrin, FirstEnergy's environmental expert,

during the time of that delay further migration of coal tar and other MGP

contaminants is likely to have occurred.

In addition to the delay occasioned by virtue of protracted

negotiations over NYSEG's purchase of property at the Cortland-Homer

Site, I.D. Booth's cooperation in the remediation of that site has been

somewhat lackluster.  I.D. Booth has not taken an active role in the

investigation or remediation processes at the site, and has failed to

provide NYSEG with requested feedback, instead taking a "wait and see"

approach.  Blazicek Deposition (May 11, 2005) at 135-38.  I.D. Booth's

lack of responsiveness to both NYSEG and the DEC caused or

contributed to delay in the issuance of a PRAP for the Cortland-Homer

Site.  *Id.*  Under these circumstances, I conclude that I.D. Booth has failed

to prove its entitlement to the third-party defense embodied in § 107(b)(3)

with respect to the Cortland-Homer Site.

The same lack of due care on the part of I.D. Booth does not appear

in the record with regard to the Elmira Site.  Although the proof at trial

revealed that a contemplated trade between NYSEG and I.D. Booth of

portions of the Elmira MGP Site in order to facilitate NYSEG's remediation

253

was under discussion for a protracted period beginning in the late 1980s,

ultimately culminating in a transfer in 2003, unlike the case with respect to

Cortland-Homer the evidence does not suggest that I.D. Booth was

responsible for the delay in this instance.  The evidence also reflects that

I.D. Booth has cooperated with NYSEG in connection with the Elmira Site,

permitting access to the site for purposes of conducting response actions

and, on occasion, providing volunteer manpower and equipment to assist

in the investigation and remediation of the site.  Under these

circumstances I conclude I.D. Booth has established the existence of due

care, and thus its ability to qualify for the § 107(b)(3) defense to what

would otherwise be strict liability as an owner of the Elmira Site.

In sum, I find that I.D. Booth is liable to FirstEnergy for its equitable

share of any response costs with respect to the Cortland-Homer Site, but

not for those associated with the Elmira-Madison Avenue facility.

F.    Compensable Response Costs

Section 107(a) of CERCLA authorizes the recovery of response

costs incurred by one PRP against another.  For purposes of CERCLA,

the term "response costs" is subject to liberal construction, and is deemed

> to cover any necessary actions taken to clean up,
> remove, or dispose of any hazardous substances,

254

> to monitor, assess, and evaluate the release of
> hazardous substances, or to remedy, prevent,
> minimize, or confine the release of hazardous
> substances.

*Schenectady Indus. Corp. v. Upstate Textiles, Inc.,* 689 F. Supp. 2d 282,

294 (N.D.N.Y. 2010) (citing *W.R. Grace & Co.-Conn.,* 559 F.3d at 92 and

42 U.S.C. § 9601(23)-(25)).  The response costs recoverable under §

107(a) include both costs of removal efforts as well as of remedial actions.

*Syms v. Olin Corp.,* 408 F.3d 95, 101 (2d Cir. 2005) (citing 42 U.S.C. §

9601(25)) ("CERCLA defines the term 'response' as encompassing both

'removal' and 'remedial actions.'").  In order to recover in this case,

NYSEG must demonstrate that the response costs incurred were both

necessary and substantially consistent with the NCP.  *See* 42 U.S.C. §

9607(a)(4)(B); *see also Schenectady Indus. Corp.,* 689 F. Supp. 2d at

294.  FirstEnergy also argues that any recovery in this case is also subject

to the requirement under New York law that damages be established with

reasonable certainty, and that NYSEG has failed to meet this test.

### 1.    Certainty of Damages

FirstEnergy's argument seeking application of New York law

regarding certainty of damages is based upon two cases, both of which

are readily distinguishable, in particular because they did not involve cost

255

recovery or contribution claims under CERCLA.  In *Raishevich v. Foster,* 9 F. Supp. 2d 415 (S.D.N.Y. 1998), a civil rights action brought pursuant to 42 U.S.C. § 1983, the court noted plaintiff's burden of demonstrating a measure of damages, in that case the market value of destroyed transparencies, with reasonable certainty, while also remarking that where there is a clear showing that some injury has been suffered but damages are not susceptible of precise measurement due to a defendant's conduct, a factfinder is accorded flexibility in affixing damages.  *Id.* at 417.  The other case cited by FirstEnergy, *Sir Speedy, Inc. v. L & P Graphics, Inc.,* 957 F.2d 1033 (2d Cir. 1992), involved application of a Connecticut law principle regarding proof of lost profits in a common law breach of contract setting.  *Id.* at 1038.  Neither of those cases involved a broad remedial federal statute in the nature of CERCLA.

More on point is *United States v. Kramer*, 757 F. Supp. 397, 404 (D.N.J.1991), in which the United States brought a cost recovery action under CERCLA against a landfill owner and sought to limit the landfill's affirmative defenses prior to trial.  The defendants in the action alleged that the response costs that the United States incurred were not properly recoverable because those costs were, *inter alia,* improper, remote,

speculative, contingent, unreasonable, duplicative, or not cost-effective. *Id.* at 436.  The court in that case expressly rejected that argument and noted that, at least in the context of the government bringing a cost-recovery action, "the only criterion for recoverability of response costs under CERCLA is whether costs are consistent with the National Contingency Plan (NCP).  All response costs not inconsistent with the NCP are recoverable." *Id.*  The court went on to conclude that any issue not dealing with consistency with the NCP is not an appropriate basis upon which to challenge response costs.  *Id.*

In the same action, but in a subsequent decision, another judge of the court analyzed the issue and noted the courts must look to the statutory language as being conclusive, unless there is some contrary legislative intent. *United States v. Kramer*, 913 F. Supp. 848, 862 (D.N.J.1995) (citing *Escondido Mut. Water Co. v. La Jolla Indians,* 466 U.S. 765, 772, 104 S. Ct. 2105, 2110 (1984)).  Focusing on the defendants' arguments relating to the  reasonableness, necessity, and cost-effectiveness of response costs, District Judge Simandle noted that "Congress was careful to enumerate the defenses to the recoverability of all response costs" in § 107(b) of CERCLA.  *Id.* at 863.  Quite simply, had

257

"Congress wished to limit recovery . . .  it could easily have done so."  *Id.*

While the court in that action appropriately focused on § 107(a)(4)(A), as it

was dealing with a government cost-recovery action, it also noted that

Congress had used such qualifying terms as "reasonable" in §

107(a)(4)(B) and "necessary" in § 107 (a)(4)(C).  *Id.*  As such, it seems

apparent that if Congress wanted to limit private party cost-recovery to

only those necessary response costs that are reasonably certain,

Congress surely would have included language to that effect.

In *New York v. Almy Bros., Inc,* No. 90-CV-818, 1996 WL 12031, at

*3 (N.D.N.Y. Jan. 8 1996) (McCurn, S.J.), another judge of this court

considered the appropriateness of a defendant's argument that

unreasonable response costs cannot be recovered.  While, again, the

court in *Almy Brothers* focused on the language of § 107(a)(4)(A) since it

was dealing with a government cost recovery action, it pertinently noted

that absent language to the contrary, as long as response costs are

consistent with the NCP, they are recoverable from liable parties.  *Id.*

Given the broad remedial underpinnings of CERCLA, I find no

basis to conclude that NYSEG's cost recovery claim is subject to the

requirement in New York that damages be proven with reasonable

certainty.  In any event, the damages now sought are quantifiable and not

speculative; accordingly, even assuming applicability of that rule, I find

that its requirements are satisfied in this case.

2.   NCP Compliance

The NCP, formulated by the EPA in 1985, was intended to provide

"organizational structure and procedures for preparing for and responding

to . . . releases of hazardous substances . . ."  40 C.F.R. § 300.1; *see*

*Solvent Chem. Co., Inc.,* 685 F. Supp. 2d at 432.  The NCP has been

described as "essentially the federal government's toxic waste play book,

detailing the steps the government must take to identify, evaluate and

respond to hazardous substances in the environment."  *Niagara Mohawk*

*Power Corp.,* 596 F.3d at 136 (citations omitted); *see also Carson Harbor*

*Vill.,* 433 F.3d at 1265-66.  "The NCP is EPA's regulatory template for a

CERCLA-quality cleanup'".  *Pub. Serv. Co. of Colorado,* 175 F.3d at 1181

(citing *County Line Inv. v. Tinney,* 933 F.2d 1508, 1514 (10th Cir. 1991)).

Under a governing regulation promulgated pursuant to CERCLA, a

private party response action will be considered

> "consistent with the NCP" if the action, *when*
> *evaluated as a whole*, is in substantial compliance
> with the applicable requirements of paragraphs (5)
> and (6) of this section and results in a CERCLA-

259

quality clean-up. . .

40 C.F.R. § 300.700(c)(3)(1) (emphasis added).  When considering

whether a response cost can be recovered under CERCLA § 107(a) a

court must examine the activity undertaken for NCP substantial

compliance, evaluating the cleanup as a whole; "immaterial or

insubstantial deviations" from the requirements of 40 C.F.R. Part 300 do

not, in and of themselves, render clean up activities inconsistent with the

NCP.  *Pub. Serv. Co. of Colorado,* 175 F.3d at 1182.

In the early years following its promulgation the courts interpreted

the NCP to require strict compliance with its mandates.   *N.Y. Solvent*

*Chem. Co., Inc*., 685 F. Supp. 2d at 432.  However, amendments to the

NCP in 1990 have clarified that such a formalistic approach is not

required, and that instead "immaterial or insubstantial" deviations from the

NCP will not preclude cost recovery under section 107(a).  *Id.; see also*

*Bedford Affiliates,* 156 F.3d at 428 (citing C.F.R. § 300.700(c)(4).

Among the ways in which NCP consistency can be established is

through a showing that a state environmental agency has approved of a

cleanup plan and monitored the remediation process, and the response

work is performed in accordance with the agency's requirements.  *Solvent*

*Chem. Co.,* 685 F. Supp. 2d at 432 (citing, *inter alia*, *NutraSweet Co. v. X-L Eng'g Co.,* 227 F.3d 776, 791 (7th Cir. 2000); *Pfhol Bros. Landfill Site Steering Comm.,* 2004 WL 941816, at *2-23) and 40 C.F.R. § 300.700(c)(3)).

All of the actions undertaken by NYSEG and implicated in this cost recovery action were taken at the direction and/or with the approval of the DEC.  This circumstance satisfies the requirement of NCP compliance. *Solvent Chem. Co.,* 685 F. Supp. 2d at 434 ("the DEC's substantial involvement in the investigation, design, selection, and implementation of the remedy at [the sites in issue] is in all respects sufficient to constitute substantial compliance with the requirement that the response costs incurred by [the plaintiff] are not inconsistent with the NCP."); *see also Niagara Mohawk Power Corp.*, 596 F.3d at 137 ("[plaintiff's] adherence to the DEC Consent Decree established its compliance with the National Contingency Plan.").

Having carefully reviewed the expansive record developed at trial, I find no basis to conclude that the response actions for which recovery is now sought were not substantially compliant with the NCP.

### 3.    Necessity of Costs

261

To qualify for recovery under CERCLA, a response cost must be "necessary".  42 U.S.C. § 9607(a)(4)(B); *see Syms*, 408 F.3d at 103-04 (citing § 9607(a)(4)(B)).  "It is generally agreed that this standard requires that an actual and real threat to human health or the environment exist before initiating a response action." *Carson Harbor Vill.,* 270 F.3d at 871 (citations omitted); *see also Reg'l Airport Auth. of Louisville v. LFG, LLC,* 460 F.3d 697, 700 (6th Cir. 2006); *Prisco*, 902 F. Supp. at 385-86. Necessary costs are those required to contain and clean up hazardous releases, and "include not only the cost of actual cleanup, but also include costs for investigation, planning, and remedial design." *City of Wichita, Kansas,* 306 F. Supp. 2d at 1091 (citations omitted).  Applying this element, courts generally deny recovery where costs incurred are duplicative of others, wasteful, or otherwise unnecessary to address the hazardous substances involved.  *Waste Mgmt. of Alameda Cnty, Inc. v. E. Bay Reg'l Park Dist.,* 135 F. Supp. 2d 1071, 1099 (N.D. Cal. 2001); *City of Wichita*, *Kansas*, 306 F. Supp. 2d at 1091-92.

FirstEnergy does not question the fact that residual hazardous substances, in the form of coal tar and coal tar impacted soils as well as other waste by-products normally associated with MGP facilities, were

present at the sixteen sites in dispute at the time of NYSEG's responses, and that those substances presented a real, rather than merely theoretical, threat to human health and the environment.  FirstEnergy nonetheless asserts that some of the expenses of remediating those sites either were unnecessary, in that they relate to studies that were redundant of earlier investigations, or in some instances were not motivated by environmental concerns but instead were incurred for purely business reasons, including a desire to enhance relations with various municipalities.

There is sometimes overlap between necessary hazardous waste responses and actions undertaken for other reasons, making it difficult to isolate costs incurred solely out of a need or desire to remediate a site impacted by a hazardous waste discharge and segregate out those expenses prompted by other considerations.  Clearly, costs motivated solely out of business concerns are not recoverable under CERCLA; "[i]f a party would have incurred identical costs to those recovery of which is sought in the absence of any threat, then the presence of the threat cannot be said to have 'cause[d] the incurrence of response costs.'"  *Reg'l Airport Auth. of Louisville,* 460 F.3d at 706 (citing 42 U.S.C. § 9607(a)(4)).

263

Oftentimes, an environmental cleanup is prompted both by business reasons, including a desire to improve one's property, as well as out of altruistic concerns or the need to comply with state and federal environmental laws.  As the Sixth Circuit has noted, speaking to the issue of whether a response cost is necessary,

> [t]his is not to say that parties are precluded from recovering all response costs incurred for self-serving motives. Parties often select a particular response based on commercial efficiency and convenience.  To recover CERCLA damages in those cases, however, the parties must show that the threat to public health or the environment was the predicate for acting.  Otherwise, businesses that happened to operate on contaminated property, yet took no additional measures in order to do so, would realize unearned fixed-cost advantages over their competitors.  We do not believe that Congress, in enacting CERCLA, intended such a result.

*Id.*  Sitting *en banc*, that same court criticized a district court's emphasis upon business motivations for remediating a hazardous waste site under circumstances similar to those now presented, observing that

> [i]n determining whether response costs are "necessary", we focus not on whether a party has a business or other motive in cleaning up the property, but on whether there is a threat to human health or the environment and whether the response action is addressed to that threat.  It is unrealistic to believe that clean up is necessarily motivated by eleemosynary factors.  Although a private plaintiff will almost always have a business or financial motive for cleaning up a site, such

> subjective intent is simply not part of the calculus.
> Rather, we focus on the objective circumstances of
> each case.  The issue is not why the landowner
> decided to undertake the cleanup, but whether it
> was necessary.

*Carson Harbor Vill.,* 270 F.3d at 872 (citation omitted).

Among FirstEnergy's concerns is the contention that in some

instances NYSEG went beyond what was truly necessary to remediate the

sites in dispute.  Undeniably, the requirement that costs, recovery of which

is sought under CERCLA, be necessary suggests that expenses

associated with achieving a better quality cleanup than the floor

established under CERCLA contemplates, based upon the uses of the

property both before and after, might not be regarded as "necessary",

particularly if not found to be cost effective.  *City of Detroit v. Simon,* 247

F.3d 619, 630 (6th Cir. 2001) (citations omitted) *cert. denied sub nom.*,

*Eaton Corp. v. City of Detroit*, 534 U.S. 1040, 122 S. Ct. 615 (2001); *see*

*also Basic Mgmt., Inc. v. United States*, 569 F. Supp. 2d 1106, 1121 (D.

Nev. 2008) (CERCLA requires that to be recoverable a response expense

be "cost effective", meaning not necessarily the least expensive, but

instead "the most cost effective method of alleviating the threat to human

health and the environment in the specific location, surroundings, and

likely uses for the land").  In *City of Detroit*, for example, the Sixth Circuit concluded that because the property in question had a longstanding history of industrial use, "[t]o require former occupants to assume liability for cleanup costs going beyond the level necessary to make the property safe for industrial use would be to provide an unwarranted windfall to the beneficiary of the clean up."  *City of Detroit*, 247 F.3d at 630.  The element of necessity is therefore contextual, requiring the court to determine whether the party seeking recovery has exceeded what was necessary to conduct a cost-effective CERCLA quality cleanup and restore the property to a condition suitable for its prior use.  *See id.; see also Basic Mgmt., Inc.,* 569 F. Supp. 2d at 1121.

In its post-trial brief, FirstEnergy focuses on three specific costs alleged not to have been necessarily incurred by NYSEG.  The first relates to a paving project undertaken in 1988 at the Dansville site, motivated not out of environmental concerns, but instead by other considerations.  This presents a non-issue, however, since NYSEG has not sought recovery of the costs associated with that 1988 project.

The second example cited relates to the reconstruction of portions of a minor league baseball stadium, situated both on and adjacent to the

Oneonta Site, following remediation.  That project, however, presents a distinctly different situation than that which confronted the court in *City of Detroit.*  In this instance NYSEG has not gratuitously expended sums beyond those required to remediate and to make the property safe and suitable for its prior use.  Rather, NYSEG has restored the property to its former use, in the process meeting the more current governing standards for such a minor league facility.  In the court's view this does not render the expense of that project unnecessary under CERCLA.  *See Darbouze v. Chevron Corp.,* No. CIV. A. 97-2970, 1998 WL 512941, at *7 (E.D.Pa. 1998).

The third item referenced concerns replacement of sewer and water lines for the City of Ithaca during the course of remediating underground coal tar ducts at the Ithaca-Court Street Site.  At trial, NYSEG representative Joseph Simone testified that while the municipality's piping may have been physically replaced by NYSEG during the course of excavating to remove portions of adjacent tar ducts, the City of Ithaca paid for the actual materials used.  Under this circumstance, and particularly since FirstEnergy has failed to identify any additional expenses associated with the replacement of those lines not required for excavation of the tar

267

ducts, I find no basis to discount the amounts now sought in connection

with the Ithaca-Court Street Site.

Although not mentioned in the section of its brief addressing the

"necessary" element under CERCLA, at trial FirstEnergy presented the

argument, primarily through its expert, Dr. Neil Shifrin, that many of the

expenses incurred by NYSEG to investigate various of the sixteen sites in

issue were unnecessary as redundant of the task reports prepared earlier

in connection with those sites.  It should be noted, however, that NYSEG

does not now seek duplicate recoveries relating to the investigative efforts

at the sites in issue; in other words, it has not sought recovery of the

expenses associated with the earlier task reports, instead limiting its

request to expenses incurred in meeting the demands of the DEC to

investigate and remediate sites, including through FS/RI preparation

where required.  I reject FirstEnergy's argument that NYSEG was under a

duty to be more aggressive with the DEC in an effort to convince the

agency that the task reports satisfy the requirement to conduct an

investigation and explore remedial alternatives at the sites.  The task

reports, which were voluntarily prepared by NYSEG early on with little or

no involvement of the DEC, were accepted by the DEC in lieu of RI/FS

268

Work Plans, where appropriate.  All of the investigative efforts undertaken

by NYSEG, for which it now seeks recovery, were at the insistence of the

DEC, which obviously found that the earlier task reports were flawed,

incomplete, or otherwise deficient, and, in the court's view, the reports

associated with later investigative efforts therefore qualify as "necessary".

*See Niagara Mohawk Power Corp.,* 596 F.3d at 137.

In sum, I find NYSEG has established that all of the costs incurred

for which it now seeks recovery were necessary.[62]

### 4.    Offset for Recovery From Collateral Sources

In defense of NYSEG's cost recovery claims, FirstEnergy argues

that prior to allocation the costs sought should be reduced as a result of a

$20 million insurance recovery by NYSEG, and additionally that when

making its allocation analysis the court should take into account the fact

that NYSEG has been able to pass the response costs on to its

---

[62]    FirstEnergy cites, as a further unnecessary cost, the expense associated with purchasing a portion of the Cortland-Homer Site from I.D. Booth.  The purchase of that property, however, was necessitated by the DEC's requirement for excavation beneath a portion of the building occupied by I.D. Booth.  Given that the DEC regarded Cortland-Homer as a priority site with likely migration of coal tar off site, and the speculative nature and likely delays associated with the suggested alternative – a condemnation proceeding brought by the State – while I conclude elsewhere that I.D. Booth's actions in connection with that transaction warrant allocation of a share of liability to that third-party defendant, *see* pp. 239-54, *ante*, I do not find that the costs associated with the purchase of that property were not necessary within the meaning of CERCLA.

ratepayers.  NYSEG has not addressed this issue in its post-trial
submission.

FirstEnergy's argument implicates application of the "collateral
source rule".  "Derived from common law, [that] rule provides that
payments made to or benefits conferred on an injured party from other
sources are not credited against tortfeasor's liability, [even though] they
[may] cover all or a part of the harm for which the tortfeasor is liable."
*Friedland v. TIC - The Indus. Co.,* 566 F.3d 1203, 1205-06 (10th Cir.
2009), *cert. denied*, 130 S. Ct. 1080 (2010).  The doctrine is premised
upon the belief that it is more just that the benefit be realized by an
innocent plaintiff, in the form of double recovery, rather than by a
tortfeasor through reduced exposure. *Id.* at 1206.

CERCLA contains a provision addressing the issue of overlapping
compensation for response actions; that section provides, in relevant part,
that

> [a]ny person who receives compensation for
> removal costs or damages or claims pursuant to
> this chapter shall be precluded from receiving
> compensation for the same removal costs or
> damages or claims pursuant to any other State or
> Federal Law.

42 U.S.C. § 9614(b).  This section effectively precludes application of the

collateral source rule in a CERCLA setting.  *Basic Mgmt., Inc.,* 569 F.

Supp. 2d at 1125 ("The field has been preempted by the federal statutory

mandate of CERCLA §114").  I note further that CERCA also provides that

such claims for contributions are to be governed by federal law.  42 U.S.C.

9613(f)(1).  For these reasons, it appears that every federal court that has

addressed the issue in the context of CERCLA litigation has declined to

apply the collateral source rule.  *Friedland*, 566 F.3d at 1207, n.3; *Vine*

*St., LLC v. Keeling*, 460 F. Supp. 2d 728, 765 (E.D. Tex. 2006).  In

addition, courts have noted that the policy of providing the innocent

plaintiff with the benefit of any windfall is simply not applicable to

contribution actions between two or more culpable parties. *Friedland*, 966

F.3d at 1207; *see also Vine St., LLC*, 460 F. Supp. 2d at 765 ("CERCLA is

not a vehicle for general tort recovery and the court has a broad duty to

consider facts bearing on the proper equitable allocation of response

costs. . ..").

a.    <u>Insurance Recovery</u>

It appears that the collateral source rule plays no role in the

equitable allocation of liability under CERCLA as between two PRPs, and

that as such a party cannot recover contribution, in whole or in part, for

271

remediation costs that have been reimbursed under an insurance policy.

*Friedland*, 566 F.3d at 1207; *Basic Mgmt. Inc.*, 569 F. Supp. 2d at 1125

(CERCLA preemption of common law tort doctrine renders collateral

source rule inapplicable); *Raytheon Aircraft Co. v. United States*, No. 05-

2328, 2007 WL 4300221, at *3 (D.Kan. Dec. 8, 2007) ("[T]he court

nonetheless will consider insurance payments and other payments or

credits received by Raytheon as an equitable allocation factor"); *Vine St.,*

*LLC v. Keeling*, 460 F. Supp. 2d at 766; *see* Russell O. Stewart, *CERCLA*

*Contribution Claims and The Collateral Source Rule*, 76 DEFENDANT

COUNS. J. 451, 451 (2009).  As the Tenth Circuit Court of Appeals has

noted,

> permitting a CERCLA contribution-action plaintiff to
> recoup more than the response costs he paid out
> of pocket flies in the face of CERCLA's mandate to
> apportion those costs equitably among liable
> parties.

*Friedland,* 566 F.3d at 1207 (citing, *inter alia*, 42 U.S.C. § 9613(f)(1)).  The

court went on to observe in *Friedland* that "[e]very Federal Court that has

addressed the issue has reached the same conclusion, either with or

without reference to the collateral source rule."  *Id.; see also Appleton*

*Papers Inc. v. George A. Whiting Paper Co.,* No. 08-C-16, 2011 WL

806411, at *14 (E.D. Wisc. March 1, 2011) (citing and following *Friedland*) (citations omitted).

In *Basic Management*, for example, plaintiffs held an insurance policy covering hazardous waste remediation costs, third party claims for cleanup costs, bodily injury and property damage, and legal expenses for groundwater contamination.  *See* 569 F. Supp. 2d at 1112.  Plaintiffs sought recovery of $890,898 in pre-insurance costs, almost all of which had been paid directly under the insurance policy without further right of subrogation. *Id.* at 1112, 1124.  The court held that plaintiffs could not recover costs reimbursed for by their insurer, reasoning that plaintiffs could only receive reimbursement for the costs expended beyond their share of actual responsibility for the environmental damage. *Id.*

Similarly, in *Vine Street* the court found the plaintiff to be responsible for twenty-five percent of the costs and defendant responsible for the remaining seventy-five percent of the costs.  *See* 460 F. Supp. 2d at 766. The court noted that plaintiff had incurred a total of $173,782.67 in response costs, but was reimbursed by insurance for all but $32,042.58. *Id.* The court applied its proportional allocation only to this unreimbursed $32,042.58, holding plaintiff responsible for $24,031.64 and defendant for

273

$8,010.64.  *Id.*  In doing so the court emphasized that "no court has ever applied the collateral source rule - a tort doctrine - in the context of a CERCLA response-cost reimbursement."  *Id*. at 765.

Although obviously involving sums greater in magnitude, the facts of this case are remarkably analogous to those presented in *Basic Management* and *Vine Street*. Here, NYSEG received $20 million in insurance reimbursement, related to hazardous waste remediation at thirty-eight former MGP sites as well as any future sites that might be discovered.  Like the courts in those cases, I find that this insurance payment must be taken into consideration when making an equitable allocation among the parties.

Unfortunately, little is known concerning the negotiations or processes leading up to the insurance settlement.  Nor does the record disclose whether, and if so to what extent, the insurance recovery was allocated as among the thirty-eight sites that it was intended to cover.  I have therefore first taken 42.1 percent of the $20 million, representing the proportion between sixteen sites implicated and thirty-eight involved in the insurance settlement, and applied that percentage to the $20 million settlement figure.  That calculation yields a figure of $8,421,052,

274

representing the *pro rata* portion of the settlement attributable to the

sixteen sites in issue.   When compared to the total amount sought of

$94,277,153, that figure results in an 8.9 percent reduction of total costs

across the board.  Though acknowledging some degree of necessary

arbitrariness surrounding this approach, invoking the broad equitable

discretion entrusted in me under CERCLA, I have therefore reduced the

amount now sought by NYSEG, at each site proportionally, by 8.9

percent, and therefore have adjusted the amounts sought as follows:

| Site | Expenses Sought | Reduced Amount |
|---|---|---|
| Corning | $584.96 | $533 |
| Cortland-Homer | $2,615,006 | $2,382,270 |
| Dansville | $864,961 | $787,979 |
| Elmira-Madison Ave. | $2,986,631 | $2,720,821 |
| Geneva-Border City | $2,650,534 | $2,414,636 |
| Goshen | $474,407 | $432,185 |
| Granville | $709,210 | $646,090 |
| Ithaca-Court St. | $29,048,259 | $26,462,964 |
| Ithaca-First St. | $41,641 | $37,935 |
| Mechanicville | $7,795,809 | $7,101,982 |
| Newark | $19,596 | $17,852 |
| Norwich | $1,835,874 | $1,672,481 |
| Oneonta | $14,664,190 | $13,359,077 |

| Owego | $1,192,123 | $1,086,024 |
| Penn Yan-Water St. | $291,997 | $266,009 |
| Plattsburgh-Saranac | $29,086,330 | $26,497,647 |

b.      Rate Recovery

FirstEnergy next emphasizes the fact that NYSEG has received full recovery for all of its response costs from its ratepayers, arguing that an award against FirstEnergy would result in a windfall double recovery. *See, e.g.* Defendant FirstEnergy Corp's Proposed Findings of Fact and Conclusions of Law (Dkt. No. 344) at pp. 83, 109. FirstEnergy maintains that the court should therefore factor this recovery into the allocation analysis.

In support of its position FirstEnergy places heavy reliance upon the court's decision in *City of Wichita,* 306 F. Supp. 2d at 1101-06. That case, however, is readily distinguishable. In *City of Wichita*, when making its equitable allocation the court considered the benefits conferred upon the City as a result of its cleanup actions by way of an increase in its tax base and correspondingly greater tax revenues. *See* 306 F. Supp. 2d at 1101-02. The court was not persuaded that this should play significant role in the allocation calculus, however, since the pollution being addressed had negatively impacted the City's tax base and the increase

276

realized through clean up of the site merely represented a return to the status quo *ante*. *Id.*    It is true that the court in *City of Wichita* also went on to consider windfalls resulting from settlements between the City and other PRPs, concluding that this factor should result in limitation of defendants' liability for orphan shares. *Id.* at 1105.  The situation now presented, however, is materially distinguishable from the *City of Wichita*. In this instance it is undoubtedly true that any recovery by NYSEG in this case will not result in a windfall recovery since it will surely be required to be return the amount realized, in one form or another, to its ratepayers.

This issue was raised in *Public Service Co. of Colorado*, a case in which the plaintiff received approval from the agency governing Colorado Public Utilities to recover the full amount of clean-up costs over a four year period through increased rates.  *See* Brief for Defendant, *Pub. Serv. Co. of Colorado*, No. 05-CV-00785 (D.Co.), 2007 WL 4444345.  In that case, defendant moved for summary judgment on the basis that the plaintiff was already in the process of realizing full cost recovery by rate increases and was thus barred by CERCLA  §114(b) from seeking recovery from other PRPs.  *Id.* The court denied the motion.  *See  Pub. Serv. Co. of Colorado*, No. 05-CV-00785, Dkt. No. 112. Unfortunately, no rationale was given,

277

and the case settled shortly after that ruling was announced.[63]  *Id. See also Carson Harbor Vill., Ltd. v. Unocal Corp.,* 287 F. Supp. 2d 1118, 1181-82 (C.D. Cal. 2003), *rev'd on other grounds,* 270 F.3d 863 (concluding that increase in rental income to the plaintiff, approved by the governing rental board, to defray cleanup expenses did not preclude response cost recovery under § 114(b) of CERCLA).

As collateral sources of reimbursement, the critical difference between insurance recovery and recoupment through rate increases is that the former poses a large risk of double recovery, while the latter does not.  In *City of Wichita*, double recovery was perceived as a significant risk, as a favorable judgment would leave the plaintiff with more settlement money than it was required to fund its own liability.  However, not every collateral source creates the same risk of double recovery. *See New York v. Moulds Holding Corp.*, 196 F. Supp. 2d 210, 216 (N.D.N.Y. 2002) (holding there was no double recovery when the state is authorized to pay 75% of the town's liability).

As was the case in *Public Service Co. of Colorado*, there is no risk

---

[63]     The same issue addressed by the parties in *Yankee Gas Servs. Co. v. UGI Utils., Inc.*, No. 06-CV-01369 (D.Conn), *see* Dkt. Nos. 183, 184.  Unfortunately, however, the second phase of trial was postponed and a ruling was not given on the issue in light of the court's finding regarding liability.  *Id.* at Dkt. No. 194.

278

of double recovery in this instance.  The money collected from NYSEG

customers in the form of increased rates and placed in the rate deferral

fund actually belongs to the ratepayers, collected to defray an extra

expense over and above payments for actual products and services

received.  One assumes, particularly given vigilant PSC oversight, that

any recovery by NYSEG in the action will ultimately inure to the benefit of

the company's customers, in the form of a lower rates.  As such, to limit

NYSEG's recovery based on this deferral plan would result in an unjust

windfall for FirstEnergy and work an injustice to NSYEG's customers who

would be required to bear a higher proportion of liability merely because

they were subject to the higher rates required to fund the rate deferral plan

in the past.  Accordingly, in making my equitable allocation in this case, I

decline FirstEnergy's invitation to factor ratepayer reimbursement through

the deferral.

      G.    Allocation

           1.    Allocation Generally

Having concluded that FirstEnergy bears responsibility for

contribution toward response costs incurred by NYSEG at the majority of

the sites in question, and that I.D. Booth must contribute to any costs to

279

be paid by FirstEnergy in connection with the Cortland-Homer Site, I must next determine how to allocate response costs as between the parties. Unfortunately, CERCLA itself provides little guidance concerning this issue, authorizing the use of "such equitable factors as the court determines are appropriate" to reach a just result. 42 U.S.C. § 9613(f)(1); *Niagara Mohawk Power Corp.,* 596 F.3d 130.

To inform the allocation determination courts generally find it appropriate to examine certain factors, which under other circumstances might be deemed more relevant to a liability determination, that are not otherwise considered in light of CERCLA's creation as a strict liability statute. *Niagara Mohawk Power Corp.,* 596 F.3d at 130. Addressing the issue of making equitable allocations in CERCLA actions, Circuit Judge Rosemary Pooler, during her district court tenure, observed that "[t]he Second Circuit has declined to compile a mandatory list of factors for consideration[.]" *Nashua Corp. v. Norton Co.,* 116 F. Supp. 2d 330, 352 (N.D.N.Y. 2000); *see also Goodrich Corp.,* 311 F.3d at 170 (noting that allocation is an "equitable determination based on the district court's discretionary selection of the appropriate equitable factors in a given case"); *Bedford Affiliates,* 156 F.3d at 429 ("While § 113(f)(1) directs

280

courts to allocate cleanup costs between responsible parties 'using such equitable factors as the court determines are appropriate, it does not limit courts to any particular list of factors. The statute's expansive language instead affords a district court broad discretion to balance the equities in the interests of justice.")  As a result of the expansive powers vested in trial courts to allocate costs under §113(f), various courts within the Second Circuit have taken differing approaches to the equitable distribution of remedial costs under CERCLA, depending upon the particular circumstances presented.   *Solvent Chem. Co., Inc.,* 685 F. Supp. 2d at 442.

The legislative history surrounding the enactment of CERCLA references six oft-cited examples of factors that can inform a proper allocation calculus; those elements, often referred to as the "Gore factors", include 1) whether a party's contribution to release is distinguishable; 2) the amount of hazardous substance involved; 3) the degree of toxicity of the hazardous substance involved; 4) the degree of involvement of the person in the manufacture, treatment, transport or disposal of the hazardous substance; 5) the degree of care taken by the parties with respect to the hazardous waste involved; and 6) the degree of cooperation

281

between the party and state, federal, or local authorities preventing harm

to the public health or the environment, including efforts to mitigate

damage after a release occurs.  *Niagara Mohawk Power Corp.,* 596 F.3d

at 130 (citing S. Rep. No. 96-848, at 345-46) (1980)).  The court is not

required to consider all or even most of these Gore factors, however,

when making an equitable allocation under section 113(f); "[t]he court may

consider 'several factors or a few, depending on the totality of the

circumstances and equitable considerations'".  *Solvent Chem. Co.,* 685 F.

Supp. 2d at 442 (citing and quoting *N.J. Turnpike Auth. v. P.P.G. Indus.,*

*Inc.,* 197 F.3d 96, 104 (3d Cir. 1999)).[64]

Section 113(f)(1) confers upon a court broad discretion in allocating

response costs among various PRPs, permitting consideration of as many

or as few factors as deemed appropriate based upon the totality of the

circumstances and the equitable considerations presented.  *Solvent*

*Chem. Co.,* 685 F. Supp. 2d at 442 (citing, *inter alia, Bedford Affiliates,*

156 F.3d at 429)).  While some courts have considered the Gore factors

---

[64] In *RG&E*, under somewhat similar circumstances, Judge Feldman predicated his allocation upon the volume of gas produced during times attributable to the various parties, concluding that "[a] more elaborate and detailed discussion of the Gore factors would not alter the Court's equitable allocation conclusions in this case." *Rochester Gas & Electric,* slip op. at 95 n.36.

identified in the legislative history underpinning CERCLA when allocating response costs, others have found the analysis of Judge Ernest C. Torres in the *United States v. Davis,* 31 F. Supp. 2d 45, 63 (D.R.I. 1998), *aff'd*, 261 F.3d 1 (1st Cir. 2001), to provide a more "real world" construct for allocating those expenses, taking into account 1) the extent to which cleanup costs are attributable to the waste for which the particular parties responsible; 2) the parties' degree of culpability; 3) the benefit realized by the party from disposal of the waste; and 4) the party's ability to pay.  *See Solvent Chem. Co.,* 685 F. Supp. 2d at 442.

> 2.  <u>Allocation as Between NYSEG and FirstEnergy</u>[65]

As a logical starting point, courts typically look to the volume of waste attributable to each PRP as providing at least some measure of relative responsibility.  *Solvent Chem. Co.,* 685 F. Supp. 2d at 442-43 (collecting cases); *Goodrich Corp.,* 311 F.3d at 171.  Both NYSEG and FirstEnergy seemingly agree that the most relevant factor, when it comes to apportioning responsibility for response costs, is the amount of the

---

[65]     In making an equitable apportionment between NYSEG and FirstEnergy I have born in mind that in the end, the analysis boils down to the question of which utility's ratepayers should bear the costs of remediation at the various sites, and in what proportion.

MGP waste attributable to each party.[66]   The parties also appear to agree

that the amount of MGP waste associated with any given period and any

particular site is roughly proportional to the volume of gas produced at the

facility, disagreeing only in some minor regards on the calculation of those

amounts; and the experts who testified at trial were also in agreement on

this point.[67]   The balance of four factors identified by Judge Ernest C.

---

[66]   In this instance, since the waste generated by the parties is the same in character it is unnecessary to distinguish between the hazardous waste contributed by each party and make an assessment of relative toxicity, an exercise often required for sites involving a more heterogenous mix of hazardous substances.   *See Solvent Chem. Co.,* 658 F. Supp. 2d at 442-43; *see also United States v. Davis,* 31 F. Supp. 2d at 64.

[67]   I note that the parties' experts have somewhat differing views regarding gas production.  NYSEG's expert, Robert Karls, offered opinions and prepared spread sheets setting forth his analysis of gas production.  *See* Exhs. P-2001, P-2002.  Mr. Karls' opinions were based upon his reviews of a publication known as *Brown's Directory of American Gas Companies* (Exh. D-670), as well as PSC filings regarding gas production volumes.  Notably, Mr Karls was unable to find production figures for certain years during which MGP facilities were known to have operated, and did not include any production for those years.  Mr. Karls acknowledged that his figures were one year off since *Brown's Directory* reports given year production figures for the prior year.  Thus, for example, gas production reported for 1930 in the *Brown's Directory* was reported by him as 1930 even though it actually reflects production in 1929.

FirstEnergy's expert, Dr. Neil Shifrin, made a similar analysis, but with slightly different results.  Dr. Shifrin reported that in that while he utilized figures from *Brown's Directory* and the PSC reports, he shifted the production years to account for the one-year delay in reporting, and extrapolated from the available data to attribute production for years where hard data could not be found, using the straight line method.  *See* Exh. D-2A. During closing arguments NYSEG shifted its position, incorporating some of the data from Dr. Shifrin.

After carefully analyzing the three sets of figures I have chosen to adopt the gas production figures set forth in my findings of fact, concluding that the approach utilized by Dr. Shifrin more realistically accounts for gas production at each of the facilities.

Torres in *Davis* as well as the Gore factors deemed important to some members of Congress appear, at best, to be neutral in this case.  Like Judge Feldman, I therefore conclude that they do not alter the analysis and dictate a different equitable allocation of costs then that based upon relative gas production.

Accordingly, I will assign the following share of NYSEG's response costs to FirstEnergy, based upon the totality of the circumstances in this case:

| Facility/Dates of AGECO Control | Gas Production Attributable to First Energy | Total Gas Production | % | Total Allowable Costs | First Energy Share |
|---|---|---|---|---|---|
| Corning (1929-1938) | 91.6 | 1,049.3 | 8.7 | $533 | $46 |
| Cortland-Homer (1922-1933) | 634.4 | 1,416.3 | 44.8 | $2,382,270 | $1,067,257 |
| Dansville (1929-1930) | 15.3 | 267.0 | 5.7 | $787,979 | $44,915 |
| Elmira (1929-1931) | 864.8 | 4,964.0 | 17.4 | $2,720,821 | $473,423 |
| Geneva (1929-1934) | 8,087 | 27,180 | 29.8 | $2,414,636 | $719,562 |
| Goshen (1930-1938) | 106.1 | 321.9 | 33.0 | $432,185 | $142,621 |
| Granville (1923-1940) | 153.4 | 329.7 | 46.5 | $646,090 | $300,432 |
| Ithaca (CS) (1922-1927) | 659.2 | 2,165.6 | 30.4 | $26,462,964 | $8,044,741 |
| Ithaca (FS) (1922-1932) | 998.3 | 998.3 | 100 | $37,935 | $37,935 |

285

| Facility/Dates of AGECO Control | Gas Production Attributable to First Energy | Total Gas Production | % | Total Allowable Costs | First Energy Share |
|---|---|---|---|---|---|
| Mechanicville (1926-1940) | 579.5 | 1,568.8 | 36.9 | $7,101,982 | $2,620,631 |
| Newark (1929) | 0 | 77.7 | 0 | $17,852 | $0 |
| Norwich (1922-1940) | 793.6 | 1,978.5 | 40.1 | $1,672,481 | $670,665* |
| Oneonta (1922-1940) | 1,043 | 2,478.3 | 42.1 | $13,359,077 | $5,624,171 |
| Owego (1929-1935) | 101.5 | 481.0 | 21.1 | $1,086,024 | $229,151* |
| Penn Yan (1929) | 0 | 317.3 | 0 | $266,009 | 0 |
| Plattsburgh (1924-1940) | 1,180.4 | 4,222.6 | 28.0 | $26,497,647 | $7,419,341 |

*  Despite these findings, with regard to Norwich and Owego I have previously concluded that NYSEG cost recovery claims for those sites are barred by the statute of limitations.  See pp. 213-39, ante.

### 3.    Allocation as Between FirstEnergy and I.D. Booth

Having concluded that third-party defendant I.D. Booth bears some responsibility for response costs incurred at the Cortland-Homer Site, I must next apportion those costs as between it and FirstEnergy.  In *New York v. Westwood Squibb Pharmaceutical*, the court addressed allocation of liability between past and present owners, holding present owner Westwood Squibb ten percent liable and former owner National Fuel ninety percent liable.  *New York v. Westwood-Squibb Pharm. Co.*, 90-CV-

286

1324C, 2004 WL 1570261, *36 (W.D.N.Y. May 25, 2005).  In arriving at

that apportionment the court was persuaded by various factors considered

by it to be relevant.  *Id.*  Initially, the court noted that a majority of the

hazardous waste at issue was disposed of on the land by National Fuel,

and was only discovered later by Westwood Squibb during a construction

project. *Id.* at *23.  Additionally, it observed that when Westwood Squibb

discovered the waste it immediately contacted the DEC, ceased

construction and promptly began a preliminary site investigation, in which

National Fuel refused to participate.  *Id.* at *35.  The court further found

that the evidence did not support a finding that Westwood Squibb had

strongly benefitted from the remediation because it did not own the creek

which was at the center of the clean up effort. *Id.* at *34.

   In the instant case, great weight is attached to the fact that

FirstEnergy is responsible for the discharge of MGP waste, whereas I.D.

Booth had no involvement with the initial discharges of hazardous wastes

at the site.  The record shows that I.D. Booth acquired the Cortland-

Homer Site at least thirty-eight years after MGP operations at that location

ceased, and I.D. Booth claims to have had no knowledge that MGP

contaminants had been released at the site when purchasing the property.

287

Although FirstEnergy argues that it acquired the disputed land as a surviving corporation emerging from bankruptcy, this is not a persuasive rationale for shifting the burden onto the current owner. *See Rochester Gas & Electric,* 355 Fed. App'x at 552.

Based upon my finding's, I.D. Booth should nonetheless be held accountable for a portion of the damage for two reasons. First, the third-party defendant will likely reap the benefit of increased property value after completion of remediation. Thus, unlike in *Westwood Squibb Pharmaceutical Co.*, where the present owner realized little benefit because the remediation focused on a creek that it did not own, here, I.D. Booth will be left with a more valuable piece of property following NYSEG's cleanup efforts.  In the interest of justice, it is equitable to require I.D. Booth to pay for some of this increased value.  *See Litgo N.J., Inc. v. Martin,* No. 06-2891, 2011 WL 65933, at *9 (D.N.J. Jan. 7, 2011) ("The financial benefit that a party may gain from remediation of a site is an appropriate factor to be considered inequitably allocating costs.") (citing *City of Wichita,* 306 F. Supp. 2d at 1101-02).

A further basis for shifting some of the response costs to the third-party defendant is my conviction that I.D. Booth's vigorous negotiation

288

stance and delays in responding during discussions with NYSEG over the acquisition of a portion of the Booth property exacerbated the problem at hand.  In response to NYSEG's efforts to purchase the necessary portion of the property to fulfill the DEC's requirements concerning remediation, I.D. Booth commanded a purchase price of approximately six times the assessed fair market value for the Cortland-Homer Site, while retaining the option to repurchase the property following remediation for one dollar. I.D. Booth's demands resulted in significant delay in the proceedings and, during the course of that delay, according to FirstEnergy's expert, further migration of coal tar likely occurred.  Thus, unlike the situation in *Westwood Squibb Pharmaceutical Co.*, where the present owner immediately contacted the DEC, ceased construction and fully cooperated, here, there are strong indications that I.D. Booth's unwillingness to cooperate resulted in delay in remediation. As such, equity counsels that I.D. Booth pay for some of the damage resulting from this delay.

Having carefully considered all of the circumstances presented and evidence adduced at trial, I conclude that I.D. Booth should bear fifteen percent of FirstEnergy's share of past and future costs associated with the

remedial actions of NYSEG taken at the Cortland-Homer Site.

IV.    CONCLUSIONS OF LAW

1.    Each of the sixteen sites at issue in this litigation is a "facility" as defined under CERCLA.  42 U.S.C. § 9601(9).

2.    There were releases of hazardous substances at each of the sixteen sites in issue.

3.    NYSEG incurred costs in responding to the releases of hazardous substances at each of the sixteen sites in issue.

4.    The costs incurred and corresponding response actions taken by NYSEG at each of the sixteen sites in issue were both necessary and substantially in conformity with the NCP.

5.    NYSEG has not proven by a preponderance of the evidence that AGECO owned any of the sixteen MGP sites in issue at any relevant time, including at any point between 1906 and 1942, and thus FirstEnergy is not directly liable as the successor to an owner under CERCLA for the discharge of hazardous wastes at those sites.

6.    Plaintiff has not proven by a preponderance of the evidence that AGECO operated any of the sixteen sites in issue between 1906 and 1942, and thus FirstEnergy is not directly liable as a successor to an

operator of those facilities under CERCLA for that time period.

7.     As the successor in interest to AGECO, the parent company of NYSEG and its affiliated utility operating companies, FirstEnergy is a potentially responsible party indirectly liable under a veil-piercing theory as an owner and operator for hazardous waste discharges associated with MGP operations at the sixteen sites in issue for portions of the period between 1922 and 1940, measured from when AGECO first gained control of the respective owner utility company owning and operating each particular site, including NYSEG, Ithaca Gas & Electric Corporation, New York Central Electric Corporation, Federal-New York Company, Inc., Empire Gas & Electric Company, and Eastern New York Electric & Gas Company, Inc., for discharges occurring from the time of acquisition by NYSEG and/or AGECO of the utility company owning the site until the end of 1940.

8.     FirstEnergy is not indirectly liable under CERCLA, based upon a veil-piercing theory, for hazardous waste discharges occurring at the MGP sites in question prior to 1922.

9.     FirstEnergy is not directly or indirectly liable as a successor in interest under CERCLA, either as an owner or operator, based upon

hazardous waste discharges occurring at the MPG sites in question after 1940.

10.    AGECO's CERCLA liabilities were not discharged in bankruptcy.

11.    The CERCLA claims now at issue were not released under the 1945 covenant not to sue, since it predated CERCLA and was limited to resolving financial disputes unrelated to environmental liabilities.

12.    FirstEnergy is the successor in interest to AGECO and is subject to AGECO's CERCLA's liabilities.

13.    NYSEG's claim for recovery of response costs is barred by the governing statute of limitations with regard to the Norwich and Owego Sites, but not as relates to actions taken at Ithaca-Court Street or Plattsburgh.

14.    FirstEnergy is liable to NYSEG for an equitable share of past response costs associated with various of the sixteen sites in issue, as follows:

| **Site** | **First Energy Share** |
| --- | --- |
| Corning | $46 |
| Cortland-Homer | $1,067,257 |
| Dansville | $44,915 |

| Site | First Energy Share |
|------|------|
| Elmira | $473,423 |
| Geneva | $719,562 |
| Goshen | $142,621 |
| Granville | $300,432 |
| Ithaca (CS) | $8,044,741 |
| Ithaca (FS) | $37,935 |
| Mechanicville | $2,620,631 |
| Newark | $0 |
| Norwich | $0 |
| Oneonta | $5,624,171 |
| Owego | $0 |
| Penn Yan | $0 |
| Plattsburgh | $7,419,341 |

15.    In light of the entry of the 1994 Consent Order and NYSEG's ongoing serial remediation of the sixteen sites, it is likely that NYSEG will continue to incur investigation and remediation costs with respect to MGP contamination at the various sites.  Accordingly, the entry of a declaratory judgment allocating future costs as between the parties is warranted.

16.    NYSEG is therefore entitled to a declaratory judgment to the effect that FirstEnergy bears liability for future necessary and NCP compliant response costs at the sixteen sites in issue, as follows:

| Site | Percentage |
|---|---|
| Corning | 8.7% |
| Cortland-Homer | 44.8% |
| Dansville | 5.7% |
| Elmira | 17.4% |
| Geneva | 29.8% |
| Goshen | 33.0% |
| Granville | 46.5% |
| Ithaca (CS) | 30.4% |
| Ithaca (FS) | 100% |
| Mechanicville | 36.9% |
| Newark | 0% |
| Norwich | 0% |
| Oneonta | 42.1% |
| Owego | 0% |
| Penn Yan | 0% |
| Plattsburgh | 28% |

17. As an owner of the Cortland-Homer Site and the Elmira Site, I.D. Booth is a PRP potentially liable under CERCLA for response costs incurred by NYSEG and apportioned to FirstEnergy in connection with those sites.

18. I.D. Booth has not proven by a preponderance of the evidence that it is entitled to the third-party defense set forth in § 107(b)(3) of CERCLA with regard to the Cortland-Homer Site, but has demonstrated its entitlement to that defense to FirstEnergy's third-party claims with

regard to the Elmira Site.  I.D. Booth is therefore liable as an owner for an equitable share, in the amount of fifteen (15%) percent, of past and future response costs incurred by NYSEG and to be recovered from FirstEnergy with respect to Cortland-Homer Site.

19.   Third-party defendant I.D. Booth is therefore liable for FirstEnergy in the total amount of $160,089, representing a fifteen percent share of NYSEG's past costs, and for fifteen percent of all future necessary and NCP compliant costs incurred by NYSEG and shifted to FirstEnergy.

20.   NYSEG is entitled to prejudgment interest upon its cost recovery claim, and FirstEnergy is entitled to prejudgment interest on its claim for contribution against I.D. Booth.  Prejudgment interest accrues as of the date that the cost in question was incurred, or the date of filing the complaint in this action, whichever is later, and is calculated based upon prevailing Superfund interest rates established by the United States EPA. 42 U.S.C. § 9607(a); *Matter of Bell Petroleum Servs. Inc.,* 3 F.3d 889, 908 (5th Cir. 1993); *Goodrich Corp.,* 311 F.3d at 177.

V.   SUMMARY AND ORDER

As the foregoing reflects, I have found a basis to conclude that the

corporate veil of NYSEG and the other AGECO predecessor companies

owning and operating the MGP sites in question should be pierced and

AGECO, and in turn FirstEnergy, should be held accountable for the

response costs incurred by NYSEG in addressing hazardous waste

discharges at those sites, covering portions of the period between 1922

and 1940 during which AGECO exercised domination and control over the

subsidiary utility companies operating those facilities.  I also conclude that

third-party defendant I.D. Booth is liable to FirstEnergy for a portion of

response costs associated with the Cortland-Homer Site.

Accordingly, it is hereby

ORDERED as follows:

1)      Except to the extent granted during the course of the trial with

respect to the Auburn (Clark Street) site, FirstEnergy's motions pursuant

to Rule 52(c) of the Federal Rules of Civil Procedure are DENIED.

2)      The parties are directed to confer, and within twenty-one days

of the date of this decision to either submit a jointly proposed judgment to

be entered in the case or, alternatively, to submit counter-proposed

judgments and letter briefs addressing the preparation of an appropriate

judgment in the case.


David E. Peebles
U.S. Magistrate Judge


Dated:       July 11, 2011
             Syracuse, NY